[No. S004720. Aug. 4, 1997.]

THE PEOPLE, Plaintiff and Respondent, v.
BARRY GLENN WILLIAMS, Defendant and Appellant.

COUNSEL

Joan W. Howarth, Cathy Dreyfuss, under appointments by the Supreme Court, Mark Rosenbaum and Mark Silverstein for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General, Donald E. De Nicola and Andrew D. Amerson, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**WERDEGAR, J.**—Barry Glenn Williams (defendant) appeals the first degree murder conviction and sentence of death he received in Los Angeles County Superior Court in connection with the shooting death of Jerome Dunn in 1982. The sole special circumstance found true was that defendant had previously been convicted of the June 16, 1981, murder of Donald Billingsley. We affirm the judgment in its entirety, finding no prejudicial error affecting either the guilt or penalty trials.

## I. FACTS

The charges against defendant arose out of two incidents: the shooting deaths of Donald Billingsley in June 1981 and of Jerome Dunn in March 1982. The People initially charged defendant with Billingsley's murder and with attempted murder of others injured in the Billingsley incident. That

information was dismissed for insufficiency of the evidence presented at the preliminary hearing. The People then filed a new complaint, charging defendant, inter alia, with the murder of Jerome Dunn and the murder of Donald Billingsley, and alleging multiple murder special circumstances as to each. Defendant moved to sever the charges. We issued a peremptory writ of mandate directing the trial court to grant defendant's motion to sever. (*Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 446, 454 [204 Cal.Rptr. 700, 683 P.2d 699].) Accordingly, charges related to Jerome Dunn's death were severed from those based on Donald Billingsley's death.

Following a jury trial on the Billingsley charges, defendant was found guilty of one count of first degree murder (Pen. Code, § 187),[1] two counts of attempted murder (§§ 187, 664) and one count of conspiracy to commit murder (§ 182). Defendant was sentenced to 34 years to life in state prison. The Court of Appeal affirmed.

The trial court denied defendant's motion to continue the trial in this matter until final resolution of the appeal of his conviction on the 1981 offenses. Accordingly, trial commenced on October 16, 1985. The jury in this case found defendant guilty of the first degree murder of Jerome Dunn (§ 187) and found true allegations that a principal was armed with a firearm (§ 12022, subd. (a)) and that defendant personally used a firearm in the commission of the offense (§§ 12022.5, 1203.06, subd. (a)(1)). Subsequently, defendant admitted a prior-murder special-circumstance allegation. (§ 190.2, subd. (a)(2).) After trial on penalty, on July 11, 1986, defendant was sentenced to death. This appeal is automatic. (Cal. Const., art. VI, § 11; § 1239, subd. (b).)

A. *Guilt Trial*

The prosecution's theory was one of gang violence, namely, that defendant, a "Blood," killed Jerome Dunn for being a "Crip." Defendant proffered an alibi.

1. *The Murder of Jerome Dunn*

In 1982, defendant Barry Williams, also known as "Big Time," was a member of the 89th Street Family Bloods, a street gang in South Central Los Angeles. At that time, the 89th Street Family Bloods associated with other Bloods gangs in Los Angeles against rival Crips gangs, especially the Avalon Garden Crips. The Crips wore blue and the Bloods wore red. On the morning of March 25, 1982, defendant led a meeting of Blood gang members. The purpose of the meeting was to "protect" the neighborhood

---

[1]Unless otherwise noted, unlabeled section references are to this code.

from various Crip gangs. Some present had weapons; defendant had a .38-caliber pistol. It specifically was stated at the meeting that anyone present who wanted to go out and shoot rival gang members could go out and shoot.

In the afternoon of the same day, Marcellus Gray (who had died by the time of trial) and a friend, Kathleen Gurley, drove, in Gray's blue van, to the Food Barn near the corner of Rosecrans and Central in Los Angeles. Around 6:30 p.m., Gurley testified, Gray came running into the market (where Gurley was shopping) and agitatedly recounted that his van had been stolen from him, at gunpoint, by two African-American men, while he was in the parking lot waiting for Gurley. Gray and Gurley reported the theft to police, then returned to their homes.

Shortly after the van was stolen, it was driven towards the intersection of 88th Place and McKinley Avenue. When the van arrived at the intersection, Kenneth Hayes, 22, and the victim, Jerome Dunn (also known as "Bone"), were riding by on their bicycles. Both Hayes and Dunn associated with the Grape Street Crips gang. The two were on their way to see their girlfriends. Hayes, who had recently been released from Soledad prison, was wearing a blue jacket, blue corduroy pants and blue hair rollers. Dunn was wearing beige corduroy pants, a blue windbreaker, white shoes and a blue cap. According to Officer Johnson, Dunn was dressed the way a typical Crip gang member would dress in that area, although a person could be dressed that way and not be a Crip.

At that time, Patricia Lewis (who lived in the neighborhood) was a passenger in a station wagon that was stopped, northbound on McKinley, at the stop sign at 88th Place. Jean Rivers (who did not testify at the trial) was driving. The street lights were on; it was twilight and misty.

Lewis testified she saw a van at the intersection of 88th and McKinley; she identified a photograph of Marcellus Gray's van as depicting the one she had seen. Lewis also testified that two young men rode by on bicycles, one following the other, and that the van then slammed on its brakes and turned so it could follow the first bicyclist. According to Lewis, the station wagon in which she was riding backed up to allow the van to proceed through the intersection, and, when the van paused momentarily at the northeast corner of 88th Place, she was able to see who was inside. When the van started to turn, she looked directly—for more than 20 seconds—into the face of the driver of the van, whom she identified as defendant. She noticed a shiny object in the upper right side of defendant's mouth. She also noticed a passenger was riding alongside defendant and the occupants of the van were laughing.

Dunn crossed McKinley Avenue, while Hayes followed at some distance. As Dunn rode his bicycle past the van, Patricia Lewis heard the driver of the van say, "Let's go f——him up." Hayes and Lewis each observed that the van then drove west on 88th Place and stopped near where Dunn had stopped on his bicycle. Someone in the van spoke with Dunn. As Hayes rode closer on his bicycle, he heard chattering and laughter inside the van. According to Hayes, Dunn shook his head in response to something said to him by an occupant of the van.

Hayes came up behind the van on its left side, noticing that the curtains on its back window were closed. He stopped within three or four feet of the driver's door and could see the driver's hands on the steering wheel. Hayes testified that a Black person's hand and right arm then came out of the van driver's window, holding a handgun, at which time he could no longer see the driver's hands on the steering wheel. The muzzle of the gun was four or five inches from Dunn's head. Hayes watched as the shooter fired about four shots at Dunn, who fell from his bicycle after the first shot. Dunn jumped and blood came from his mouth and nose. In all, the shooter fired five .38-caliber bullets into Dunn's head and upper body, killing him. The shooting occurred at approximately 6:30 p.m.

Patricia Lewis testified that, as she watched the van, she leaned over and rolled down the station wagon's driver's side window. According to Lewis, she did so because she was "nosey." Defendant was wearing a dark jacket. Lewis saw defendant's hand come out through the driver's side window of the van, holding a gun. At that point, Lewis testified, Rivers drove the station wagon forward across 88th Place and Lewis heard three or four gunshots. Rivers then drove to Lewis's home, nearby on 87th Place. As the two women were speaking before Lewis entered her house, Lewis looked up and saw the van again, speeding back along Wadsworth Avenue, heading south, towards 88th Place. At this time, Lewis saw "Bongo" and Mark Williams in the van with defendant.

Less than an hour later, police recovered Marcellus Gray's van, approximately four blocks from the scene of the shooting. Kenneth Hayes identified it as the van that was used in Jerome Dunn's killing.

In April 1982, after Patricia Lewis selected defendant's photograph from a photographic showup, defendant was arrested for the murder of Jerome Dunn.

On several occasions before trial, defendant acknowledged killing Dunn. First, according to John Gardner (a former Blood gang member), about 9

o'clock on the evening Dunn was shot, defendant told Gardner that he (defendant) "shot, took out—he said say bloody shot and took out of the box some fool A.G. quarters" who was "a gangster dude with flew clothes on." (In gang parlance, this meant that he had shot dead a gang member who was wearing blue clothing.) Gardner testified defendant repeatedly stated it was "Silky" who had been killed, but that, walking off, he muttered under his breath the victim was actually "Bone" (i.e., Dunn). Defendant also said to Gardner that the police were looking for him and he intended to "go over on the westside and lay low for a while."

Second, about a week and a half after Dunn's shooting, defendant spoke again with Gardner, at a house frequented by gang members. According to Gardner, defendant and he discussed the incidents of March 25, and defendant stated that he "took this fool out of the box, you know, from A.G. Crips."

Third, Arthur Cox testified that, while he and defendant were in Los Angeles County jail together, defendant in two conversations told Cox that fellow Blood gang member Curtis Thomas, who was in the van with defendant when Jerome Dunn was killed, actually shot Dunn, but that it was he, defendant, who told Curtis Thomas to shoot. According to Cox, defendant also said that all of the Crips in the jail were trying to "get" him for killing "Bones."

Subsequent to his arrest, defendant attempted to intimidate prosecution witness Patricia Lewis by arranging for Mark Williams (no relation to defendant), a fellow gang member (also known as "Snoop Dog"), to shoot up Lewis's home while she and her family were inside.

The shooting of Lewis's house occurred on an evening in January 1983. Lewis was home with her husband and grandson. Forty-five or fifty shots were discharged into the house, possibly by more than one shooter. Lewis, holding the baby, crawled to safety in a back bedroom. Nothing like this had ever happened to Lewis prior to her witnessing Jerome Dunn's murder. As a consequence of the shooting of her house and various threatening phone calls she had received, Lewis became afraid for her life and testified falsely at the preliminary hearing that she did not know whose arm had held the gun that was used to shoot Dunn.

Kenneth Simmons, a former 89th Street Family Bloods gang member, at first testified he did not remember having a conversation with Mark Williams. Later, Simmons testified that Mark Williams had told him defendant wanted Williams to scare "the lady on 87th Street who was going to court on him." After refreshing his recollection by listening to a tape of a conversation he had had with Officer Michael Mejia, Simmons provided more detail.

Simmons testified he had a conversation with Mark Williams on January 7, 1983, while the two of them were in an alley "getting high." Williams told Simmons that Williams and others had gone to "take care of some business" involving "a witness" for defendant, but it "wasn't done right." Simmons specifically testified that Williams told him it was defendant who wanted this "business" taken care of and that the witness involved lived on 87th Street.

Mark Williams denied shooting at Patricia Lewis's house, and denied having any conversation with Kenneth Simmons regarding any such shooting. Williams admitted, however, that he was a member of the 89th Street Family Bloods at the time Dunn was shot, as well as at the time Lewis's house was shot up, and that he was still a Blood at the time of trial. Williams also admitted he knew defendant and knew that Kenneth Simmons considered himself to be a member of the 89th Street Family Bloods.

## 2. Defense Case

Defendant did not testify at the guilt phase of this trial, but, through testimony of other witnesses, proffered an alibi.

Private investigator Edward J. Sanchez testified he had interviewed Jeanette Houston for the defense in August 1982. Houston told him that defendant and she were boyfriend and girlfriend, and they had spent the night of March 25, 1982, together, first at her mother's house on South Compton Avenue and then at defendant's aunt's house on 88th Place. Houston told him that when she and defendant arrived that night at defendant's aunt's residence, his aunt, Lena Bridges, was preparing to go to a cosmetics sales party. Defendant and Houston stayed together that night in one of the bedrooms of the Bridges house.

Jeanette Houston (née Jeanette Renee King), the mother of defendant's five-year-old child, testified that her relationship with defendant ended in October 1981, but that she still saw defendant after that. She further testified she did *not* recall seeing defendant on March 25, 1982 (the date Dunn was killed), but did remember hearing about a shooting that occurred that day. Houston also testified she and defendant were together on the night *after* the shooting, but not on the night of the shooting.

Defendant's aunt, Lena Bridges, testified that defendant and Jeanette Houston were in her home together on the evening of March 25, 1982. She saw defendant about 5:30 p.m. or 6 p.m.; he accompanied Houston into a bedroom. Between 6 p.m. and 6:30 p.m., Bridges and a neighbor were standing in the doorway talking, when they heard shots. About 6:30 p.m., defendant came out of the bedroom to take a telephone call and subsequently

reentered the bedroom. The last time Bridges saw defendant and Houston was about 7:30 p.m. or 7:45 p.m., as she was preparing to leave to attend a cosmetics sales party. Exhibit M was a receipt, dated March 25, 1982, showing cosmetics were ordered by Bridges.

Defendant also challenged the perceptions and recollections of the prosecution's eyewitnesses, Patricia Lewis and Kenneth Hayes.

Defendant presented Dr. Shomer, a psychologist, as an expert witness on eyewitness identification. Dr. Shomer discussed various factors affecting human perception. In response to defense hypotheticals analogous to Patricia Lewis's identification of defendant, Dr. Shomer opined that such factors might contribute to misidentification. Defendant also presented Dr. Golden, a forensic dentist, who testified that approximately one-eighth of the African-American male teenagers he had examined professionally while working at a dentistry clinic had a stainless steel crown in the front of the mouth, like defendant.

Kenneth Hayes testified that, as he passed by the station wagon that had been at the intersection near where Jerome Dunn was killed, he had to steer his bicycle around it; as he did so, he noticed that a person was sitting on the passenger side of the front seat and that the windows were foggy and rolled up.

Joe Lewis, husband of witness Patricia Lewis, testified that defendant had been, for four or five years, a member of a neighborhood youth "cadet corps" he had organized. Defendant had been in the Lewis's backyard every day during that period and Mrs. Lewis was sometimes there. Mr. Lewis maintained a photo album containing pictures of the cadets, and Mrs. Lewis, he was sure, had seen the album. Mr. Lewis had shown the album to investigating police in connection with this case. Officer Mejia testified the album contained defendant's picture.

Officer Jerry Jones testified that, on the night Dunn was shot, Kenneth Hayes had stated to him (in contrast to his testimony at trial) that the van driver's hands were on the steering wheel and it was the passenger in the van who had extended his arm holding a gun.

Defendant questioned the motives of the prosecution's informant witnesses, Arthur Cox and John Gardner:

Officer Mejia testified that Arthur Cox had sought to "cut a deal for information" respecting this case. Mejia also acknowledged Cox had testified that defendant had told him (Cox) that Curtis Thomas had actually shot

Dunn, and that no criminal charges were being brought against Curtis Thomas.

Ernest Cox testified that, in 1982, when he was housed in the same Los Angeles County jail module as his brother, Arthur Cox, he saw Arthur reading defendant's preliminary hearing transcript. He further testified Arthur had told him that he (Arthur) could receive a sentence of probation, instead of a prison term, on a robbery charge pending against him, if he could provide information that would help the district attorney convict defendant (in this case). Ernest testified Arthur told him that he had only pretended, when speaking with Deputy District Attorney Jacobs, to know something about defendant's case and so would have to "find something." On cross-examination, the prosecution suggested Ernest was testifying against his brother to avoid gang retaliation in Folsom prison (where he was serving a life sentence), but Ernest denied the allegation.

In cross-examining Gardner, defense counsel suggested it was Gardner who had mentioned to defendant that it was "Bone" (i.e., Dunn) who had been killed, rather than defendant who had mentioned that fact to Gardner. Gardner insisted it had been defendant who had "mumbled" something that "sounded like Bones." Defense counsel also inquired into Gardner's motivation for testifying against defendant. Gardner testified the only thing he received in return for his testimony was relocation for himself and his mother. Later, Gardner acknowledged that, when he pled guilty to a charge of possession for sale of marijuana, he received a sentence of only eight days in jail.

Defendant also attempted to cast doubt on the thoroughness of the investigation conducted into the available fingerprint evidence.

### B. *Penalty Trial*

#### 1. *Prosecution Evidence*

##### a. *Cakewalk shooting*

Karry Island, Mary Nixon, Barbara Nixon and Deontray Turner testified that, on the morning of July 19, 1980, defendant and two other Blood gang members fired shotguns at a crowded church carnival or "cakewalk," being attended by rival gang members, between Mary and 89th Streets in Los Angeles. Thelma Turner and Michael Hardwick corroborated their testimony. Several adults and a child were injured in the shooting. Two shotguns were used. Defendant was the leader of the attack and the one who fired the

first shot. Defendant yelled, "This is Neighborhood Family Blood 89th Street." Criminal charges were filed in connection with the cakewalk shooting, but the case, ultimately, was not prosecuted.

### b. *The Green Meadow Park shooting*

Arthur Cox testified that, in June 1981, he attended a meeting at Margot Bridges's house attended by seven or eight members of the 89th Street Family Bloods. According to Cox, defendant and Junior Bridges led the meeting. The purpose of the meeting was to plan a shooting of the members of the Green Meadow Park Boys gang and the Avalon Garden Crips gang (if they were present), at Green Meadow Park. Shotguns and handguns were laid out on the floor at the meeting; defendant picked up a .357-caliber handgun and said he would use that. Defendant did not mention wanting to shoot any particular individual. The people at the meeting were just supposed to be there and shoot whoever was at the park. For transport, they were going to use a blue Cadillac belonging to a fellow gang member known as "Hang Bang." The guns were stored at Margot Bridges's house.

Lea Stoneham, who worked as a pool attendant at Green Meadow Park, had known defendant since elementary school. She testified that, at approximately 9:20 p.m. on the night of June 16, 1981, she saw a blue Cadillac, which she recognized from the neighborhood as belonging to Michael Wilson (whom she also knew as "Bang"), approach the area of an outdoor stage at the park. Five or ten minutes later, Stoneham saw defendant and one other person walk towards the stage.

Carol Freeman testified that, at Green Meadow Park that night, she was among a group of about 10 people gathered about an outdoor stage. They were just laughing and talking; no one had any weapons. Lea Stoneham testified she saw defendant and one other person shooting at this group of people from behind nearby bushes. According to Stoneham, defendant fired in the direction of the stage with a handgun he carefully aimed through a gap in the bushes. Carol Freeman and Anthony Debose sustained shooting injuries. Donald Billingsley was killed by a bullet that defendant's weapon was capable of firing.

Arthur Cox testified he went back to Margot Bridges's house on the morning after Donald Billingsley had been shot. Defendant and others were there, according to Cox, discussing what had happened at Green Meadow Park on the previous night. Defendant said he did not shoot the person who had died from a shotgun wound, as he had been carrying a .357-caliber weapon. Junior Bridges said that a girl had been shot in the hand.

### c. *Possession of weapon while in jail*

The prosecution entered into evidence a certified copy of defendant's plea of guilty to a charge of having possessed a weapon, a homemade "shank," while he was in Los Angeles County jail awaiting trial.

## 2. *Defense Evidence*

Defendant's aunt, Lena Bridges, testified that defendant's mother had abandoned him when he was three days old, and that she and defendant's grandmother had raised him. Various residents of defendant's neighborhood, who had known defendant in his youth, testified to his good character: that he was religious, obedient and respectful, and that he did not deserve the death penalty. According to these accounts, when young, defendant participated in church activities, including the choir. He tried very hard to help his grandmother when she was sick. He also worked as a security guard.

Dawn Williams, 20, was defendant's wife. They were married, in jail, while defendant was in custody. Mrs. Williams had known defendant for more than five years, but was not engaged to him before he was arrested. She married defendant because she was in love with him and because she liked the way he understands people and because she felt him to be warmhearted. Mrs. Williams did not feel that defendant should receive the death penalty.

Joe Lewis formed a community youth group called the Southeast Cadet Corps in 1967, after the Watts riots. The cadet corps was a quasi-military group, but no weaponry was taught; only discipline and control were taught. The members drilled five days a week. Defendant was a member of the cadet corps until he became a gang member. He was one of the better boys in the group, working his way up from "private" to become a "second lieutenant." In order to be promoted in the cadet corps, a cadet had to have letters from teachers about how well he was doing in school and good recommendations from people in the neighborhood; defendant achieved these prerequisites to promotion.

Jeanette Houston (née King) was the mother of defendant's son, Damien, who was five years old at the time of trial. When she was eight months' pregnant with Damien, Houston was shot by a Crip gang member. At that time, defendant had tried to grab her and protect her, even though he had been shot himself.

Mrs. Bridges testified that, prior to his arrest, defendant often visited his son and acted as a father to him. After he was arrested, Mrs. Bridges

testified, she would frequently take Damien to the jail to visit with defendant. Damien Williams testified that he loved his father.

Defendant took the stand for the first time at the end of the penalty phase. He testified the weapon he had possessed in jail was a hard wire with cloth wrapped around it that he had bought because he had been placed in a Crips section of the jail and needed a weapon in order to protect himself.

Defendant testified he was not the shooter at the cakewalk shooting incident, although he could not recall where he had been on the day that incident occurred. He had gone to the police station voluntarily when he learned the police were looking for him in connection with the cakewalk shooting, spending about 12 days in custody. Defendant testified he had ongoing disputes with Karry Island, the principal witness against him in connection with the cakewalk shooting, and that these disputes had their root in Island's having wanted defendant and his friends to join the Crips, while defendant had preferred to become a Blood.

Defendant testified that he dropped out of the Bloods when his son was born. He worked to support his son and often visited him or picked him up to spend time with him at defendant's grandmother's house. When prosecutors confronted defendant with items recently taken from his house that the prosecution argued indicated he maintained his gang membership after 1980, defendant explained the items were relics of his past gang associations.

Defense clinical psychologist Margaret Bennett testified that she had done a psychological evaluation of defendant and that her tests and interviews were not consistent with the charges against him. She testified, specifically, that defendant did not seem to have the "personality structures" or "levels of violence or anger" to indicate he would be capable of the murders with which he was charged. The only explanation for defendant's behavior she could offer was defendant's long-term association with gangs. Although she acknowledged that gang involvement in prison naturally enhanced the risk that an inmate would be violent, Dr. Bennett did not anticipate that defendant would be violent or hostile in prison.

## II. GUILT PHASE ISSUES

Defendant raises a number of claims attacking the judgment as to guilt.

### A. *Peremptory Challenge of Two African-American Potential Jurors*

Defendant, the victim and all the percipient witnesses involved in this matter were African-Americans. After the prosecutor had exercised peremptory challenges to remove six African-American prospective jurors, defendant moved to quash the jury panel under *People* v. *Wheeler* (1978) 22 Cal.3d

258 [148 Cal.Rptr. 890, 583 P.2d 748]. The prosecutor had earlier accepted the jury with two African-Americans on it, and three African-Americans had been seated when the defense *Wheeler* motion was made. At that point, the defense had also excused one African-American.

After inquiring into the prosecutor's specific reasons for his peremptory challenges of African-American prospective jurors, the trial court denied defendant's *Wheeler* motion.

■ Defendant argues reversal of his conviction is required because the prosecutor's peremptory challenges of African-American potential jurors Frederick Bussey and Mary Smith violated his state and federal constitutional rights to trial by a jury drawn from a representative cross-section of the community. According to defendant, the trial court erred under both *People v. Wheeler, supra,* 22 Cal.3d 258, and *Batson v. Kentucky* (1986) 476 U.S. 79 [106 S.Ct. 1712, 90 L.Ed.2d 69], in permitting the prosecutor to excuse Bussey and Smith, without adequate explanation, after defendant had presented a prima facie case of discrimination based on presumed group bias.

■ A party's use of peremptory challenges is presumed to be valid. The presumption is rebutted if the other party establishes a prima facie case that jurors were challenged solely on the basis of their presumed group bias. (*People v. Wheeler, supra,* 22 Cal.3d at pp. 278-281.) To establish a prima facie case, a party "should make as complete a record of the circumstances as is feasible. Second, he must establish that the persons excluded are members of a cognizable group within the meaning of the representative cross-section rule. Third, from all the circumstances of the case he must show a strong likelihood that such persons are being challenged because of their group association rather than because of any specific bias." (*Id.* at p. 280, fn. omitted.)

Although the court did not expressly rule that defendant had made a prima facie case under *Wheeler,* the record supports a conclusion that the trial court so found.

Once a prima facie case has been shown, the burden shifts to the other party to provide race-neutral explanations for each of the disputed peremptory challenges. (*People v. Wheeler, supra,* 22 Cal.3d at pp. 280-282; *Batson v. Kentucky, supra,* 476 U.S. at pp. 96-98 [106 S.Ct. at pp. 1722-1724].) If the court finds, as to any of the challenges, that the burden of justification is not sustained, the presumption of validity is rebutted. (*People v. Wheeler, supra,* 22 Cal.3d at pp. 281-282.) ■ Defendant does not quarrel with the specific reasons the prosecutor gave for peremptorily challenging four of

the African-Americans excused from service on defendant's jury. Defendant does object, however, to the reasons the prosecutor gave for his peremptory challenges of African-American prospective jurors Smith and Bussey.

### 1. *Prospective Juror Smith*

The prosecutor stated he had excused prospective juror Smith "in error." More specifically, the prosecutor stated: "She should be on this jury. I got her confused. She's a police officer, and I made a mistake. I should have kept her on. Let me show you what I have here. I have an eight to nine for guilt. Eight to nine for overall. I didn't pull this one out beforehand, and I thought we were going this way and . . . ." In response to further questioning from the court, the prosecutor stated he wanted Smith "on the jury. I will be glad to pull my other statements as to the other blacks on the panel, and her guilt rating and death rating are higher than theirs. That was a flat out mistake." The prosecutor offered to "call her back and put her on the panel—if [the] defense wants to stipulate to this . . . ." Defense counsel stated: "I don't think it is an issue at this time."

Defendant argues the prosecutor's claim his challenge of potential juror Smith was simply a "mistake" did not constitute a sufficient rebuttal of the prima facie case of presumed racial bias the trial court impliedly found. ■ Defendant points out that, in *Wheeler*, we stated that in order "to sustain his burden of justification, the allegedly offending party must satisfy the court that he exercised such peremptories on grounds that were reasonably relevant to the particular case on trial or its parties or witnesses—i.e., for reasons of specific bias. . . ." (*People* v. *Wheeler*, *supra*, 22 Cal.3d at p. 282; see also *People* v. *Johnson* (1989) 47 Cal.3d 1194, 1216 [255 Cal.Rptr. 569, 767 P.2d 1047].) In *People* v. *Johnson* we contrasted *Wheeler*'s holding that peremptory challenges "are permissible so long as they are based on specific bias," with the rule of *Batson* v. *Kentucky* which "does not use the term 'specific bias' [but] permits the challenges so long as they may be justified by a 'neutral explanation related to the particular case to be tried.' " (*People* v. *Johnson*, *supra*, 47 Cal.3d 1194, 1216, citing *Batson* v. *Kentucky*, *supra*, 476 U.S. at p. 98 [106 S.Ct. at pp. 1723-1724].) ■ Defendant argues the prosecutor's proffered reason for excusing prospective juror Smith—"a mistake"—amounts to no reason at all, hence neither a reason "on grounds of specific bias" (*Wheeler*, *supra*, 22 Cal.3d at p. 277) nor one "related to the particular case to be tried" (*Batson*, *supra*, 476 U.S. at p. 98 [106 S.Ct. at p. 1724]). We disagree.

First, a "mistake" is, at the very least, a "reason," that is, a coherent explanation for the peremptory challenge. It is self-evidently possible for

counsel to err when exercising peremptory challenges. Second, a genuine "mistake" is a race-neutral reason. Faulty memory, clerical errors, and similar conditions that might engender a "mistake" of the type the prosecutor proffered to explain his peremptory challenge are not necessarily associated with impermissible reliance on presumed group bias. (*People* v. *Davis* (1987) 189 Cal.App.3d 1177, 1194 [234 Cal.Rptr. 859], overruled on other grounds by *People* v. *Snow* (1987) 44 Cal.3d 216 [242 Cal.Rptr. 477, 746 P.2d 452].) Third, a "mistake" may be a reason based on "specific bias" (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 277) where, as appears to have been the case here, the prosecutor's error is one of erroneously *believing,* owing to clerical error, that a prospective juror had earlier been evaluated as specifically biased, when in fact she had not. Finally, a "mistake" is a reason "related to the particular case to be tried" (*Batson* v. *Kentucky, supra,* 476 U.S. at p. 98 [106 S.Ct. at p. 1724]) to the extent the *possibility* that genuine errors of this sort will be made exists in every case.

We realize the possibility always exists that counsel called upon to explain a questionable peremptory challenge will take refuge in a disingenuous claim the challenge was mistakenly made. In such a case, "we rely on the good judgment of the trial courts to distinguish bona fide reasons for such peremptories from sham excuses belatedly contrived to avoid admitting acts of group discrimination." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 282.) We and the United States Supreme Court give great deference to the trial court's determination that the use of peremptory challenges was not for an improper or class bias purpose. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1221; *Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 21 [106 S.Ct. at p. 1724].)

Defendant suggests the trial court never even reached the analytic stage of making the "sincere and reasoned attempt to evaluate the prosecutor's explanation" (*People* v. *Hall* (1983) 35 Cal.3d 161, 167-168 [197 Cal.Rptr. 71, 672 P.2d 854]) we expect from the trial court as the price of our deference. The record refutes the suggestion. After the prosecutor indicated he had "made a mistake" in excusing prospective juror Smith, the court requested clarification: "so you excused her in error?" When the prosecutor responded affirmatively, the court pressed for additional clarification: "you wanted her to—." Only after the prosecutor had offered "to pull my other statements as to the other blacks" and show that "her guilt rating and death rating are higher than theirs," did the court indicate it would "accept these reasons at this time."

In short, nothing in the record suggests the trial court failed to make the requisite sincere and reasoned determination regarding the genuineness of

the prosecutor's explanation for challenging prospective juror Smith. Though in making its determination a trial court is not necessarily required affirmatively to make further inquiry of the prosecutor concerning his proffered explanations for disputed peremptory challenges (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1222), the trial court in this instance, where the proffered explanation was of a type particularly susceptible to abuse by overzealous prosecutors, wisely engaged in such inquiry. The trial judge's findings in such a context, largely turning on evaluations of credibility, are entitled to great deference. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1221; *Batson* v. *Kentucky, supra,* 476 U.S. at p. 98, fn. 21 [106 S.Ct. at p. 1724].)

### 2. *Prospective Juror Bussey*

The prosecutor stated as his basis for excusing juror Bussey: "[H]e had a high death rating, but he had a low guilt rating because of his Blood association at Morningside High School. I have him down as a six to seven on guilt rating and seven is the breaking point for me." The prosecutor also stated: "I have an eight to nine for a death rating on him."

Defendant concedes the prosecutor's proffered explanation for excusing prospective juror Bussey is facially neutral as to race, but argues such an explanation functions, in practice, as a proxy for race. Defendant cites *U.S.* v. *Bishop* (9th Cir. 1992) 959 F.2d 820, 827-828 as illustrating the principle that a potential juror's place of residence "often acts as an ethnic badge" and suggests we should find the prosecutor's proffered explanation invalid in light of the fact a person's place of residence often determines the high school he attends.

Of course, *Bishop, supra,* 959 F.2d 820, is not controlling. ■ Decisions of lower federal courts interpreting federal law are not binding on state courts. (*People* v. *Zapien* (1993) 4 Cal.4th 929, 989 [17 Cal.Rptr.2d 122, 846 P.2d 704].)

■ More importantly, *Bishop* is not apposite. There, a prosecutor peremptorily challenged African-American jurors who "lived in a predominantly low-income, black neighborhood and therefore were likely to believe the police 'pick on black people.'" (*U.S.* v. *Bishop, supra,* 959 F.2d at p. 821, quoting the prosecutor.) The United States Court of Appeals for the Ninth Circuit invalidated the peremptory challenge as based on stereotypical presumed group bias, but only because there was no "nexus between the jurors' characteristic"—i.e., that they lived in a poor, predominantly African-American city—"and their possible approach to the specific trial." (*U.S.* v. *Bishop, supra,* 959 F.2d at p. 825.) The court elaborated thus: "This is not to say that residence never can constitute a legitimate reason for excluding a

juror, even after a prima facie showing of intentional discrimination has been made. . . . What matters is not whether but how residence is used. Where residence is utilized as a link connecting a specific juror to the facts of the case, a prosecutor's explanation based on residence could rebut the prima facie showing." (*U.S.* v. *Bishop, supra,* 959 F.2d at p. 826.)

The prosecutor here used residence as a link connecting prospective juror Bussey to the facts of defendant's case. Referring to evidence that "defendant is a Blood gang member," the prosecutor stated he suspected Bussey would be "sympathetic toward Blood gang members" owing to his having attended Morningside High in "a Blood gang area." Indeed, on voir dire, Bussey confirmed he had gone to school with gang members, that the Bloods gang was prevalent at Morningside High School and that "the whole school would get together and run [the Crips] out" if they came to Morningside High.

The "law recognizes that a peremptory challenge may be based on a broad spectrum of evidence suggestive of juror partiality. The evidence may range from the obviously serious to the apparently trivial, from the virtually certain to the highly speculative." (*People* v. *Wheeler, supra,* 22 Cal.3d at p. 275.) Despite the fact Bussey also stated on voir dire that he did not become involved with gangs at high school and defendant's being a Blood "wouldn't mean a thing" to him, the prosecutor may have concluded the likelihood Bussey would evince sympathy for defendant owing to his high school familiarity with Bloods gang members was sufficient to warrant use of a peremptory challenge. The trial court accepted the prosecutor's reason; we see no error in its having done so.

Thus, we conclude the trial court's denial of defendant's *Wheeler* motion was not erroneous.

### B. *Evidence of Gang Membership*

Defendant moved *in limine* to exclude all evidence of his alleged gang membership on the grounds such evidence was irrelevant to motive and identity (Evid. Code, § 1101, subd. (b)) and unduly prejudicial (*id.,* § 352). Defendant argued gang evidence was of limited probative value because the prosecution theory was not based on evidence the victim was a gang member.

Before ruling on defendant's motion *in limine,* the court stated it would hold admissibility hearings outside the presence of the jury pursuant to Evidence Code section 402. Subsequently, the trial court denied defendant's

motion to exclude gang evidence. In making its ruling, however, the court stated it "would be concerned if the People's evidence was repeated in reference to gang memberships to the extent that it may reflect other uncharged crimes," and it would, therefore, "ask the People before they introduce this proof of gang membership, this proof of hostility, outside the presence of the jury to make an offer of proof." The court again stated it would conduct "a proceeding outside the presence of the jury" prior to actually admitting gang evidence.

In fact, no hearings under Evidence Code section 402 were held prior to the trial court's admission of testimony regarding gangs. Officer Johnson, John Gardner, Officer Holmes, Officer Mejia and Arthur Cox each gave such testimony.

Officer Johnson testified as to his expertise and training about gangs, and about the rivalry between the Bloods and the Crips in the area where Dunn was shot. He further testified that the area of 88th and McKinley Streets was "mainly a blue Crip area but you will find some Blood members congregating there from time to time . . . ," and that when he died Dunn was dressed "more like a Crip" than a Blood. After Johnson testified, defendant renewed his motion to exclude gang evidence, on the ground Johnson had testified the shooting took place in Crip, not Blood, territory, which defendant argued undermined the prosecution's gang confrontation theory. The prosecution responded that Johnson's testimony established the intersection of 88th and McKinley was in an area where Crip and Blood "territory" overlapped and offered to prove, by a subsequent witness, that defendant had attended a meeting where Bloods discussed plans for killing Crips in that area. The trial court denied defendant's renewed motion.

John Gardner testified that, shortly before the Dunn shooting, he attended a meeting between his gang set, the Inglewood Family Bloods, and the 89th Street Family Bloods, and that defendant was a leader of the meeting. Gardner testified the meeting was held for the two gang sets to combine forces to kill Crips and that several people, including defendant, had guns at the meeting. Gardner also testified that after Dunn's death defendant said to him: "I took shot . . . and took this fool out of the box, you know, from A.G. [i.e., Avalon Gardens, a housing project] Crips."

Officer Holmes testified as to his experience and training about gangs. Holmes testified John Gardner was a member of the 84 Swan gang and described the geographical location of the 84 Swans.

Officer Mejia testified as to his experience and training about gangs. He identified as being in Blood territory some of the same streets Officer

Johnson had earlier identified as being in Crip territory. The defense objected to Officer Mejia marking this area blue on a map, which was a People's exhibit, on the ground Mejia's testimony conflicted with Johnson's, but the court overruled the objection. Officer Mejia subsequently testified that the area claimed by the 89th Street Family Bloods was inhabited by the Avalon Gardens Crips as well.

Arthur Cox testified that, in 1982, he and defendant were members, and defendant a leader, of the 89th Street Family Bloods, and that they "hung out" at 89th, Wadsworth and McKinley Streets, and at the home of Margot Bridges on 90th Street.

Defendant contends the trial court committed prejudicial error in permitting Officers Johnson, Holmes and Mejia to testify as gang experts. Defendant further contends the trial court erred in denying his motion to exclude all gang evidence because, as the prosecution's attempt to establish a gang-related motive was logically flawed, the prejudicial effect of gang evidence outweighed its probative value. Finally, defendant complains the trial court neither provided the Evidence Code section 402 hearings it had earlier promised nor observed limitations it had earlier set on use of gang membership evidence.

### 1. *Denial of Motion in Limine*

We have recognized that admission of evidence of a criminal defendant's gang membership creates a risk the jury will improperly infer the defendant has a criminal disposition and is therefore guilty of the offense charged. (*People* v. *Champion* (1995) 9 Cal.4th 879, 922 [39 Cal.Rptr.2d 547, 891 P.2d 93], citing *People* v. *Pinholster* (1992) 1 Cal.4th 865, 945 [4 Cal.Rptr.2d 765, 824 P.2d 571].) As defendant points out, evidence of a defendant's criminal disposition is inadmissible to prove he committed a specific criminal act. (Evid. Code, § 1101.) Moreover, even where gang membership is relevant, because it may have a highly inflammatory impact on the jury trial courts should carefully scrutinize such evidence before admitting it. (*People* v. *Champion, supra,* 9 Cal.4th at p. 922.)

The trial court did not err in denying defendant's motion to exclude gang evidence. As defendant acknowledges, in a gang-related case, gang evidence is admissible if relevant to motive or identity, so long as its probative value is not outweighed by its prejudicial effect. (*People* v. *Champion, supra,* 9 Cal.4th at pp. 922-923.) Gang evidence in this case was relevant to both motive and identity.

The prosecution's theory was that the victim Dunn, clothed in blue like a Crip and having traveled into an area "claimed" by both Bloods and Crips,

was shot by a Blood for at least appearing to be a Crip. Evidence defendant was a member and leader of a Blood gang set that operated in the area of the murder (Arthur Cox), that defendant led a meeting of Blood gang sets where killing Crips was discussed and weapons were distributed (John Gardner), as well as evidence describing gang colors, behavior and areas of influence (Officers Johnson, Holmes and Mejia) all had a "tendency in reason to prove" (Evid. Code, § 210) that defendant had a motive for killing, and may indeed have shot, a young male wearing blue clothing in the area where Dunn was shot.

Defendant argues the issue of gang hostility as a motive was not reasonably raised because the prosecution failed to adduce any evidence that the victim, Dunn, was a gang member. The contention fails for the obvious reason that defendant's alleged motive to kill Crips was just as arguable on facts suggesting (as they did) that the victim was dressed *like* a Crip when he was shot, as it would have been on facts suggesting he actually *was* a Crip. Similarly, contrary to defendant's characterization, the prosecution did not stake the relevance of its gang evidence on Dunn's having been shot in recognized Blood "territory." The prosecution argued only that the area where Dunn died was frequented by Bloods as well as Crips, such that the area would occasionally be the scene of conflict between the two groups.

Defendant argues even if gang membership evidence was relevant, its probative value was outweighed by its prejudicial effect. We do not agree. The gang evidence presented in this case was of more than minimal probative value. It tended to establish, among other things, that the victim appeared to be a member of a gang which was a deadly rival of defendant's gang. (Cf. *People* v. *Sandoval* (1992) 4 Cal.4th 155, 175 [14 Cal.Rptr.2d 342, 841 P.2d 862] [no error to admit gang membership evidence where evidence established that victims and defendants were members of rival gangs].) Nor does defendant argue the gang membership evidence was cumulative to other evidence of motive presented to the jury. (Cf. *People* v. *Cardenas* (1982) 31 Cal.3d 897, 904 [184 Cal.Rptr. 165, 647 P.2d 569] [admission of evidence of gang membership to prove witness bias was abuse of discretion where bias already established by other testimony].)

### 2. *Gang Experts*

Defendant never sought at trial to challenge the qualifications of the prosecution's gang experts, and it is too late to raise the issue now. (*People* v. *Roberts* (1992) 2 Cal.4th 271, 298 [6 Cal.Rptr.2d 276, 826 P.2d 274].) In fact, defense counsel conceded that police officers can give expert testimony concerning gangs. Nevertheless, defendant argues on appeal that Officers

Johnson, Holmes and Mejia were not, under Evidence Code section 720, qualified to testify as gang experts. Even if cognizable, the contention lacks merit.

Admissible expert opinion must be based on matter that reasonably may be relied upon by an expert in forming an opinion on the subject to which his opinion relates. (Evid. Code, § 801.) Defendant argues the testimony of Officers Johnson, Holmes and Mejia was not based on consistent and reliable data because some commentators on gang activities in Los Angeles have written that the Crips and the Bloods are poorly structured, undisciplined and lack leadership. Defendant suggests the existence of such commentary calls into question the notion these gangs can influence their individual members to commit crimes. Defendant misses the mark, impliedly mischaracterizing the prosecution's theory. John Gardner's testimony was that defendant killed the victim, not because he was directed to do so by some gang member in authority over him, but in furtherance of a general plan to attack Crips in the area, which was settled upon at a Blood gang meeting led by defendant himself.

The record reveals the trial court properly permitted the officers to testify as gang experts, based upon their "special knowledge, skill, experience, training [and] education" (Evid. Code, § 720) related to gangs. At the time of the trial, Officer Johnson had been a gang investigator since 1973, had attended many seminars and classes on gang activity and gang crime, and had investigated more than a hundred gang homicides. Officer Holmes had worked with gangs for 10 years, specializing in them for 4. He had testified in many courts as a gang expert, given many lectures concerning gang culture, and had appeared on local and national television to speak on the topic. Officer Mejia, a member of a special Los Angeles Police Department gang unit, had been involved with gangs for seven years and had attended numerous professional seminars regarding gangs. We have found qualified, as gang experts, officers with investigative experience similar to that of the officers here. (See *People* v. *Gardeley* (1996) 14 Cal.4th 605, 617-620 [59 Cal.Rptr.2d 356, 927 P.2d 713]; *People* v. *Roberts, supra,* 2 Cal.4th at p. 298.)

Expert opinion also must be related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact. (Evid. Code, § 801, subd. (a).) Defendant cites *People* v. *McClendon* (1986) 146 Ill.App.3d 1004, 1008 [100 Ill.Dec. 671, 497 N.E.2d 849, 851-852] for the proposition gang membership is not so abstruse as to be beyond the ken of a juror. Obviously, this case from a sister state's intermediate appellate court is not controlling. More importantly, *McClendon* does

not hold gang membership *may* not be the subject of expert testimony, only that it *need* not. In fact, the court in *McClendon* actually approved expert testimony by a police officer who had done investigative work in a gang crimes unit on the question whether the defendant was a gang member. (See *People* v. *McClendon, supra,* 146 Ill.App.3d at p. 1008 [497 N.E.2d at pp. 851-852].) In any event, we have without question permitted police to provide expert testimony regarding gangs. (See, e.g., *People* v. *Champion, supra,* 9 Cal.4th at p. 919; *People* v. *Fudge* (1994) 7 Cal.4th 1075, 1091 [31 Cal.Rptr.2d 321, 875 P.2d 36]; *People* v. *Hawthorne* (1992) 4 Cal.4th 43, 52 [14 Cal.Rptr.2d 133, 841 P.2d 118].)

### 3. *Foundational Hearings*

■ Defendant complains the trial court promised to conduct Evidence Code section 402 hearings prior to actually admitting gang membership evidence, but never did so.

Although it was at defense counsel's suggestion the court deferred a determination as to whether police gang experts could testify, counsel raised no objection immediately prior to testimony by Officers Johnson, Holmes or Mejia. As defendant acknowledges, counsel only renewed his motion for exclusion of gang evidence *following* Officer Johnson's testimony. In response, outside the jury's presence, the court heard arguments of counsel and again denied defendant's motion. Defendant was heard only once more at trial regarding the admission of gang evidence—on a mistrial motion made *after* Officer Johnson had testified to his assignment with a gang unit. Again outside the jury's presence, the court heard argument on and denied defendant's motion.

Under these circumstances the trial court was not bound to provide, unprompted, additional hearings under Evidence Code section 402 merely because it had earlier suggested it would do so "at the appropriate time."

In determining the admissibility of evidence, the trial court has broad discretion. Thus, it is within the court's discretion whether or not to decide admissibility questions under Evidence Code section 402, subdivision (b) within the jury's presence. (*People* v. *Mattison* (1971) 4 Cal.3d 177, 187 [93 Cal.Rptr. 185, 481 P.2d 193].) A trial court's ruling on admissibility implies whatever finding of fact is prerequisite thereto; a separate or formal finding is, with exceptions not applicable here, unnecessary. (Evid. Code, § 402, subd. (c).) A ruling on a motion under section 402, moreover, is not binding on the trial court if the subject evidence is proffered later in the trial. (*People* v. *Jackson* (1980) 28 Cal.3d 264, 343 [168 Cal.Rptr. 603, 618 P.2d 149] (dis.

opn. of Bird, C. J.), citing *Saidi-Tabatabai* v. *Superior Court* (1967) 253 Cal.App.2d 257 [61 Cal.Rptr. 510].) On appeal, a trial court's decision to admit or not admit evidence, whether made *in limine* or following a hearing pursuant to Evidence Code section 402, is reviewed only for abuse of discretion. (*People* v. *Rodrigues* (1994) 8 Cal.4th 1060, 1167 [36 Cal.Rptr.2d 235, 885 P.2d 1]; *People* v. *Clair* (1992) 2 Cal.4th 629, 676 [7 Cal.Rptr.2d 564, 828 P.2d 705].) In light of these principles, we conclude the trial court here was within its discretion in failing to conduct additional proceedings outside the jury's presence on the question of gang evidence.

Defendant also complains the trial court permitted the prosecution to use gang evidence on the issue of identity, after having ruled such evidence was relevant only to the issue of motive. Defendant is mistaken in stating the court expressly limited gang evidence to the issue of motive. In fact, in ruling on the motion *in limine* the trial court stated: "I want to limit this proof to motive and to identity. . . ." Moreover, the court admonished the jury that testimony relating to gangs "was allowed only for the limited purpose of showing motive to commit the crime for which Mr. Williams is on trial or to prove identity."

We are satisfied there was no prejudicial error in the admission of gang evidence at defendant's trial.

## C. *Witness Intimidation Evidence*

Mark Williams, who testified at defendant's trial, had been previously prosecuted in juvenile court for the shooting of witness Patricia Lewis's house. Evidence about the shooting of Lewis's house was admitted at defendant's trial. On the basis of this evidence, the trial court instructed the jury regarding a criminal defendant's attempts to suppress evidence as tending to show consciousness of guilt. (See CALJIC No. 2.06 (5th ed. 1988 bound vol.).)

As detailed below, defendant contends the trial court committed numerous errors in admitting evidence about the shooting of Lewis's house. He argues admission of such evidence was prejudicial because "[b]y transforming this into a trial about the shooting of the witness's home, the prosecution was able to transform a weak eyewitness into the heroine of the case." Further, defendant argues the trial court erred when it instructed the jury with CALJIC No. 2.06, because there was insufficient evidence in the record to show that defendant directed or authorized the attack on the Lewis home.

### 1. *Testimony of Patricia Lewis*

Patricia Lewis testified she saw defendant point a gun at Jerome Dunn and moments thereafter heard the fatal shots fired. She also testified that, subsequently, on an evening in January 1983, while she was sitting in her living room with her grandson and husband, someone shot at her house continually for about 5 minutes, sending 45 to 50 bullets through the walls, windows and front door, frightening the occupants of the house and causing property damage (but not actually wounding any occupant). Lewis further testified that nothing like that had ever happened to her prior to her witnessing the Dunn shooting.

Defendant does not suggest the admission of Patricia Lewis's testimony about her own victimization was independent error, only, as discussed below, that admission of the testimony by Mark Williams, Kenneth Simmons and Arthur Cox (which provided the foundation for admission of Lewis's testimony) was error. Lewis's dramatic testimony about the shooting of her house would not have been relevant, argues defendant, but for the erroneous admission of Williams's, Simmons's and Cox's testimony linking the shooting to defendant.

### 2. *Testimony of Mark Williams and Kenneth Simmons*

Mark Williams admitted he was a member of the 89th Street Family Bloods gang set. Williams denied, however, that he shot at Patricia Lewis's house and denied having a January 8, 1983, conversation with Kenneth Simmons regarding the shooting. Finally, Williams denied visiting defendant in jail in October or November of 1982 and testified his prior testimony to the contrary in certain juvenile court proceedings was not correct.

The prosecution then called Kenneth Simmons to testify about prior inconsistent statements by Mark Williams. Simmons also testified he was a member of the 89th Street Family Bloods gang set. Simmons testified that, in a conversation held while they ingested drugs together in an alley on the morning of January 7 or 8, 1983, Mark Williams told him that he (Mark) and other persons had gone, one or two nights previously, "to take care of some business" for defendant, involving a female witness who lived on 87th Street. The prosecutor then asked: "Who did he say wanted it done?" Simmons answered: "Barry" [Williams, i.e., defendant]. Simmons also testified that Williams had a shotgun during that conversation[2] and that he (Simmons) was arrested later that same day carrying a shotgun Williams had given him.

---

[2]Defendant complains Simmons made other, prior, inconsistent statements, but does not contend he was denied the opportunity to confront Simmons with any such. Defendant also

Defendant argues admission of Simmons's and Williams's testimony was erroneous in several respects. First, defendant asserts Simmons's testimony was improperly admitted because the prosecution failed to lay a proper foundation for it. Second, defendant contends admission of Simmons's testimony violated his right of confrontation. Third, defendant maintains admission of Simmons's and Williams's testimony was fundamentally unfair because the prosecution failed to show that defendant authorized or directed the intimidation of Lewis. Finally, defendant contends that, even if relevant, testimony by Simmons and Williams should not have been admitted because it was more prejudicial than probative.

The People laid a proper foundation for Simmons's testimony about Williams's out-of-court statements. "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with [Evidence Code] Section 770 [requiring a witness be given an opportunity to explain or deny any extrinsic inconsistent statement sought to be admitted]." (Evid. Code, § 1235.)

Williams's statements to Simmons regarding the shooting of Patricia Lewis's house were inconsistent with Williams's subsequent testimony at defendant's trial. According to Simmons, Mark Williams told him defendant wanted Williams to scare "the lady on 87th Street who was going to court on him" so that "she doesn't go to court." Simmons further testified that Mark Williams said to him on January 7 or 8, 1983, that he (Mark Williams) and others had taken care of "some business" that "Barry" (i.e., defendant) wanted taken care of concerning "a witness," a "lady" who lived on 87th Street. At defendant's trial, when given an opportunity to explain or deny these statements, Williams denied that he made them. Thus, the trial court properly overruled defendant's hearsay objection to admission of Simmons's testimony about Williams's out-of-court statements. (Evid. Code, § 1235.)[3]

Defendant argues even if Williams's statements to Simmons fall within a hearsay exception, they were inadmissible because no evidence showed

characterizes Simmons's testimony as being only that Mark Williams stated defendant "wanted" a witness intimidated, not that Mark Williams repeated any of defendant's actual statements, gestures or expressions. Defendant's characterization is only half correct. Indeed, as defendant insists, Simmons *did* testify that Mark Williams told him defendant "wanted" Williams to scare witness Lewis. But Simmons *also* confirmed he had testified in an earlier juvenile court adjudication (see fn. 4, *post*, and accompanying text) *that* "Barry told Snoop Dog [also known as Mark Williams] that" he wanted witness Lewis scared.

[3]Defendant *does not argue Simmons's testimony was improperly admitted solely because* it contained *double* hearsay: Williams's out-of-court statements to Simmons about defendant's out-of-court statements to Williams. Such an argument would fail in any event. The admission of multiple hearsay is permissible where each hearsay level falls within a hearsay exception. (Evid. Code, § 1201.) As discussed, Williams's statements to Simmons were

Williams ever visited or communicated with defendant before the shooting of Lewis's house, so as to acquire personal knowledge of defendant's wishes in that regard. In the absence of such evidence, defendant argues, any statement to Simmons by Williams purporting to describe defendant's intention was not competent evidence. Defendant is incorrect.

Williams testified at defendant's trial that he recalled testifying at a previous juvenile court adjudication about his involvement in the shooting of Lewis's house.[4] Williams acknowledged he had testified in the earlier proceeding to visiting defendant at the county jail, although he denied that previous testimony was correct. The substance of Williams's prior testimony was properly admitted pursuant to Evidence Code section 1235, to show he communicated with defendant before the shooting of Lewis's home. Admission of the testimony was not fundamentally unfair.

Defendant argues admission of Mark Williams's out-of-court statements violated his right of confrontation. Not so. ■■■ "The receipt in evidence of a prior inconsistent statement does not violate the confrontation clauses of the federal and state Constitutions where the declarant testifies at trial and is subject to cross-examination." (*People* v. *Zapien, supra,* 4 Cal.4th at p. 955.) Mark Williams testified at defendant's trial and was subject to cross-examination. Therefore, the trial court's having received in evidence Mark Williams's prior inconsistent statements to Simmons did not violate defendant's confrontation right.

■■■ Defendant further argues that, in any event, evidence Mark Williams visited him in jail could not have established a sufficient connection between defendant and the intimidation of Lewis to justify admitting the testimony of Simmons and Williams on that topic. Defendant cites *People* v. *Hannon* (1977) 19 Cal.3d 588, 599 [138 Cal.Rptr. 885, 564 P.2d 1203], and *People* v. *Terry* (1962) 57 Cal.2d 538, 566 [21 Cal.Rptr. 185, 370 P.2d 985]. ■■■ In *Hannon,* we stated: " ' "Generally, evidence of the attempt of third persons to suppress testimony is inadmissible against a defendant where the effort did not occur in his presence. [Citation.] However, if the defendant has authorized the attempt of the third person to suppress testimony, evidence of such conduct is admissible against the defendant." ' " (*People* v. *Hannon, supra,* 19 Cal.3d at p. 599, quoting *People* v. *Weiss* (1958) 50 Cal.2d 535, 554 [327 P.2d 527].) In *Terry,* we held that proof of a criminal defendant's "mere opportunity" to authorize a third person to attempt to influence a witness "has no value as circumstantial evidence" that the defendant did so. (*People* v. *Terry, supra,* 57 Cal.2d at p. 566.)

---

properly admitted as prior inconsistent statements. Defendant's statements to Williams were properly admitted as statements of a party. (Evid Code, § 1220.)

[4]Defendant's jury was not told the purpose of the adjudication.

█ More than "mere opportunity" was shown here.

First, as previously discussed, Kenneth Simmons testified Mark Williams told him that he and others had gone "to take care of some business" that "Barry" wanted done. This "business," Simmons testified Williams told him, involved "a witness," a lady who lived on 87th Street. That Simmons's testimony suggested defendant authorized the shooting of Lewis's home is illustrated by the fact that, after Simmons testified, defendant's trial counsel (unsuccessfully) moved for a mistrial on the basis that the prosecutor had put into evidence "this statement that 'Barry told me to shoot up her house' . . . ."

Second, Arthur Cox testified that, while they were in jail together, defendant stated he (defendant) was "going to get some witnesses shot" in order to "beat this case." Cox testified defendant "said he was going to get Curtis [Thomas] to shoot one of the witnesses . . . ." Cox further testified the witness defendant referred to was Patricia Lewis.

In light of the evidence showing that defendant authorized the shooting of Lewis's house, the trial court properly admitted evidence of the shooting on the theory that evidence of attempts to suppress evidence are relevant to show consciousness of guilt. (*People* v. *Hannon*, *supra*, 19 Cal.3d at p. 599.)

### 3. *Testimony of Arthur Cox*

█ Defendant contends admission of Cox's testimony violated his Sixth Amendment right to counsel, as Cox was a government agent and deliberately elicited incriminating statements from defendant when his counsel was not present. (*Massiah* v. *United States* (1964) 377 U.S. 201, 207 [84 S.Ct. 1199, 1203-1204, 12 L.Ed.2d 246].) Accordingly, defendant argues, the trial court erred in denying defendant's motion to suppress the evidence of defendant's statements to Cox. Defendant also argues Cox's testimony was erroneously admitted as tending to prove defendant's consciousness of guilt, because the statements Cox reported were cast only in terms of an *intention* to suppress evidence, not in terms of an admission of having done so. Finally, defendant argues admission of Cox's testimony violated Evidence Code section 352.

Defendant asserts Arthur Cox was not acting on his own initiative when he reported defendant's jailhouse statements about shooting Lewis's house. According to defendant, Cox was "in effect directed" to elicit incriminating information. Defendant argues government agents induced Cox to act on their behalf in exchange for leniency on a robbery charge that was pending

against him. Defendant does not claim that police or prosecutors made any *explicit* request of Cox for information, nor that they *expressly* promised him any benefit for eliciting statements. Instead, defendant claims Cox was given the "impression" that a deal was possible, and was led by indirect comments to expect leniency if he were to elicit incriminating information from defendant. The record, however, reveals no *Massiah* violation.

Defendant was arrested on these charges in April 1982. In early July 1982, Officer Mejia testified, after defendant's preliminary hearing on these charges had concluded, he received a call from Arthur Cox, who, like defendant, was being held in Los Angeles County jail. Cox was charged with burglary and personal use of a gun. Mejia went down to the jail and met with Cox. Cox told Mejia he wished to cut a deal for information. Mejia told Cox he could not promise anything and that he would have to see the district attorney. Before departing, Mejia testified, he made clear to Cox that Cox was not his agent and that there was no deal.

About a week later, Deputy District Attorney Jacobs accompanied Mejia to the county jail and met with Cox. Jacobs's primary interest in talking with Cox was in connection with Cox's status as a victim and witness on an unrelated murder case.

At the meeting, Jacobs testified, Cox related certain statements defendant allegedly had made regarding a series of incidents between the 89th Street Family Bloods and the Avalon Gardens Crips. Among other things, Cox related defendant's statements about a killing at Green Meadow Park, in connection with which defendant had been indicted. Jacobs was at that time assigned to prosecute the Green Meadow Park incident. Cox also related some statements defendant allegedly had made about the shooting of Jerome Dunn. Cox told Jacobs that defendant had said Curtis Thomas was in the van with him at the time Dunn was shot and that defendant had told Thomas to shoot. Jacobs testified he did not recall Cox speaking that day about Patricia Lewis.

Jacobs testified he told Cox, "I'll get back to you," and that he further indicated if anything could be worked out it was not up to Jacobs, but to his supervisors. Jacobs told Cox it would "take considerable amount of persuasion on my part to get anything done." Jacobs acknowledged indicating to Cox he was "interested to know what his [i.e., defendant's] reaction is now." Later in the interview, Mejia apparently said to Cox: "If you talk to him now, he would have a different thing to say about beating it." But, Jacobs testified, he did not promise Cox leniency, intercede to affect the handling of Cox in jail or ask Cox to obtain any additional information. Similarly, Mejia

testified that neither he nor anyone else present at the interview exchanged anything with Cox or promised him anything in exchange for information.

On September 2, 1982, Mejia testified, Cox called him from jail with information about the shooting of Lewis's house. Cox told Mejia that defendant, in a conversation with Cox, had indicated he was "going to" use one of his friends, or "home boys," named Curtis Thomas, to get rid of witness Patricia Lewis by killing her. In that conversation, Mejia testified, he neither requested of Cox additional information nor promised Cox any reward. Subsequently, the police provided 24-hour protection to Lewis.

Jacobs testified that, in September 1982, he wrote a letter to counsel for the Youthful Offenders Parole Board, California Youth Authority, requesting that a certain parole hold on Cox be lifted so Cox could be released from jail. Jacobs desired Cox's release because he wanted to call Cox to testify without endangering Cox's life, and, in Jacobs's opinion, Cox's life would have been endangered if Cox testified while remaining in jail.

Cox pled guilty to the robbery charge with use of a firearm under section 12022.5. In exchange for the plea, Jacobs struck the allegation under section 1203.06 (which, if true, would have barred Cox's probation, thus ensuring his being sent to state prison or the Youth Authority).

At trial, defendant, pursuant to *Massiah* v. *United States, supra,* 377 U.S. 201, moved to suppress evidence of his statements to Cox. Defendant suggests Cox was induced by Jacobs's and Mejia's comments at the July 1982 jail meeting to seek additional incriminating information from defendant. Defendant further suggests the sentence Cox received on his robbery charge, favorable dispositions on a probation violation and a parole violation, and certain small monetary payments together constituted quid pro quo for the information Cox had provided. Accordingly, defendant argues, Cox was a government agent when defendant made incriminating statements to him, and the trial court erred in denying his suppression motion. We disagree.

As we have recognized, "[i]n order to prevail on a *Massiah* claim involving use of a government informant, the defendant must demonstrate that . . . the informant (1) was acting as a government agent, i.e., under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage, and (2) deliberately elicited incriminating statements." (*In re Neely* (1993) 6 Cal.4th 901, 915 [26 Cal.Rptr.2d 203, 864 P.2d 474].)

The trial court properly denied defendant's *Massiah* motion because defendant failed to meet either prong of the foregoing test. Defendant

established *neither* that Cox was acting "under the direction of the government pursuant to a preexisting arrangement, with the expectation of some resulting benefit or advantage" *nor* that he "deliberately elicited incriminating statements" from defendant.

■ "Where [—as here—] the informant is a jailhouse inmate, the first prong of the foregoing test is not met where law enforcement officials merely accept information elicited by the informant-inmate on his or her own initiative, with no official promises, encouragement, or guidance." (*In re Neely, supra,* 6 Cal.4th at p. 915.) ■ As the trial court observed, Cox's telephone contact with the police regarding defendant's case was initiated by Cox himself. All of the prosecution witnesses who testified on the suppression motion stated they in no way asked or even suggested that Cox should be their agent. No evidence contradicted that testimony. The trial court also found that Cox had neither been promised nor led to expect any benefit in return for his statements.

Jacobs's remark that he would be "interested to know what [defendant's] reaction is now" plainly does not constitute an express request or direction that Cox act as a government agent. Moreover, we agree with the trial court that the remark must be considered in its context. Just before making the remark, Jacobs told Cox he had an absolutely airtight case against defendant and did not need Cox's statement. The trial court correctly concluded Jacobs's statement did not, under the circumstances, imply that Cox should act for the prosecution or the police.

Defendant points out that Cox spoke with prosecutors more than once, that he informed on defendant and that he subsequently received what appears to have been favorable treatment as to various penalties. We have not found such circumstances sufficient to support a conclusion that an informant was motivated to inform by prosecutorial promises of leniency. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1249-1250 [278 Cal.Rptr. 640, 805 P.2d 899].) In *Pensinger,* we observed: "[The inmate-informant]'s housing arrangement had nothing to do with any hope of eliciting information from defendant. . . . [N]o officer ever promised [the inmate-informant] any benefit. No one asked him to perform any service. The police simply made use of [the inmate-informant]'s own motivation to inform on defendant, a technique we found not to be a knowing subversion of the defendant's right to counsel . . . ." (*People v. Pensinger, supra,* 52 Cal.3d at p. 1250, citing *People v. Whitt* (1984) 36 Cal.3d 724, 742-743 [205 Cal.Rptr. 810, 685 P.2d 1161].)

Similarly here. There was no evidence prosecutors or police deliberately placed Cox in proximity to defendant in jail. ■ "Absent evidence of

direct motivation by police in this case, or of a *prior* 'working relationship' between [the informant] and the authorities from which such encouragement might be inferred, there is no basis to hold the police accountable for [the informant]'s decision to question defendant." (*People* v. *Gonzalez* (1990) 51 Cal.3d 1179, 1241 [275 Cal.Rptr. 729, 800 P.2d 1159], citing *People* v. *Whitt, supra,* 36 Cal.3d at p. 744.)

Defendant also failed to establish that Cox deliberately elicited defendant's statements. As defendant acknowledges, in order to establish a Sixth Amendment violation, "the defendant must demonstrate that the police and their informant took some action, beyond merely listening, that was designed deliberately to elicit incriminating remarks." (*Kuhlmann* v. *Wilson* (1986) 477 U.S. 436, 459 [106 S.Ct. 2616, 2630, 91 L.Ed.2d 364].) ▮ Although Cox testified that he and defendant talked about their cases together, nothing in the record suggests that Cox actively questioned defendant about defendant's case. As discussed, there was no evidence prosecutors or police directed that Cox be jailed in proximity to defendant. If it were necessary to reach the question (which it is not, inasmuch as the trial court, as discussed above, properly found the government did not have a preexisting arrangement with Cox), we would conclude Cox acted as "a mere governmental 'listening post,' which, according to *Kuhlmann,* raises no Sixth Amendment concern." (*People* v. *Williams* (1988) 44 Cal.3d 1127, 1141 [245 Cal.Rptr. 635, 751 P.2d 901].) Thus, the trial court properly denied defendant's suppression motion.

As the People acknowledge, defendant at trial also objected on relevance grounds to the admission of Cox's testimony. "[*People* v. ] *Weiss*[, *supra,* 50 Cal.2d 535] holds that the admission of evidence purporting to show the suppression or attempted suppression of evidence is erroneous absent the prerequisite of proof that the defendant was present at such an incident or proof of authorization of such illegal conduct." (*People* v. *Hannon, supra,* 19 Cal.3d at p. 600.)

Invoking *Weiss, supra,* 50 Cal.2d 535, defendant correctly notes that Cox's testimony about defendant's statements suggested defendant phrased them in terms of an intention to arrange for suppression of Mrs. Lewis's evidence, rather than in terms of an admission that he had already done so. Even so, *Weiss* would not for that reason bar admission of the statements. "From the declared intent to a do a particular thing an inference that the thing was done may fairly be drawn." (*People* v. *Alcalde* (1944) 24 Cal.2d 177, 185 [148 P.2d 627], citing *Mutual Life Ins. Co.* v. *Hillmon* (1892) 145 U.S. 285, 295-296 [12 S.Ct. 909, 912-913, 36 L.Ed. 706].) Thus, defendant's "declarations of . . . intent are admissible . . . as evidence of the probable

doing of the act . . . ." (*People v. Weatherford* (1945) 27 Cal.2d 401, 422 [164 P.2d 753].) Specifically, the statement by defendant indicating he was "going to" have witnesses or a witness shot, would constitute evidence from which the trier of fact could infer that he authorized the shooting that actually occurred. Such evidence is admissible to prove consciousness of guilt. (*People v. Weiss, supra,* 50 Cal.2d at p. 554.) Therefore, Cox's testimony about defendant's statements was not inadmissible on the ground the statements expressed intention only.

 Finally, defendant complains that, in admitting Cox's testimony, the trial court failed to weigh its prejudicial effect against its probative value. (Evid. Code, § 352.) As he concedes, however, defendant failed at trial to object to admission of Cox's testimony on section 352 grounds. Indeed, the record reveals he objected only on relevancy grounds. Consequently, any objection based on the prejudicial effect of Cox's testimony was waived. (Evid. Code, § 353, subd. (a); *People v. Garceau* (1993) 6 Cal.4th 140, 179 [24 Cal.Rptr.2d 664, 862 P.2d 664].) Defendant's relevancy objection to witness intimidation evidence has been discussed.

In a single sentence, defendant asserts his trial counsel was ineffective for not specifically objecting on Evidence Code section 352 grounds to admission of Cox's testimony. Points "perfunctorily asserted without argument in support" are not properly raised. (*People v. Ashmus* (1991) 54 Cal.3d 932, 985, fn. 15 [2 Cal.Rptr.2d 112, 820 P.2d 214].) To the extent defendant means impliedly to adopt his argument on the merits of the trial court's failure to conduct section 352 weighing as also showing why counsel was ineffective, we reject the conclusion. As discussed, Cox's testimony was relevant to prove defendant's consciousness of guilt. It is not reasonably probable that an objection on section 352 grounds would have succeeded.

In sum, defendant fails to demonstrate the trial court erred in admitting testimony from Patricia Lewis, Kenneth Simmons, Mark Williams and Arthur Cox that defendant authorized or directed the shooting of Patricia Lewis's house. As that evidence was admissible, the court did not err in instructing the jury with CALJIC No. 2.06, regarding consciousness of guilt.

D. *Limitation on Cross-examination of Arthur Cox*

 As previously discussed, Arthur Cox testified for the prosecution about incriminating statements defendant allegedly made while Cox and defendant were in jail together. Defendant complains that, in twice sustaining prosecution objections to defense counsel's cross-examination of Cox regarding Cox's sources of material support, the trial court violated defendant's due process rights and right of confrontation.

Cox was extensively cross-examined by defense counsel. The trial court sustained objections by the prosecution to three lines of defense counsel's questioning. Defendant contends two of the rulings were erroneous. Defendant challenges the trial court's ruling sustaining the prosecution's relevancy objection to the question: "How do you come up with the money [to pay for your current rent]?" Defendant also contends the trial court erred in sustaining the prosecution's relevancy objections to questions about the manner in which Cox supported himself after he was released from jail.

Defendant accurately observes the high court has "'recognized that the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" (*Delaware* v. *Van Ardsall* (1986) 475 U.S. 673, 678-679 [106 S.Ct. 1431, 1435, 89 L.Ed.2d 674], quoting *Davis* v. *Alaska* (1974) 415 U.S. 308, 316-317 [94 S.Ct. 1105, 1110-1111, 39 L.Ed.2d 347].) "It does not follow, [however], that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." (475 U.S. at p. 679 [106 S.Ct. at p. 1435], citing *Delaware* v. *Fensterer* (1985) 474 U.S. 15, 20 [106 S.Ct. 292, 294-295, 88 L.Ed.2d 15].)

Defense counsel was permitted to cross-examine Cox on numerous topics that were relevant to Cox's credibility. Defense counsel was permitted to ask about the particulars of Cox's commitment to the California Youth Authority, his history of gang membership, his arrest for robbery, the favorable disposition of the robbery charges following cooperation with prosecutors and the favorable disposition of his probation violations following such cooperation.

Defense counsel also was permitted to cross-examine Cox closely about money he had received from police and prosecutors. Defense counsel asked who was paying for his rent and whether Cox was working. He also asked whether Cox was getting his rent money from the police department or the district attorney's office. Only when defense counsel asked, "'How do you come up with the money?" did the court sustain a relevancy objection. A moment later, Cox testified, without objection, that he got his rent money from his "parents, girlfriend and things like that."

We cannot conclude defendant was denied the opportunity to appropriately cross-examine Cox about income or credibility issues. Defendant has the burden of demonstrating that a reasonable jury might have received a significantly different impression of Cox's credibility had defense counsel been permitted to pursue his proposed lines of questioning. (*Delaware* v. *Van*

*Ardsall, supra*, 475 U.S. at p. 680 [106 S.Ct. at pp. 1435-1436].) In view of the extensive cross-examination of Cox on topics relevant to his credibility, including financial topics, defendant fails to carry that burden.

■ "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." (*Delaware* v. *Van Ardsall, supra*, 475 U.S. at p. 679 [106 S.Ct. at p. 1435].) ■ The trial court apparently was concerned that defense counsel, by repeatedly questioning Cox about his income sources, was unfoundedly creating the impression Cox was generating income illegally. Accordingly, the court limited such questioning to periods of time Cox was housed by the government, and disallowed generalized questioning ranging over longer periods.

We discern no error.

E. *"Climate of Fear"*

■ Defendant contends he was denied a fair trial because the prosecution elicited, from several witnesses, irrelevant and excessively prejudicial testimony regarding their fear of testifying. Defendant analogizes to *Dudley* v. *Duckworth* (7th Cir. 1988) 854 F.2d 967, a robbery prosecution. There, the United States Court of Appeals, Seventh Circuit, found fundamentally unfair the trial court's refusal to strike extended testimony by a prosecution witness to the effect that, on the eve of trial, he had received certain anonymous telephone calls that caused him to fear for his family's safety should he testify. (*Id.* at p. 972.) Defendant argues the admission at his trial of certain testimony by John Gardner, Officer Joe Holmes, Officer Michael Mejia, Kenneth Simmons and Patricia Lewis was similarly unfair. We are not persuaded.

First, by failing to raise them at trial, defendant waived the objections he now makes to John Gardner's, Officer Holmes's and Officer Mejia's testimony. Defendant argues there was no waiver under the rules in effect at the time of his trial. Citing *People* v. *Frank* (1985) 38 Cal.3d 711 [214 Cal.Rptr. 801, 700 P.2d 415], defendant apparently means to suggest that, because this is a capital case, we should disregard "technical insufficiencies" in his objections to admission of evidence regarding prosecution witnesses' fear of testifying and, instead, examine the whole record to determine whether there has been a "miscarriage of justice." (See *Frank, supra*, 38 Cal.3d at p. 729, fn. 3 ["On an appeal from a judgment imposing the penalty of death, a

technical insufficiency in the form of an objection will be disregarded and the entire record will be examined to determine if a miscarriage of justice resulted."].) We reject the suggestion. We previously have noted that "[t]he lead opinion in *Frank* was not signed by a majority of the court, and although later cases from this court have never disapproved its language, they have cited it only for the purpose of distinguishing it." (*People* v. *Diaz* (1992) 3 Cal.4th 495, 527 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) Moreover, defendant's reliance on the *Frank* footnote is misplaced, as his waiver consisted not merely in raising technically insufficient objections, but in raising none whatsoever. (See *People* v. *Poggi* (1988) 45 Cal.3d 306, 331 [246 Cal.Rptr. 886, 753 P.2d 1082].)

Even had defendant not waived the objections, we would reject his claim of error based on Gardner's, Office Holmes's and Officer Mejia's testimony.

John Gardner, a jailhouse informant whose role in the prosecution's case has been described, testified he and his mother were relocated by the authorities after he provided information about defendant. Gardner answered "Yes" to the question: "I take it your mother was relocated also?" Immediately thereafter, the prosecutor said: "Is that in case—strike that." Defendant complains the prosecutor's aborted question "put unanswerable innuendo before the jurors." We disagree. If the defense had desired to cross-examine Gardner on that topic, so as to dispel any perceived innuendo, it was free to do so. Presumably for its own tactical reasons, however, the defense conducted no such cross-examination.

Officer Holmes was asked whether Gardner had been given any favors or special consideration for his testimony; Holmes testified Gardner had been relocated. Extending his answer, unbidden, Holmes volunteered that Gardner "didn't want to get killed" and was "really concerned about the safety of his family." Defendant complains Officer Holmes's remarks regarding Gardner's fears were irrelevant to the issue of any rewards Gardner received for testifying and unfairly raised the implication defendant or someone acting at his behest would kill Gardner or his family.

Defendant's trial counsel unsuccessfully moved for a mistrial after Officer Holmes's testimony; defendant argues the trial court erred in denying the motion. The motion for a mistrial was grounded on the supposition that cumulatively Holmes's testimony on direct examination (that he was concerned, when first contacting witness Gardner, that Gardner "be safe"), and on cross-examination (that Gardner was relocated by the government because "[h]e didn't want to get killed or his family didn't get killed"), deprived defendant of a fair trial, "the inference being logically that any

reprisal will come because of the defendant in the case." The trial court denied the motion without explanation.

Officer Holmes's remarks regarding Gardner's fears were quite brief and did not, in our estimation, necessarily suggest to the jurors that defendant was guilty of witness intimidation. Defense counsel did not object to Holmes's testimony on direct that he was concerned for Gardner's safety. Moreover, Holmes's testimony on cross-examination (that Gardner was afraid) was elicited by defense counsel, but the defense made no motion to strike any of Holmes's responses to its questions. Counsel was free to request that the jury be admonished to disregard any objectionable portions of Officer Holmes's testimony, but did not.

Both times when Officer Holmes remarked on Gardner's fears, he was responding to questions about any inducements offered Gardner in return for his testimony. Personal safety may logically comprise one such inducement, and Holmes's answers were responsive in this general sense. We review a ruling on a motion for mistrial under the deferential abuse-of-discretion standard. (*People* v. *McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569].) Under this standard, we discern no error.

Officer Michael Mejia, responding to a question by defense counsel about the original complaint against defendant, stated: "We had Mrs. Lewis positively identifying him as seeing him in the van. We had in excess of eight phone calls, again, they were—" The court interrupted Officer Mejia and repeated twice: "Don't tell us what the phone calls were." Defendant suggests that Mejia's mention of "phone calls" may have caused the jury improperly to infer that other people reported information to the police, but did not, out of fear of defendant, come forward as witnesses. We disagree. Once the trial court sua sponte instructed Officer Mejia not to elaborate on his remark that "[w]e had an excess of eight phone calls," Officer Mejia went no further. There simply is no reason to suppose that defendant's jurors inferred witness intimidation had occurred from the bare testimony that police received eight telephone calls of an unspecified nature.

Kenneth Simmons, another jailhouse informant whose testimony has substantially been described, arrived in court one day wearing a white jail-issue wristband, whereas on previous days he had been wearing a red wristband. Asked by the prosecutor about the color change, Simmons testified it related to a change in the area of the jail in which he was housed, and that the change in housing assignment was related to the fact he had been "scared" when he was housed with the general inmate population. Simmons also stated he was "scared" to be testifying. Defendant complains Simmons's

testimony transgressed a limitation the trial court had imposed moments earlier to the effect that Simmons could be asked only *whether* he was scared in jail, and could not be questioned further on the topic.

Defendant too narrowly characterizes the trial court's ruling, which was: "I will let you ask him if he was scared because of when he was in the court jail, but I want you to stop right there. I don't want you to go into any detail[ed] explanations [of] why he is scared of any threats made to him, or anything like that." We agree with the People, as, apparently, did the trial court itself, that the prosecutor's subsequent questions whether Simmons was scared because he was "in the general population" and "testifying in this case" fell within the trial court's ruling.

Patricia Lewis was questioned by defense counsel about the timing of her identification of defendant. She testified her initial failure positively to identify defendant from a photographic show-up was "due to the fact I was afraid." Asked, "Then what happened?" she answered, "That's when I started getting telephone calls I had gotten prior to that if I testified I would be killed." At defense counsel's request, the latter answer was stricken and the jury admonished to disregard it. Later in her testimony, Lewis stated "I had gotten a call to the effect—" The trial court intervened: "Don't tell us about that call." Lewis went on, "This is the reason I made the statement that I did." Moments later, questioned about possible inconsistencies between certain statements she made at the preliminary hearing and her trial testimony, Lewis stated, "I was [in] fear for my life." The trial court denied the defense motion for a mistrial based on this exchange. Later, the court denied a defense motion for a mistrial based on the cumulative impact of Lewis's references to her fears.

■ "Although most cases involve prosecutorial or juror misconduct as the basis for [a mistrial] motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice." (*People* v. *Wharton* (1991) 53 Cal.3d 522, 565 [280 Cal.Rptr. 631, 809 P.2d 290].) ■ Nevertheless, the trial court properly denied defendant's mistrial motions. As previously discussed, there was evidence defendant attempted to intimidate Lewis so that she would not testify against him. Moreover, Lewis's testimony that she was afraid for her life at the preliminary hearing was relevant to the issue of her credibility, as it explained apparent inconsistencies between her testimony there and at trial. We find no error. ■ "Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People* v. *Haskett* (1982) 30 Cal.3d 841, 854 [180 Cal.Rptr. 640, 640 P.2d 776].)

██ Finally, defendant contends that, when considered for their cumulative impact, references by the prosecution witnesses to their fears of testifying denied him fundamental fairness. ██ We have recognized that "evidence of an anonymous threat not connected with the defendant 'should at once be suspect as . . . an endeavor to prejudice the defendant before the jury in a way which he cannot possibly rebut satisfactorily because he does not know the true identity of the pretender.'" (*People* v. *Mason* (1991) 52 Cal.3d 909, 946 [277 Cal.Rptr. 166, 802 P.2d 950], quoting *People* v. *Weiss*, *supra*, 50 Cal.2d at p. 554.) ██ Nevertheless, for several reasons, we reject defendant's contention.

First, as we recently noted, a witness's statement, alone, that he or she is afraid to testify is "far from accusing defendant or his associates of threatening [the witness] if he testified." (*People* v. *Padilla* (1995) 11 Cal.4th 891, 944 [47 Cal.Rptr.2d 426, 906 P.2d 388].) Similar analysis is appropriate as to most of the "fear" testimony of which defendant complains.

Second, we have previously distinguished *Dudley* v. *Duckworth*, *supra*, 854 F.2d 967, upon which defendant relies, on the basis of the trial court's failure there to admonish the jury to disregard testimony about unattributed threats. (See *People* v. *Wharton*, *supra*, 53 Cal.3d at p. 566, fn. 9.) We have also distinguished *Dudley* as a case in which "the record suggested the 'strong possibility that the prosecutor intended to get the threat testimony before the jury under a pretext.'" (*People* v. *Mason*, *supra*, 52 Cal.3d at p. 947, fn. 17, quoting *Dudley* v. *Duckworth*, *supra*, 854 F.2d at p. 971.) *Dudley* is distinguishable on both these grounds from this case, as well.

Finally, and most fundamentally, we cannot conclude that Patricia Lewis's testimony was more prejudicial than probative. Lewis's testimony about her fears was directly relevant to why she did not identify defendant with certainty at the first photographic showup. When recently considering similar facts, we found no error, concluding that to have omitted explanatory fear testimony would have grossly distorted the record. (See *People* v. *Rodrigues*, *supra*, 8 Cal.4th at p. 1123.)

F. *Denial of Jury Visit to Crime Scene*

██ Defendant argues the trial court erred in denying a defense motion that the jury visit the scene of the crime. The standard of review for a trial court's decision to grant or deny a request for a jury view is abuse of discretion. (*People* v. *Price* (1991) 1 Cal.4th 324, 422 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

Defendant argues his motion for a crime scene visit would have enabled the jury properly to appreciate the distance and angle from which Patricia

Lewis claimed to have witnessed him. "When the purpose of [a jury] view is to test the veracity of a witness's testimony about observations the witness made, the trial court may properly consider whether the conditions for the jury view will be substantially the same as those under which the witness made the observations, whether there are other means of testing the veracity of the witness's testimony, and practical difficulties in conducting a jury view." (*People* v. *Price, supra,* 1 Cal.4th at p. 422.) The trial court here, in denying defendant's motion, correctly reasoned that lighting and foliage conditions at the scene might be different than those prevailing at the time of the offense.

Defendant's trial counsel conceded, in making the motion, that the only justification for undertaking a crime scene visit would be to illustrate relative distances as testified to by Lewis and to acquaint the jury with the trees at the scene. The jury ultimately was taken to a plaza in front of the courthouse and permitted to view there the distances involved. There was no reason to believe a visit to the crime scene would have afforded the jury an opportunity to view trees as they were on the day of the crime. Defendant fails to demonstrate that the trial court abused its discretion in denying his motion.

### G. *Plastic Foam Head With Knitting Needles*

Immediately preceding the testimony of coroner Dr. Sara Reddy, defendant objected to the introduction into evidence of a model head, made of plastic foam and pierced with two knitting needles (head exhibit), on grounds of undue prejudice. The trial court denied the motion and the head exhibit was admitted into evidence. Dr. Reddy referred to the head exhibit when describing the trajectory of the bullets used to shoot Dunn. Defendant now contends the trial court erred in denying his motion.

We review a trial court order denying a defendant's motion to exclude evidence pursuant to Evidence Code section 352 for abuse of discretion. (*People* v. *Lucas* (1995) 12 Cal.4th 415, 449 [48 Cal.Rptr.2d 525, 907 P.2d 373].)

On a procedural level, defendant complains the trial court's comments about the head exhibit were too short and conclusory to demonstrate the balancing required by Evidence Code section 352. We do not agree. We have recognized that, when ruling on a section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352. (*People* v. *Lucas, supra,* 12 Cal.4th at p. 449.) The record here so demonstrates.

Substantively, defendant argues the head exhibit was insufficiently probative because specific intent was not at issue in this case, the knitting needles were cumulative of the coroner's testimony, and the needles served only to inflame the jurors. Defendant is mistaken in all three respects. First, defendant was charged with murder, and he concedes that both first and second degree murder (other than on a theory of implied malice) require a specific intent to kill. In a previous murder case involving crime scene and autopsy photographs, we noted "[t]he trial court did not abuse its discretion on relevance" where "[e]ach of the [autopsy] photographs in question had some tendency in reason to prove" malice or intent to kill. (*People* v. *Clair*, *supra*, 2 Cal.4th at p. 660.)

Second, that the head exhibit "may have been somewhat cumulative is not determinative: '[w]e repeatedly have rejected the argument photographs of a murder victim should be excluded as cumulative if the photographs are offered to prove facts established by testimony.' " (*People* v. *Lucas*, *supra*, 12 Cal.4th at p. 450, quoting *People* v. *Cain* (1995) 10 Cal.4th 1, 29 [40 Cal.Rptr.2d 481, 892 P.2d 1224].) Similarly, "[m]annequins may be used as illustrative evidence to assist the jury in understanding the testimony of witnesses or to clarify the circumstances of a crime." (*People* v. *Cummings* (1993) 4 Cal.4th 1233, 1291 [18 Cal.Rptr.2d 796, 850 P.2d 1] (mannequin impaled with six dowels demonstrating bullet trajectories more probative than prejudicial).)

Finally, " 'a trial court has broad discretion in determining the admissibility of murder victim photographs in the face of a claim . . . they are unduly gruesome or inflammatory.' " (*People* v. *Lucas*, *supra*, 12 Cal.4th at p. 449, quoting *People* v. *Wilson* (1992) 3 Cal.4th 926, 938 [13 Cal.Rptr.2d 259, 838 P.2d 1212].) We conclude similarly as to the exhibit at issue here. Defendant offers no basis for concluding the coroner's head exhibit threatened to create such a prejudicial impact that the trial court abused its discretion in admitting it.

## H. *Ineffective Assistance of Counsel During Guilt Phase*

Defendant argues that certain actions and omissions of the lawyers representing him at trial amounted to ineffective assistance of counsel in violation of his right to counsel as guaranteed by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. In order to demonstrate ineffective assistance, a defendant must first show counsel's performance was deficient because the representation fell below an objective standard of reasonableness under prevailing professional norms. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 687-688 [104 S.Ct.

2052, 2064-2065, 80 L.Ed.2d 674].) Second, he must show prejudice flowing from counsel's performance or lack thereof. Prejudice is shown when there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. (*In re Avena* (1996) 12 Cal.4th 694, 721 [49 Cal.Rptr.2d 413, 909 P.2d 1017].)

 Defendant argues, first, that his trial counsel was ineffective in failing to object to the admission of certain prejudicial testimony. He cites jailhouse informant Arthur Cox's testimony that, while defendant was in jail, "Grape Streets was after him." Defendant argues Cox's testimony indicated that members of the Grape Street Crips, a gang to which the victim, Dunn, may have belonged, thought defendant had murdered Dunn and wanted retaliation. He complains counsel should have objected to Cox's testimony on grounds of hearsay, relevance and undue prejudice, but did not. As a result, defendant contends, he was incriminated on the basis of unidentified gang members' uncorroborated conclusions as to his guilt.

 "Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference [citations], failure to object seldom establishes counsel's incompetence." (*People* v. *Hayes* (1990) 52 Cal.3d 577, 621 [276 Cal.Rptr. 874, 802 P.2d 376].) "In order to prevail on [an ineffective assistance of counsel] claim on direct appeal, the record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission." (*People* v. *Ray* (1996) 13 Cal.4th 313, 349 [52 Cal.Rptr.2d 296, 914 P.2d 846].) This case is no exception. As the People suggest, trial counsel may have decided not to object to Cox's testimony about defendant's fear of gang retaliation because an objection would have highlighted the testimony and made it seem more significant, especially in light of the general rivalry between Crips and Bloods with which the jury was already familiar.

Defendant also notes counsel did not object when Patricia Lewis volunteered that her house had been twice shot at or when the prosecutor asked Kenneth Simmons about the shooting of Lewis's house and about a shotgun possessed by Junior Bridges. These points, however, "perfunctorily asserted without argument in support" (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 985, fn. 15), are not properly raised.

 Second, defendant argues trial counsel was ineffective for failing to pursue inconsistencies in the testimony of Patricia Lewis and Kenneth Hayes. What defendant describes as the "greatest inconsistency" concerns Lewis's testimony describing the path taken by the van from which the fatal

shots were fired at Jerome Dunn. At the preliminary hearing, Lewis testified that the van, traveling on 88th Place, approached McKinley Street from the *west* and turned *left*, northward, onto McKinley Street. At trial, Lewis testified similarly, except she said the van approached from the *east* and turned *right*, northward, onto McKinley Street. Trial counsel did not impeach Lewis with the variation.

Defendant insists "[t]he implications are great: If the van was coming from [the west] and making a left, rather than coming from [the east] and making a right, Mrs. Lewis could not have seen the driver of the van as she claimed." Defendant is mistaken; Lewis did not testify she saw the driver of the van when the van was first approaching her. Lewis's testimony was, rather, that *after* the van had turned northward onto McKinley it stopped and began to back up. She testified she saw the driver's face turned towards her as the van was backing up (and turning) into 88th Place from McKinley. Whether the van originally approached Lewis from the west or from the east, thus, had no bearing on whether Lewis saw defendant's face at the point she testified it was visible to her. Accordingly, defendant errs in suggesting trial counsel missed an opportunity to suggest to the jury that Lewis could not have seen the driver of the van.

Defendant also complains his trial counsel failed to cross-examine Hayes and Lewis about what defendant deems a "conflict" between their respective testimony. Hayes testified that the windows of the station wagon in which Lewis was riding were "fogged up" when he rode his bicycle past the stopped vehicle in the intersection of 88th Place and McKinley; Lewis testified that, when she saw the driver of the van, "the window was down on his side, and the window was down on my side . . . ." Even if Lewis's testimony is assumed to refer to the passenger window of the station wagon in which she was riding, her testimony does not necessarily conflict with Hayes's. Hayes's testimony about the condition of the station wagon's windows at one point in time does not foreclose the possibility a window was later rolled down or partially rolled down, or that any "fog" on the glass was wiped away. As discussed, Lewis testified she saw the van's driver *after* the van had reversed direction and was backing onto 88th Place.

In any event, defendant does not suggest that either Hayes's or Lewis's testimony was internally inconsistent on the subject of the position of the station wagon passenger-side window. Defendant's trial counsel extensively cross-examined both Hayes and Lewis. ■■■ "As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation." (*People* v. *Cox* (1991) 53 Cal.3d 618, 662 [280 Cal.Rptr. 692, 809 P.2d 351].)

Third, defendant argues his trial counsel was ineffective because counsel elicited certain purportedly prejudicial testimony from Kenneth Simmons, John Gardner, Patricia Lewis and Officer Mejia.

From Kenneth Simmons, defense counsel elicited testimony that Simmons had lied at the juvenile court hearing about what defendant told him. Simmons also testified on direct examination that he had refused to grant an interview to defense counsel on one particular morning without getting the prosecutor's permission because he "was just scared." As previously mentioned, the prosecutor subsequently was permitted to ask Simmons whether he was scared because he was in the general population in jail and testifying in this case. Simmons affirmed he was scared for these reasons. On recross, Simmons stated he was scared because he was "coming to court on Barry." Defendant complains that, because defense counsel opened the door on the issue, Simmons was able to use his fear of defendant to excuse his change in testimony and protect himself from impeachment.

From John Gardner, defense counsel elicited testimony that Gardner had refused to permit defense counsel to tape-record a pretrial interview with him because he was concerned that "you'll show the defendant, defendant sent word out to take Gerald [alias Gardner] out of the box if I do that." When defense counsel asked a follow-up question, Gardner elaborated: "He could have seen it. He could have talked to someone from the jail house and, you know, people be getting out of jail every day."

Assuming, without deciding, that trial counsel should have anticipated his questions would elicit testimony by Simmons and Gardner about their fear of defendant, we do not believe the examination constitutes ineffective assistance. Even where defense counsel may have " 'elicit[ed] evidence more damaging to [defendant] than the prosecutor was able to accomplish on direct' " (*People* v. *Robertson* (1982) 33 Cal.3d 21, 43, fn. 11 [188 Cal.Rptr. 77, 655 P.2d 279]), we have been "reluctant to second-guess counsel" (*ibid.*) where a tactical choice of questions led to the damaging testimony.

The People suggest, plausibly, that trial counsel's tactical intent in cross-examining Simmons about his purported fear of testifying may have been to suggest that Simmons had no genuine cause for fear, as he was being held in protective custody, and that, in reality, Simmons was lying about the cause of his change in testimony. Similarly, trial counsel's tactical intent in cross-examining Gardner may have been to show he was lying and that he refused to have himself taped only because he was afraid he would get caught in a lie at trial. Such plausible tactical possibilities undermine defendant's claim of ineffective assistance.

From Patricia Lewis, defense counsel elicited testimony regarding her statement at the preliminary hearing (recanted at trial) that she could not see the shooter's arm coming out of the van. To defense counsel's question, "So your memory is better today than it was three and a half years ago?" Lewis responded, "It was still the same. I just didn't—I was [in] fear for my life." As previously discussed, defense counsel moved for a mistrial, but the trial court denied the motion after stating, "[y]ou knew that was going to come out." Later, defense counsel asked, "Who were you scared of?" Lewis responded, "The same person that shot my house up." Defendant complains that this performance by counsel on cross-examination "destroyed any possibility of impeachment by giving Lewis the perfect justification for her changes in testimony."

Trial counsel plainly attempted to impeach Mrs. Lewis with discrepancies in her testimony. Counsel cross-examined Lewis regarding her changes in testimony and, when confronted with Lewis's response that she had been scared, asked questions designed to suggest that Lewis should not have been scared of defendant because defendant was in jail. As previously mentioned, determinations "[a]s to whether certain witnesses should have been more rigorously cross-examined . . . are normally left to counsel's discretion and rarely implicate inadequacy of representation." (*People* v. *Cox, supra,* 53 Cal.3d at p. 662.) Counsel's cross-examination of Patricia Lewis was not unconstitutionally deficient.

From Officer Mejia, defense counsel elicited testimony regarding the sufficiency of the information upon which the People had based their complaint. Mejia stated: "We had Mrs. Lewis positively identifying him as seeing him in the van. We had an [*sic*] excess of eight phone calls, again, that were . . . ." At this point, the court interrupted, saying, "Don't tell us what the phone calls were." Defendant suggests the jury was given the impression that more than eight potential witnesses had contacted the police, but were not testifying, because they were afraid of defendant. We agree with the People that defendant's suggestion is utterly speculative. No prejudice is demonstrated.

Fourth, defendant contends his trial counsel was ineffective with respect to jury instructions. We address this branch of defendant's ineffective assistance claim *post,* in conjunction with his claim that numerous guilt phase instructional errors require reversal.

Fifth, defendant contends counsel was ineffective in delivering a prejudicially deficient guilt phase closing argument. Specifically, he complains that: (1) counsel's argument respecting the degree of murder applicable to the case was incorrect and confusing; (2) counsel failed to argue the

reasonable doubt principle to the jury; and (3) counsel's argument on defendant's alibi defense was inadequate and prejudicial. ▓▓ Bearing in mind that "[t]he effectiveness of an advocate's oral presentation is difficult to judge accurately from a written transcript" (*People* v. *Cudjo* (1993) 6 Cal.4th 585, 634-635 [25 Cal.Rptr.2d 390, 863 P.2d 635]), we consider each complaint in turn.

▓▓▓ Defendant's sole indictment of trial counsel's argument with respect to the degree of murder is that it was "illogical." We have never suggested that counsel's failure to argue in purely logical terms constitutes ineffective assistance. Be that as it may, defendant correctly points out that counsel argued Jerome Dunn's death was neither first nor second degree murder, even though the court had decided not to instruct on manslaughter.

We agree with the People that counsel's argument respecting degree of murder did not necessarily suggest to the jury they should convict defendant of manslaughter, a crime on which they had not been instructed. Counsel mentioned "heat of passion" in describing the shooting, but did not refer to "manslaughter" in analyzing the jury's task with respect to degrees of homicide. His argument was apparently meant to suggest the jury must acquit defendant altogether, as the killing did not constitute either first or second degree murder, the only crimes of homicide on which they had been instructed. Counsel's decision to so argue "is a matter of trial tactics and strategy that a reviewing court generally may not second-guess." (*People* v. *Davenport* (1995) 11 Cal.4th 1171, 1237 [47 Cal.Rptr.2d 800, 906 P.2d 1068].)

Defendant next complains trial counsel did not emphasize the "reasonable doubt" principle as forcefully as he should have. Defendant fails to demonstrate counsel's argument fell below an objective standard of reasonableness. Defendant concedes counsel's argument covered the significant items of evidence presented by the prosecution, but faults counsel for failing actually to use the words "reasonable doubt" at particular junctures. Surely such matters of diction fall within the range of tactical decisions to which we ordinarily defer. In any event, counsel did not fail altogether to argue "reasonable doubt." Twice, in summarizing, counsel expressly invoked that principle.

Defendant also complains that counsel undermined the significance of one piece of potentially favorable physical evidence—a receipt purportedly corroborating the testimony of one of defendant's alibi witnesses—by suggesting it may not have been "that significant." Not necessarily. We frequently have acknowledged that candor with the jury may be an effective trial tactic.

(See, e.g., *People* v. *Freeman* (1994) 8 Cal.4th 450, 498 [34 Cal.Rptr.2d 558, 882 P.2d 249, 31 A.L.R.5th 888]; *People* v. *Breaux* (1991) 1 Cal.4th 281, 306-307 [3 Cal.Rptr.2d 81, 821 P.2d 585].)

Respecting his alibi defense, defendant contends trial counsel failed to discuss the details of key testimony and delivered "a barely comprehensible argument." There is no doubt that portions of counsel's remarks, at least as they appear in the trial transcript, are somewhat less than crystal clear, but such lack of clarity is not necessarily ineffective assistance. An occasional garbling in presentation is to be expected, and a closing argument presumably may contain such, yet fall within the range of constitutionally acceptable representation.

Defendant also complains that counsel undermined the effectiveness of his alibi witnesses by stating that they were not of "the honor class of Beverly High School" and that "it is possible" that one of them had lied. When these comments are considered in context, however, it is plain counsel made a tactical choice to acknowledge the generally dubious backgrounds of various persons upon whom defendant relied in presenting his alibi defense, while highlighting the degree to which they corroborated each other's testimony. Thus, that one witness might lie is "possible"; that all three witnesses were lying, counsel attempted to imply, is unlikely. As discussed, we generally defer to such tactical choices.

Thus, defendant fails to demonstrate his trial counsel's closing argument constituted ineffective assistance.

I. *Prosecutorial Misconduct*

 Defendant contends the prosecutor committed prejudicial misconduct by: (1) referring, in his closing argument, to the occupants of the van from which the fatal shots were fired as "a pack of laughing hyenas," (2) representing, also in closing, that Kenneth Hayes had testified the passenger window in the station wagon occupied by Patricia Lewis was rolled down, when in fact Hayes testified it was rolled up and foggy, (3) mischaracterizing, at several points during the trial, Arthur Cox's testimony regarding defendant's incriminating statements relating to witness intimidation, (4) misdefining for the jury the element of deliberation required for a finding of first degree murder, (5) referring, in closing argument, to the victim's corpse as being "cold" and "in decay," and (6) implying, also when closing, that defense counsel disbelieved his own client's defense.

We need not reach the merits of these claims, because defendant failed to make a timely objection and request an admonition when such could have

cured any error. Accordingly, any claim of prosecutorial misconduct was forfeited. (*People* v. *Sully* (1991) 53 Cal.3d 1195, 1248 [283 Cal.Rptr. 144, 812 P.2d 163].) We have previously discussed, and rejected, defendant's argument based on *People* v. *Frank, supra*, 38 Cal.3d at page 729, footnote 3, that the foregoing rule of forfeiture was not in effect at the time of his trial.

Defendant contends that, if his right to complain of prosecutorial misconduct was forfeited, then his trial counsel was constitutionally ineffective for failing to preserve it. Keeping in mind that "[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel" (*People* v. *Kelly* (1992) 1 Cal.4th 495, 540 [3 Cal.Rptr.2d 677, 822 P.2d 385]), we examine each instance of alleged misconduct.

First, the prosecutor's "laughing hyenas" epithet does not seem beyond the pale, in light of evidence that the occupants of the van were laughing and joking about doing injury to the victim just prior to his death. " 'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.] It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature.' [Citation] 'A prosecutor may "vigorously argue his case and is not limited to 'Chesterfieldian politeness' " [citation], and he may "use appropriate epithets . . . ." ' " (*People* v. *Wharton, supra*, 53 Cal.3d at pp. 567-568.)

 In *People* v. *Terry, supra*, 57 Cal.2d 538, we held that the prosecutor's characterization of the defendant as an "animal" and as one of the most "vicious gunmen and killers" fell properly under the rule that prosecuting attorneys are allowed a wide range of descriptive comment. (*Id.* at p. 561.) In *People* v. *Pinholster, supra*, 1 Cal.4th at page 948, we concluded that a prosecutor's denigration of the defendant's credibility by referring to him as a "weasel" was permissible use of "colorful terms." Similarly, here. The prosecutor's epithet "laughing hyenas" was reasonably warranted by the evidence that defendant shot Jerome Dunn while riding in a vehicle containing several passengers, some of whom, immediately prior to the shooting, had been laughing and speaking about injuring Dunn.

We find unpersuasive defendant's suggestion that the prosecutor's reference to "hyenas" appealed to jurors' "racial animus and biases" because the hyena, assertedly, is an African animal. A fundamental factual premise of

the suggestion is mistaken; some species of hyena are native to India and other parts of southern Asia, as well as Africa. (Webster's New Internat. Dict. (2d ed. 1957) at p. 1223.) Moreover, we agree with the People the prosecutor's reference apparently was just to the popular understanding of hyenas, which includes the notion that they "laugh." There is no record basis for concluding the prosecutor either meant, or was understood to refer to, the geographical origins of certain hyena species or hyenas generally. The epithet was not misconduct; hence, trial counsel was not ineffective for failing to object.

Second, defendant contends the prosecutor misrepresented that Kenneth Hayes had testified the passenger window in the station wagon being ridden in by eyewitness Patricia Lewis was rolled down when, in fact, Hayes had testified it was rolled up and foggy.

As the record reveals, the prosecutor's summary inaccurately indicated that Hayes, rather than Lewis, testified the window on the passenger side of the station wagon (i.e., the side on which Lewis sat) was down. We do not agree with defendant, however, that it is reasonably probable that, but for the prosecutor's erroneous statement of fact, the jury would have assessed the state's entire factual case differently.

The prosecutor accurately reported Hayes's testimony that the windows of the station wagon (those, presumably, as were visible to him) were "fogged up," and that Hayes was able to see only one person in the station wagon. Moreover, the jury reasonably could have understood Lewis's testimony (that "the window was down on my side") to indicate the passenger window in the station wagon was rolled down, and the jury may have credited her testimony more than Hayes's. Defendant exaggerates the relative importance of the prosecutor's misstatement by inaccurately characterizing the state's case as resting essentially on the testimony of one witness, Patricia Lewis, as to what she saw from a distance of 300 feet through several car windows. While Lewis was the only eyewitness to identify defendant as the driver of the van, she testified to an unobstructed line of sight, not to seeing defendant through several windows. Hayes, as well as Lewis, testified as an eyewitness to the events immediately surrounding the shooting. The state also presented extensive informant testimony regarding defendant's incriminating statements and actions. Finally, the court, as well as both the prosecutor and defense counsel, informed the jury that statements in argument were not to be considered as evidence. In such a context, we cannot conclude defense counsel's failure to object to the prosecutor's minor factual misstatement constituted ineffective assistance. (Cf. *People* v. *Padilla, supra,* 11 Cal.4th at p. 943.)

Third, defendant contends the prosecutor several times mischaracterized Arthur Cox's testimony regarding defendant's incriminating statements to Cox relating to witness intimidation. Specifically, defendant complains the prosecutor misrepresented (to the court, during pretrial and during trial, in making an offer of proof outside the jury's presence) that Cox would testify defendant engaged in witness intimidation and (to the jury, in closing) that Cox testified defendant had admitted ordering "the shooting." Defendant fails to establish misconduct (or, consequently, ineffective assistance) in either respect.

Defendant's complaint about the prosecutor's characterization, to the court, of Arthur Cox's testimony is related to his relevance objection, previously discussed (*ante*, part II.C.3.), to admission of that testimony. As noted, Cox's testimony suggested defendant spoke in terms of an *intention* to arrange for suppression of Patricia Lewis's evidence, rather than in terms of an admission that he had already done so. Therefore, defendant argues, the prosecutor mischaracterized Cox's testimony in telling the court he intended to prove that "Mr. Williams ordered the witnesses in this case to be shot" and "attempted to get rid of a witness . . . ." Defendant's argument is not meritorious. As discussed, any statements of intention defendant made regarding witness intimidation were competent evidence that he subsequently engaged in such (*People* v. *Alcalde, supra*, 24 Cal.2d at pp. 184-185), and the prosecutor's representations to the court that he would produce such evidence ultimately were supported by Cox's testimony.

Defendant also objects to the prosecutor's closing statement "that Barry told him [i.e., Cox] that he [i.e., defendant] told Curtis [Thomas] to do the shooting." Defendant apparently understands the prosecutor's statement to refer to the shooting of witness Patricia Lewis's house, and so to be inaccurate in the same fashion, just discussed, as were the prosecutor's representations to the court regarding defendant's statements about witness intimidation. Defendant is mistaken. In this instance, as examination of the record makes plain, the prosecutor was referring, *not* to the shooting of Patricia Lewis's house, but to the shooting of Jerome Dunn. This much of the prosecutor's statement indubitably was consistent with the evidence; Arthur Cox *did* testify that defendant told him "he told Curtis [Thomas] to shoot" Jerome Dunn.

Fourth, defendant erroneously contends the prosecutor misdefined for the jury the element of deliberation required for a finding of first degree murder, so as to allow a finding of "deliberation" based on evidence the murder was merely intentional. The record does not support defendant's contention. "All we want to know," the prosecutor argued, "is was the killing accompanied

by a clear deliberate intent on the part of the defendant to kill which was the result of deliberation, a result of having formed it in his mind, having been reflected upon even for a split second . . . ." Such phraseology does not reduce deliberation to intent, but, rather, expressly retains both concepts, as required for a finding of deliberate, premeditated murder. In fact, the prosecutor's language would seem to pass muster even under what defendant, quoting *Davis* v. *State* (1972) 251 Ark. 771 [475 S.W.2d 155, 156], asserts is the "proper definition of deliberation," i.e., "weighing in the mind of the consequences of a course of conduct . . . ." There was no misconduct, hence no ineffective assistance.

Fifth, defendant decries the prosecutor's reference to the victim's corpse as being "cold" and "in decay." Defendant calls this an improper appeal to the jurors' emotions, but the prosecutor did not dwell upon or repeat the image. We conclude it was "fair comment on the evidence." (*People* v. *Wharton, supra*, 53 Cal.3d at pp. 567-568.) There was no misconduct; counsel was not ineffective.

Finally, defendant complains the prosecutor inappropriately implied defense counsel disbelieved his own client's defense. What the prosecutor actually said was, "In fact I'd be surprised if defense lawyers based on the state of the evidence do not agree this is a first degree murder case." Defense counsel asked that the remark be repeated, and stated: "I guess the district attorney is easily surprised, your honor." Subsequently, after additional examination and during a recess, counsel objected to previous remarks of the prosecutor, including these, and asked that the jury be admonished to disregard them.

Even assuming the prosecutor's remarks were improper, defendant suffered no prejudice from counsel's delay in objecting. The prosecutor stated to the jury that nothing he said was evidence, evidence came from the witnesses, and the jury was the judge of the facts. The trial court told the jury "not to consider personal opinions," and the prosecutor apologized. When defense counsel argued, he plainly stated: "Not only do we not agree that it is a first degree murder, we don't even agree that it is a second degree murder." Defense counsel found the court's corrective admonition "sufficient" and so do we. There is no reasonable probability the outcome would have been different had counsel assigned misconduct sooner. Hence, counsel was not ineffective. (See *People* v. *Osband* (1996) 13 Cal.4th 622, 700 [55 Cal.Rptr.2d 26, 919 P.2d 640].)

## J. *Guilt Phase Instructional Errors*

Defendant contends that guilt phase instructional errors require reversal of his conviction. Specifically, defendant complains the trial court: (1) failed to

give appropriate cautionary instructions regarding accomplice testimony, (2) erroneously delivered CALJIC No. 2.11.5,[5] (3) erred in refusing to give heat of passion manslaughter instructions, and (4) failed to give appropriate cautionary instructions regarding informant credibility.

### 1. *Cautionary Accomplice Instructions*

The trial court did not err in failing to read cautionary accomplice instructions (nor was trial counsel ineffective for failing to request such). True, "[w]hen the prosecution calls an accomplice as a witness, the trial court must instruct the jury that the witness's testimony should be viewed with distrust." (*People* v. *Mincey* (1992) 2 Cal.4th 408, 461 [6 Cal.Rptr.2d 822, 827 P.2d 388].) We agree with the People, however, that the record contains insufficient evidence to suggest that either Mark Williams or John Gardner was defendant's accomplice in the murder of Jerome Dunn.

Neither Williams nor Gardner was actually seen at the scene of Dunn's murder, nor was there any evidence either acted with the intent or purpose of encouraging or facilitating the murder. As the People point out, Patricia Lewis's testimony placed Mark Williams in the van with defendant, not when Dunn was shot, but after Lewis and her companion in the station wagon had departed the crime scene, had driven to Lewis's nearby home and were chatting curbside. By Lewis's estimate, she saw Mark Williams in the van three or more minutes after the shooting. In any event, Lewis provided no evidence Mark Williams intended to facilitate the shooting. Although Gardner was present at a gang meeting (led in part by defendant) prior to the shooting, there was no evidence Gardner encouraged Dunn's killing or was present when Dunn was shot. Thus, as to neither Mark Williams nor Gardner has defendant demonstrated an "intent to facilitate the crimes—an essential element of accomplice liability." (*People* v. *Stankewitz* (1990) 51 Cal.3d 72, 91 [270 Cal.Rptr. 817, 793 P.2d 23].)

Cautionary instructions as to Gardner and Mark Williams were not, in any event, compelled by the evidence defendant cites to suggest they were defendant's accomplices. No instruction was required as to Gardner because the evidence defendant suggests connects Gardner to the killing was Gardner's own testimony, such that the usual reasons for distrusting accomplice testimony are not present. No instruction was required as to Mark Williams because his trial testimony did not inculpate defendant.

---

[5]"There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [¶] Do not discuss or give any consideration to why the other person is not being prosecuted in this trial or whether [he] [she] has been or will be prosecuted." (CALJIC No. 2.11.5 (5th ed. 1988 bound vol.).)

Moreover, even assuming the trial court erred in failing to instruct on accomplice testimony, defendant has not demonstrated prejudice. A trial court's failure to instruct the jury that it should view an accomplice's testimony with distrust does not prejudice the defendant when the record contains sufficient corroborating evidence. (*People* v. *Arias* (1996) 13 Cal.4th 92, 143 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Mark Williams's and Gardner's testimony was amply corroborated by Patricia Lewis's eyewitness testimony and the testimony of Arthur Cox.[6]

### 2. *CALJIC No. 2.11.5*

 Defendant correctly observes "CALJIC No. 2.11.5 [see fn. 5, *ante*] should not be given when a nonprosecuted participant testifies because the jury is entitled to consider the lack of prosecution in assessing the witness's credibility." (*People* v. *Rankin* (1992) 9 Cal.App.4th 430, 437 [11 Cal.Rptr.2d 735]; see also *People* v. *Hardy* (1992) 2 Cal.4th 86, 189 [5 Cal.Rptr.2d 796, 825 P.2d 781]; *People* v. *Carrera* (1989) 49 Cal.3d 291, 312, fn. 9 [261 Cal.Rptr. 348, 777 P.2d 121].) Defendant contends the trial court erred in using CALJIC No. 2.11.5 because Mark Williams and John Gardner, both of whom testified against defendant, were, according to defendant, unprosecuted coparticipants in the crime for which defendant was tried.

As discussed in the preceding section, the record does not indicate that either Mark Williams or Gardner was defendant's accomplice in the murder of Jerome Dunn. As our previous pronouncements make plain, however, the question whether either Williams or Gardner "was or may have been involved in the crime" for the purposes of CALJIC No. 2.11.5 is a "separate issue" (*People* v. *Cox*, *supra*, 53 Cal.3d at p. 667) from the question whether either was an accomplice. Indeed, "[o]ne purpose of the instruction is to focus the jury's attention on an individualized evaluation of the evidence against the person on trial without extraneous concern for the fate of other participants *irrespective* of their culpability." (*Id.* at p. 668, italics added.)

The People suggest the trial court's use of CALJIC No. 2.11.5 was clearly intended to refer to Junior Bridges and Tommy Bridges. We agree with defendant the record contains no satisfactory basis for concluding the jury must have understood the instruction as being so limited. Thus, the trial

---

[6]Defendant perfunctorily asserts, without citation, that Kenneth Simmons's own testimony establishes he was an accomplice in the shooting of Patricia Lewis's house and implies he was an accomplice in the shooting of Jerome Dunn. We have reviewed Kenneth Simmons's testimony in this trial and find no such admission, express or implied. Defendant provides no supporting argument or evidence respecting his further assertion that accomplice instructions were required as to Arthur Cox; accordingly, we do not address that claim.

court erred in instructing the jury with CALJIC No. 2.11.5 without first modifying it to make clear that it did not apply to Gardner and Williams.

Defendant, however, fails to demonstrate he was prejudiced by use of CALJIC No. 2.11.5 in its unmodified form. On the one hand, even if the jury believed CALJIC No. 2.11.5 referred to Gardner and Williams, it was not without compass in determining the credibility of these two witnesses. The jury was instructed in the words of CALJIC No. 2.20 on evaluating the credibility of witnesses generally, including the existence or nonexistence of a bias, interest or other motive for testimony. On the other hand, even if the trial court had modified CALJIC No. 2.11.5 to ensure the jury would not apply the instruction to Gardner and Williams, it is unlikely the jury would have reached a different verdict. Gardner and Williams were not the mainstays of the prosecution case, which depended, in the first instance, on eyewitness testimony by Patricia Lewis and Kenneth Hayes. On balance, then, we conclude that the trial court's unmodified use of CALJIC No. 2.11.5 did not prejudice defendant.

### 3. *Manslaughter*

■ Defendant complains the trial court erred in refusing to instruct the jury regarding heat of passion manslaughter. A trial court must instruct on a lesser included offense "only if there is substantial evidence to support a jury's determination that the defendant was in fact only guilty of the lesser offense." (*People* v. *Ramos* (1982) 30 Cal.3d 553, 582 [180 Cal.Rptr. 266, 639 P.2d 908], reversed on other grounds *sub nom. California* v. *Ramos* (1983) 463 U.S. 992 [103 S.Ct. 3446, 77 L.Ed.2d 1171].) We agree with the People there was no such evidence here.

Defendant, without citation to the record, argues that Dunn's "sudden shooting following three to five minutes of high-spirited conversation [with the occupants of the van] could be reasonably interpreted to have resulted from a sudden quarrel, which dramatically changed the nature of their preceding conversation and caused [defendant] to act upon heat of passion." Defendant mischaracterizes the record. There was no evidence of "high-spirited conversation," of any "sudden quarrel" or of any "dramatic change" in the nature of Dunn's conversation with the occupants of the van.

Kenneth Hayes gave the only testimony regarding the interaction Jerome Dunn had with occupants of the van before he was killed. Hayes testified he could not hear what Dunn was saying, but that Dunn appeared to be involved in "a friendly-type conversation." In fact, Hayes told an investigating officer that he had not heard any angry words exchanged. We discern no substantial evidence of provocation or heat of passion.

Unlike *People* v. *Wynn* (1968) 257 Cal.App.2d 664, 674 [65 Cal.Rptr. 210], on which defendant relies, the record in this case contains no evidence from which the fact finder could infer a quarrel from "testimony which revealed the victim's curt reply to the defendant." Moreover, in *Wynn*, actual words spoken, heard and testified to formed the basis for a voluntary manslaughter instruction. (*Ibid.*) By contrast, Kenneth Hayes testified only that he observed a conversation taking place; he could not make out any of the words. The court did not err in declining to instruct on heat of passion manslaughter.

### 4. *Cautionary Informant Instructions*

Defendant complains the trial court failed to give appropriate cautionary instructions regarding informant Arthur Cox's testimony. Defendant concedes that, under current law (*People* v. *Turner* (1994) 8 Cal.4th 137, 202 [32 Cal.Rptr.2d 762, 878 P.2d 521]), the trial court had no duty to instruct the jury on the possible unreliability of Cox's testimony, but urges us to reconsider the issue. Defendant refers to section 1127a, subdivision (b), enacted in 1989, *after* his 1986 conviction. Under that statute, however, a cautionary informant instruction is required only "upon the request of a party." (§ 1127a, subd. (b).) Defendant made no such request. Defendant offers no compelling reason for us to revisit this issue, let alone change our established rule. There was no error.

In light of recent high court action, defendant in his reply brief withdraws his contention the trial court committed reversible error in reading CALJIC No. 2.90 (5th ed. 1988 bound vol.), which contains the terms "moral certainty" and "moral evidence." (See, generally, *Victor* v. *Nebraska* (1994) 511 U.S. 1 [114 S.Ct. 1239, 127 L.Ed.2d 583].) Defendant also abandons his claim the trial court prejudicially erred in failing to instruct the jury with CALJIC No. 17.48 (juror's use of notes) immediately prior to deliberation, conceding the jury was so instructed prior to trial.

For the foregoing reasons, we conclude the trial court committed no reversible error when instructing the jury in the guilt phase of defendant's trial.

### K. *Combined Effect of Guilt Phase Errors*

As the preceding analysis reveals, defendant has conclusively demonstrated only a single instance of actual error by the trial court at the guilt phase—i.e., the unmodified use of CALJIC No. 2.11.5. (See pt. II.J.2., *ante.*) As will be recalled, that error did not prejudice defendant. It follows no

cumulative error warranting reversal occurred at the guilt phase of defendant's trial.

### III. PENALTY PHASE ISSUES

Defendant raises a number of claims attacking the judgment as to penalty.

### A. *Failure to Reopen Jury Voir Dire Prior to Penalty Phase*

 After the guilt phase of his trial had concluded, but before the beginning of the penalty phase, defendant moved to reopen voir dire of the jury, pursuant to section 190.4, subdivision (c) (section 190.4(c)). That statute provides "[i]f the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn." The trial court denied defendant's motion, observing "[t]he only ground that you base your opinion on is that they came in with a verdict within an hour and 45 minutes, and I will submit that is probably a product of the strength of the People's case rather than any jury misconduct."

Defendant contends the denial of his motion to reopen voir dire was prejudicial error. He argues that the jury's having deliberated less than two hours after a long trial involving extensive exhibits "constitutes reason enough to justify a voir dire of the jury to determine if good cause exists to impanel a new jury for the penalty phase." Defendant's argument lacks merit. "Voir dire is not to be reopened on speculation that good cause to impanel a new jury may thereby be discovered; rather, a showing of good cause is a prerequisite to reopening." (*People* v. *Fauber* (1992) 2 Cal.4th 792, 846 [9 Cal.Rptr.2d 24, 831 P.2d 249].)

Section 190.4(c) reflects the long-standing legislative preference for a single jury to determine both guilt and penalty. (*People* v. *Fauber, supra,* 2 Cal.4th at p. 845.) Defendant's mere speculation that his jury cut short its deliberations out of prejudice does not establish "good cause" for a departure from that preference. Good cause is established only by facts which " 'appear in the record as a demonstrable reality' " (*People* v. *Gates* (1987) 43 Cal.3d 1168, 1199 [240 Cal.Rptr. 666, 743 P.2d 301]), and defendant cites to none. Thus, no error appears.

### B. *Failure to Excuse Juror Savolt for Inattentiveness*

 Prior to the beginning of penalty phase testimony, defendant moved for removal of Juror Savolt, who served as jury foreman during both the

guilt and penalty phases, on the ground Savolt committed misconduct during the guilt phase. Defense counsel, based on alleged observations of Savolt's "body language," contended Savolt had reached a decision in the case before the matter was submitted to him. Specifically, counsel alleged Savolt "turned away from watching defense witnesses," and "was not paying any attention" to defense witnesses. Instead, Savolt was "facing away, not looking at . . . defense witnesses that were testifying."

In response to defendant's motion, the trial court stated that "during the course of the trial I make it a habit to observe the jury" and "I don't recall seeing anything that would make me feel that he was not listening to the evidence." When defense counsel requested that Savolt be asked if he had listened to the defense, the court denied the request, finding "no objective evidence that he did such a thing . . . other than what you [i.e., defense counsel] say [about] his body language." Ultimately, the court denied defendant's motion to excuse Juror Savolt.

Defendant contends it was reversible error for the trial court not to voir dire Juror Savolt as to whether he had listened to the defense. It is true that "[a] trial court must conduct a sufficient inquiry to determine facts alleged as juror misconduct 'whenever the court is put on notice that good cause to discharge a juror may exist.'" (*People* v. *Davis* (1995) 10 Cal.4th 463, 547 [41 Cal.Rptr.2d 826, 896 P.2d 119], quoting *People* v. *Burgener* (1986) 41 Cal.3d 505, 519 [224 Cal.Rptr. 112, 714 P.2d 1251].) On this record, however, we cannot conclude the trial court was put on notice of good cause to discharge Savolt.

First, defense counsel made inconsistent factual allegations in support of his request that the court voir dire Juror Savolt, thus undermining his claim of misconduct. In the same breath, trial defense counsel alleged *both* that Juror Savolt was "showing his disgust, his disbelief in any defense witnesses" *and* that he "[p]aid absolutely no attention to what the defense was presenting."

Second, the trial court was attentive to the possibility of Savolt's misbehavior. Twice confronted by defense counsel with concerns that Juror Savolt was not listening to defense witnesses, the trial judge stated, "I've seen nothing improper, but I will observe much more closely." At the end of the court session at issue, as defendant acknowledges, the court further stated: "I would like the record to reflect that I have constantly observed juror No. 7 [Savolt]. Through all these witnesses he has been attentive."

Third, even if Juror Savolt did turn his face for some periods of time so that he was not directly observing defense witnesses, this fact would not

alone establish that he was not listening to the witnesses or that he was not paying proper "attention" to their testimony.

In short, defendant merely speculates there might have been jury misconduct. Before a juror may be dismissed for losing, during trial, the ability to render a fair and unbiased verdict, "the juror's inability to perform his functions must appear as a 'demonstrable reality.'" (*People* v. *Van Houten* (1980) 113 Cal.App.3d 280, 288 [170 Cal.Rptr. 189], quoting *People* v. *Collins* (1976) 17 Cal.3d 687, 696 [131 Cal.Rptr. 782, 552 P.2d 742].) The record here does not establish that the trial court was put on notice of good cause to believe that Juror Savolt had prejudged the issues submitted to him. Accordingly, no duty arose on the part of the trial court to conduct an inquiry, let alone to discharge Juror Savolt. (*People* v. *Davis, supra,* 10 Cal.4th at p. 547.)

### C. *Failure to Replace Juror Rogers*

Defendant contends the trial court committed reversible error in failing to replace Juror Rogers with an alternate.

After Juror Rogers indicated to the court clerk that, if the case lasted too much longer, she might not be physically able to continue to serve as a juror, the trial judge asked her to come into the courtroom, with counsel present, but outside the presence of the jury. The court told Rogers that counsel estimated the trial would last about one more week, and asked: "Would one more week or soon thereafter cause you any great problems?" Rogers responded: "I have the faith to keep going," and said that she "felt better after lunch." The court then stated: "At any time that you feel you would have problems, just let me know." Rogers responded, "I appreciate that."

After this colloquy, the trial judge asked defense counsel if they had any questions they would like to ask Juror Rogers; each answered, "No, your honor." Rogers continued to serve on defendant's jury, which began deliberations 10 days later.

Defendant argues the trial court erred in failing to inquire further into the problems Juror Rogers was having and in failing to ask her about possible prejudice or bias she might have with respect to the case. We do not agree.

"[A]n inquiry sufficient to determine the facts is required whenever the court is put on notice that good cause to discharge a juror may exist." (*People* v. *Burgener, supra,* 41 Cal.3d at p. 519.) If a juror upon "good cause shown to the court is found to be unable to perform his duty, or if a juror

requests a discharge and good cause appears therefore, the court may order him to be discharged" and substitute an alternate juror. (§ 1089.) " 'A "good cause" determination in this context is one calling for the exercise of the court's discretion [citations], and if there is any substantial evidence supporting the decision, it will be upheld on appeal. [Citation].' " (*People* v. *Burgener, supra,* 41 Cal.3d at p. 520, quoting *People* v. *Van Houten, supra,* 113 Cal.App.3d at p. 288.)

Juror Rogers's statements to the clerk were sufficient to raise the possibility she was physically unable to continue serving as a juror. (Cf. *People* v. *Burgener, supra,* 41 Cal.3d at p. 520.) Accordingly, it was incumbent upon the trial judge to conduct "an inquiry sufficient to establish whether good cause for her discharge existed." (*Id.* at pp. 520-521.) This the trial judge did. Rogers, in defense counsel's presence, answered questions put to her by the judge. Defense counsel was afforded an express opportunity to ask any additional questions. Rogers indicated she felt able to continue as a juror, and nothing in the record indicates she experienced any further problems, let alone that her ability to function competently as a juror was impaired.

Nor was there ever any suggestion that Juror Rogers was subject to bias or prejudice. Bias in a juror may not be presumed (*People* v. *Collins, supra,* 17 Cal.3d at p. 696), and the trial court here had no basis for further questioning of Rogers on that topic. Before a trial court may excuse a juror for inability to perform the juror's functions, " 'that inability must appear in the record as a demonstrable reality.' " (*Ibid.,* quoting *People* v. *Compton* (1971) 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537].) Accordingly, the trial court did not err in failing to discharge Rogers from the jury.

### D. *The Cakewalk*

 Defendant contends that his federal and state constitutional rights were violated by admission of evidence respecting his participation in an unadjudicated shooting at a July 19, 1980, church carnival (the "Cakewalk"). Defendant and another Bloods gang member shot into the crowd attending the Cakewalk, which included members of a Crips gang. Several people were injured and four people (Karry Island, Mary Nixon, Barbara Nixon and Deontray Turner), including a minister of the church (Barbara Nixon), testified they recognized defendant when the red bandanna he was wearing slipped from his face. Initially, charges respecting the Cakewalk incident were filed against defendant, but they were dismissed and never refiled.

Defendant contends admission of the evidence was erroneous in several respects. First, defendant argues, presentation of an unadjudicated felony

charge as to which the statute of limitations had expired denied him due process and a fair penalty trial and resulted in a death sentence based on unconstitutionally unreliable evidence. As defendant concedes, however, we consistently have rejected the contention that a defendant's statutory or constitutional rights are violated by the consideration, as a factor in aggravation of penalty, of evidence of unadjudicated criminal activity for which prosecution would be time-barred. (See, e.g., *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1244 [14 Cal.Rptr.2d 702, 842 P.2d 1]; *People* v. *Jones* (1991) 53 Cal.3d 1115, 1152 [282 Cal.Rptr. 465, 811 P.2d 757].)

We have long recognized that, as " '[section 190.3, factor] (b) imposes *no* time limitation on the introduction of "violent" crimes; the jury presumably may consider criminal violence which has occurred at any time in the defendant's life.' " (*People* v. *Douglas* (1990) 50 Cal.3d 468, 529 [268 Cal.Rptr. 126, 788 P.2d 640], quoting *People* v. *Balderas* (1985) 41 Cal.3d 144, 202 [222 Cal.Rptr. 184, 711 P.2d 480], original italics.) Defendant asks us to reconsider our holding that "the Eighth Amendment's aim of assuring the reliability of penalty determinations is furthered, not frustrated, by the admission of . . . prior violent criminal activity." (*People* v. *Johnson, supra*, 3 Cal.4th 1183, 1244.) Defendant somewhat opaquely argues that our reasoning in *Johnson* was "circular."

Having considered defendant's arguments and reviewed *Johnson*'s reasoning and rationales, we are not persuaded we should revisit that decision in this case. Accordingly, we reject defendant's contention of error in admission of evidence concerning the Cakewalk incident, even though the statute of limitations had, at the time of trial, expired as to crimes with which defendant was originally charged in connection with that incident.

██ Second, defendant argues, his rights under the state and federal Constitutions were violated because he received inadequate notice that the prosecution would introduce evidence respecting the Cakewalk. We have reviewed the record and conclude defendant received adequate notice. As defendant acknowledges, the prosecution sent a letter to defense counsel dated November 21, 1983, which gave notice that evidence respecting the Cakewalk incident was going to be used in aggravation at the penalty phase. The prosecution's letter specifically stated that "[t]he evidence includes, but is not limited to, five counts of murder and assault with intent to commit murder, which was the subject of Case No. A449580, dismissed 8-4-80 after witnesses failed to appear . . . ." On December 3, 1983, in response to the prosecution's notice letter, defense counsel requested (and later received) certain discovery, including the arrest report on the Cakewalk incident.

Before defendant's trial commenced, on March 10, 1985, the prosecution sent another notice letter to trial defense counsel. The second letter listed the

specific Cakewalk-related counts and enhancements the prosecution intended to present in aggravation. Before the commencement of the penalty phase, defense counsel moved to exclude the prosecution's Cakewalk-related evidence on the ground the arrest report of the Cakewalk incident did not establish substantial evidence of defendant's involvement so as to render the Cakewalk-related evidence relevant and admissible against him. The trial court denied defendant's motion, finding the Cakewalk evidence admissible.

Finally, the trial court gave defense counsel a continuance in order to conduct any interviews of Cakewalk witnesses to be presented by the prosecution; defense counsel interviewed three witnesses (Karry Island, Mary Nixon, and Michael Hardwick). The prosecution presented testimony of Karry Island, Mary Nixon, Michael Hardwick, Thelma Turner, Barbara Nixon and Deontray Turner.

In light of the foregoing, it is apparent defendant received adequate notice the prosecution intended to introduce evidence respecting his participation in the Cakewalk incident as a factor in aggravation of penalty.

Defendant correctly observes section 190.3 provides "no evidence may be presented by the prosecution in aggravation unless notice of the *evidence* to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial." (Italics added.) Defendant argues that, because the notice his counsel received (i.e., the previously described letters and discovery) did not specify which of the individuals mentioned in the Cakewalk police report would be called to testify, what their testimony would be, or what physical evidence would be introduced in conjunction with their testimony, the notice provided was statutorily inadequate. We previously have rejected the identical contention. (See *People* v. *Grant* (1988) 45 Cal.3d 829, 852-854 [248 Cal.Rptr. 444, 755 P.2d 894].)

In *Grant*, defendant contended the prosecution's notice was insufficient under section 190.3 because, while the notice "advised defendant of the particular prior offenses the prosecution planned to prove at the penalty trial" (*People* v. *Grant*, *supra*, 45 Cal.3d at p. 853), it did not state which specific "testimony, writings, material objects, or other things" (Evid. Code, § 140) would be offered. We ruled: "The point is unpersuasive. A challenge to the sufficiency of a notice of aggravating evidence . . . cannot be resolved by a mechanical application of a general definition of the word 'evidence.' " (*People* v. *Grant*, *supra*, 45 Cal.3d at p. 853.) In *Grant*, "the notice given to defendant . . . advised him of the date, place, and charge" of certain prior charges and "the date, place, nature, and victim" of certain "additional criminal acts that the prosecution intended to prove he had

committed. In these circumstances, the notice was adequate to fulfill the statutory purpose . . . ." (*People* v . *Grant, supra,* 45 Cal.3d at pp. 853-854.) Similarly, here there was no error.

■ Third, defendant argues, the trial court denied him due process in refusing to conduct a lineup to test several eyewitnesses' identification of him as a shooter in the Cakewalk incident. Defendant relies on *Evans* v. *Superior Court* (1974) 11 Cal.3d 617 [114 Cal.Rptr. 121, 522 P.2d 681] (*Evans*). In *Evans,* we held that "due process requires in an appropriate case that an accused, upon timely request therefor, be afforded a pretrial lineup in which witnesses to the alleged criminal conduct can participate." (*Id.* at p. 625.) We explained, however, that the right to a lineup arises "only when eyewitness identification is shown to be a material issue and there exists a reasonable likelihood of a mistaken identification which a lineup would tend to resolve." (*Ibid.*)

Defendant argues the trial court abused its discretion in denying his motion for a lineup because the in-court eyewitness identification testimony actually elicited at the penalty phase of his trial was unreliable. Specifically, defendant complains that: (1) approximately five years had elapsed between the Cakewalk incident and the eyewitness testimony to it at the penalty phase of his trial; (2) the eyewitnesses who testified against him had strong motivation to lie, because they were either rival gang members or family members of rival gang members; and (3) the eyewitnesses each testified that, prior to their testimony, they had known or encountered defendant at times and places other than the Cakewalk incident.

There was, here, no "reasonable likelihood of a mistaken identification" such as was discussed in *Evans.* (See *Evans, supra,* 11 Cal.3d at p. 625.) In *Evans,* "[i]t was argued in support of the motion [for a lineup] that because [the defendant] was identified at the scene of the robbery by witnesses . . . who saw only a limited view of [the defendant]'s head and shoulders from the rear, the identification was faulty; [and] that because the witnesses had committed themselves as to the identifications [at the preliminary hearing] they would be reluctant to recede from such a position, even if in error, at later proceedings in court . . . ." (*Evans, supra,* 11 Cal.3d at p. 621.) Neither argument was—or could have been—made in support of defendant's motion. The witnesses who identified defendant as a participant in the Cakewalk incident testified to seeing his face. Moreover, as defendant himself emphasizes, their testimony identifying him at trial was the first these witnesses had given respecting the Cakewalk incident.

Defense counsel, in addition to having the opportunity to cross-examine the prosecution's Cakewalk eyewitnesses, was given, just prior to their

testimony, a continuance to interview them. Counsel did not request any further continuance. As we have previously noted, "[i]nsofar as defendant contends that an in-court identification not preceded by a lineup is impermissibly suggestive and prejudicial as a matter of law, he is wrong." (*People v. Rodrigues, supra,* 8 Cal.4th at p. 1155.)

We emphasized in *Evans* that "the resolution [of a lineup request] must be arrived at after consideration not only of the benefits to be derived by the accused and the reasonableness of his request but also after considering the burden to be imposed on the prosecution, the police, the court and the witnesses." (*Evans, supra,* 11 Cal.3d at p. 625.) Before ruling, the judge at defendant's penalty phase heard argument at some length from defense counsel as well as the prosecution on the relative benefits and burdens of conducting a lineup. Even defense counsel conceded a lineup "might not accomplish much, your honor," though he did "think it would accomplish something."

We noted in *Evans* that "[t]he questions whether eyewitness identification is a material issue and whether fundamental fairness requires a lineup in a particular case are inquiries which necessarily rest for determination within the broad discretion of the magistrate or trial judge." (*Evans, supra,* 11 Cal.3d at p. 625.) In light of the attendant circumstances, we discern no abuse of discretion in the trial court's having denied defendant's motion for a lineup.

Fourth, defendant argues, he was denied due process of law because the allegation that he was involved in the Cakewalk incident was adjudicated by the same jury that had previously convicted him of murder.

As defendant acknowledges, we repeatedly have rejected the claim that due process rights are infringed when the same jury that convicted a capital defendant subsequently determines the truth or falsity of previously unadjudicated aggravating charges. (See, e.g., *People v. Johnson, supra,* 3 Cal.4th at p. 1244; *People v. Balderas, supra,* 41 Cal.3d at pp. 204-205.) Defendant requests we reconsider our original holding in *Balderas* to that effect, but we quite recently declined to do so. (See *People v. Avena* (1996) 13 Cal.4th 394, 427 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) Defendant suggests no basis for our concluding differently in this case.

 Finally, defendant argues, the trial court committed prejudicial error by admitting one Willie Smith's medical records to show that Smith was injured in the Cakewalk shooting. Karry Island testified that Smith was present at the Cakewalk carnival during the shooting. Island also testified

that Smith grabbed Michael Hardwick when Hardwick was shot by defendant and, because Hardwick was unable to run from the shooting, dragged him into the back of a nearby truck for safety. Smith was not able to appear because he was in state prison at the time of defendant's trial. The trial court admitted Smith's medical records into evidence.

Defendant concedes that evidence defendant shot Smith at the Cakewalk would be relevant as a factor in aggravation of penalty. The record contains evidence that defendant discharged a shotgun several times at this crowded neighborhood carnival. (There was also testimony that another individual discharged a shotgun.) Several people were wounded by shotgun pellets. As discussed, there was evidence that Willie Smith was present at the Cakewalk and that he assisted another shooting victim to safety. Plainly, medical records indicating Smith sustained gunshot wounds on the date of a shooting at which he was present and at which several other individuals also present in the crowd were injured, have a "tendency in reason to prove or disprove" (Evid. Code, § 210) that Smith sustained his wounds there and then.

Even assuming, however, that the inference defendant shot Smith at the Cakewalk was so tenuous that Smith's medical records should have been excluded on relevancy grounds, defendant has not shown prejudice. Record evidence shows that a number of children were in the area into which defendant shot, and that at least one child was hit by a shotgun pellet. There was testimony that Karry Island, Stacey Jones and Michael Hardwick all were wounded. Hardwick sustained injuries in the chest, stomach and arm. Shotgun pellets were still lodged in Hardwick's arm at the time of trial. We agree with the People that, under these circumstances, evidence that Smith also was shot at the Cakewalk can hardly be considered prejudicial, even if it was improperly admitted.

In sum, we cannot conclude that admission at the penalty phase of evidence respecting the Cakewalk incident was, in any of the particulars of which defendant complains, prejudicially erroneous.

### E. *The Shank*

Defendant argues his death sentence must be reversed because the trial court erroneously allowed evidence of his conviction for possessing a weapon (specifically, a handmade "shank") while he was in jail, as well as evidence respecting the circumstances surrounding that conviction, to be presented as a factor in aggravation at the penalty phase.

Defendant does not dispute he was convicted of possessing the shank. He argues, rather, that his shank possession was not indicative of violence

because, as he testified, he possessed it for defensive purposes, as he was jailed among rival gang members; hence evidence respecting it should not have been admitted under section 190.3, factor (b), as indicating an "implied threat to use force or violence."

Under section 190.3, factor (b), a penalty phase jury "shall take into account . . . if relevant" the "presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

We do not believe defendant's self-serving testimony about his motives rendered the shank evidence inadmissible. As we observed in *People* v. *Ramirez* (1990) 50 Cal.3d 1158 [270 Cal.Rptr. 286, 791 P.2d 965], a case involving a Youth Authority inmate's possession of a knife, defendant "was free to present any additional evidence of the circumstances of the incident that would be relevant to the jury's assessment of the incident's probative value with respect to defendant's propensity for violence." (*Id.* at p. 1187.) The People correctly observe the jury was not bound to accept defendant's explanation, but could reasonably have concluded he possessed the shank for violent purposes. "[T]hat defendant . . . did not actually use [a weapon he possessed while incarcerated] in a threatening or violent manner when his possession of the weapon was discovered . . . does not mean that he did not engage in criminal conduct involving the implied threat to use force or violence" for the purposes of section 190.3, factor (b). (50 Cal.3d at p. 1186.) In *Ramirez,* we stated that "possession of the type of 'dirk' or 'dagger' involved [in that case] [citation] is prohibited precisely because such an implement is a 'classic instrument[] of violence' [citation] that is 'normally used only for criminal purposes.' [Citation.]" (*Id.* at pp. 1186-1187.) Here, too, the shank defendant possessed would appear to have been a "classic instrument of violence."

Defendant next argues that, under factors (b) and (c) of section 190.3, only the *existence* of his conviction for possessing a weapon while in jail should have been admitted, and not the *circumstances* surrounding that conviction. He argues the facts underlying his conviction cannot, consistent with the statute's plain language, be considered in aggravation, because, unlike some other subdivisions of the statute, factors (b) and (c) refer to the "presence or absence" of the factors they discuss (i.e., "criminal activity" and "any prior felony conviction," respectively), rather than to "the circumstances of" those factors. (Compare § 190.3, factors (b) and (c) with § 190.3, factors (a), (f) and (k).)

Defendant concedes we have previously upheld introduction of similar evidence under section 190.3, factor (b). (See, e.g., *People* v. *Brown* (1988)

46 Cal.3d 432, 449 [250 Cal.Rptr. 604, 758 P.2d 1135] [possession in jail of stolen wirecutters; circumstances of theft admitted].) In fact, we expressly have held that "[w]hen dealing with violent conduct it is not the *fact* of conviction which is probative in the penalty phase, but rather the *conduct* of the defendant which gave rise to the offense." (*People* v. *Gates, supra,* 43 Cal.3d at p. 1203, original italics.) We further noted in *Gates* that [factor] (b) of section 190.3 . . . permits the introduction of *all evidence* of violent crimes and does not require a conviction." (*Ibid.*, italics added, citing *People* v. *Balderas, supra,* 41 Cal.3d at pp. 202-203 [relitigation before penalty phase jury of facts underlying prior violent convictions consistent with due process].)

Defendant asks us to reconsider our previous pronouncements regarding section 190.3, on the ground our holdings conflict with various decisions of the United States Supreme Court concerning the need for heightened reliability in capital sentencing procedures. Defendant acknowledges, however, that the federal courts have not decided the precise issue he raises.

In *People* v. *Balderas* we acknowledged "[a]t least two other jurisdictions have concluded that due process precludes a 'guilt' jury from hearing 'other crimes' evidence at the penalty phase." (*People* v. *Balderas, supra,* 41 Cal.3d at p. 204, citing *State* v. *Bartholemew* (1982) 98 Wn.2d 173 [654 P.2d 1170, 1184], remanded 463 U.S. 1203 [103 S.Ct. 3530, 77 L.Ed.2d 1383], opn. after remand 101 Wn.2d 631 [683 P.2d 1079]; *State* v. *McCormick* (1979) 272 Ind. 272 [397 N.E.2d 276, 279-281].) "However," we declared, "we find nothing in recent United States Supreme Court decisions to support such a conclusion. The court has often declared that states have the broadest possible range in deciding what negative aspects of the defendant's character and background are relevant to the sentencing determination." (41 Cal.3d at pp. 204-205, citing numerous high court decisions.)

In recent years, we have reaffirmed that "[e]vidence of the *facts* of criminal activity, whether or not accompanied by a conviction, is admissible under section 190.3, factor (b), but only if the activity involves force or violence." (*People* v. *Livaditis* (1992) 2 Cal.4th 759, 776 [9 Cal.Rptr.2d 72, 831 P.2d 297].) We have also refused to overrule our decision in *People* v. *Balderas* that admission of such evidence at the penalty phase of a capital trial is consistent with due process and a reliable death judgment. (*Id.* at p. 777; see also *People* v. *Avena, supra,* 13 Cal.4th at p. 427.) Defendant offers no persuasive reason why we should rule differently in his case.

Defendant contends, finally, that the trial court's failure to clarify CALJIC No. 8.84.1, tracking the language of section 190.3, improperly allowed the

jury to consider his weapon-possession conviction under *both* factors (b) and (c) of the statute. Defendant more fully develops this contention in his general argument concerning penalty phase instructional errors. Accordingly, we address defendant's contentions regarding CALJIC No. 8.84.1 *post*, when reviewing that argument.

### F. *The Green Meadow Park Shooting*

■ Defendant argues his state and federal constitutional rights were violated when the jury was permitted to consider evidence of the Green Meadow Park shooting incident. Defendant's argument has several parts.

First, defendant contends he was not given adequate notice that his convictions for the attempted murders of Anthony Debose and Carol Freeman (who were injured in the Green Meadow Park shooting incident) would be presented in aggravation at his penalty trial. Defendant's trial counsel conceded the prosecution on "several different occasions" provided timely oral notice that aggravating evidence relating to defendant's conviction for the murder of Donald Billingsley (who died in the Green Meadow Park shooting incident) would be presented. Defendant also concedes the prosecution provided timely written notice that Arthur Cox would testify about the gang meeting, led by defendant, at which the plan to shoot rival gang members at Green Meadow Park was discussed. Defendant, nonetheless, contends the notice provided was inadequate to apprise his trial counsel that defendant's Green Meadow Park attempted murder convictions also would be presented.

Over defense objection, the trial court held that the notice the prosecution provided satisfied section 190.3 as to evidence respecting defendant's criminal activities at Green Meadow Park, including the attempted murders of Debose and Freeman. The trial court did not err.

"Notice that evidence will be presented regarding a specific prior crime or crimes should alert counsel that evidence of all crimes committed as part of the same course of conduct may be offered, and, therefore, substantially complies with the notice requirement of section 190.3." (*People* v. *Visciotti* (1992) 2 Cal.4th 1, 70 [5 Cal.Rptr.2d 495, 825 P.2d 388], citing *People* v. *Cooper* (1991) 53 Cal.3d 771, 842 [281 Cal.Rptr. 90, 809 P.2d 865].) Defendant concedes he was convicted of the attempted murders of Anthony Debose and Carol Freeman, as well as the murder of Donald Billingsley, in connection with the Green Meadow Park shooting incident. Defendant's attempts to murder Debose and Freeman were " 'crimes [he] committed during a continuous course of criminal activity which includes force or

violence' " (*People* v. *Livaditis, supra,* 2 Cal.4th at p. 776, quoting *People* v. *Cooper, supra,* 53 Cal.3d at p. 841) and, as such, are admissible under section 190.3, factor (b). (2 Cal.4th at pp. 776-777.)

Defendant points out, however, that his trial in this case was conducted before we decided *Cooper, Visciotti,* and *Livaditis.* Defendant was tried during the latter half of 1985 and first month of 1986. Defendant asserts his trial counsel relied on section 190.3 as it had been interpreted at the time of his trial and could not reasonably have anticipated our subsequent interpretation of that statute in *Cooper* and its progeny. We are not persuaded.

Defendant does not point to any previous judicial interpretation of section 190.3—let alone any previous pronouncement by this court—that suggests his trial counsel might reasonably have anticipated the trial court would rule differently than it did on his objection to admission of the attempted murder evidence. Moreover, when we announced our decision in *Cooper,* it was without any suggestion it should have prospective application only. Indeed, without remark, we applied our holding in *Cooper* to the defendant in that case. (See *People* v. *Cooper, supra,* 53 Cal.3d at p. 841.) Similarly, *Cooper* properly may be applied in this case.

We recently reaffirmed our holding in *Cooper.* (See *People* v. *Sanders* (1995) 11 Cal.4th 475, 543 [46 Cal.Rptr.2d 751, 905 P.2d 420].) Defendant requests we reconsider that holding, but provides no persuasive reason why we should. There was no error.

Nor does defendant demonstrate prejudice. Defendant does not contend the prosecution's failure expressly to provide notice, prior to the guilt phase of this trial, of its intention to present evidence of his attempted murder convictions, was one of the "kinds of state interference with counsel's assistance" (*Strickland* v. *Washington, supra,* 466 U.S. at p. 692 [104 S.Ct. at p. 2067], citing *United States* v. *Cronic* (1984) 466 U.S. 648, 659 [104 S.Ct. 2039, 2047, 80 L.Ed.2d 657]) constituting " ' "constitutional error of the first magnitude [such that] no amount of showing of want of prejudice could cure it." ' " (*United States* v. *Cronic, supra,* 466 U.S. at p. 659 [104 S.Ct. at p. 2047].)

A defendant's "failure to request a continuance [to prepare a response to aggravating evidence] generally 'precludes any showing of prejudice attributable to [the] delay' [in receiving notice of it]." (*People* v. *Mayfield* (1997) 14 Cal.4th 668, 799 [60 Cal.Rptr.2d 1, 928 P.2d 485], citing *People* v. *Medina* (1995) 11 Cal.4th 694, 771 [47 Cal.Rptr.2d 165, 906 P.2d 2].) Defendant does not contend he requested a continuance. Rather, defendant

simply asserts that deficiencies in the notice provided prevented his trial counsel from making key decisions about his defense. Defendant suggests it was not possible for his counsel to prepare a coherent overall trial strategy, but identifies no portion of the trial record illustrating the effect the prosecution's omissions assertedly had on his counsel's performance. Indeed, defendant does not state how counsel's trial strategy might have differed had the prosecution's notice come sooner.

In sum, defendant does not demonstrate either that the trial court violated his statutory rights in finding the prosecution's notice respecting aggravating evidence adequate or that, assuming his rights were violated, he was prejudiced thereby. *Sheppard* v. *Rees* (9th Cir. 1989) 909 F.2d 1234, cited by defendant for the proposition that the trial court's ruling deprived him of his constitutional right to effective assistance of counsel, is not apposite.[7] *Sheppard* involved "a pattern of government conduct [that] affirmatively misled the defendant, denying him an effective opportunity to prepare a defense." (*Sheppard* v. *Rees*, *supra*, 909 F.2d at pp. 1236-1237.) Under such circumstances, the United States Court of Appeals for the Ninth Circuit concluded, " ' "[t]he defendant was ambushed" ' " and his Sixth Amendment right to notice violated. (*Id.* at pp. 1236-1237, quoting *Gray* v. *Raines* (9th Cir. 1981) 662 F.2d 569, 575.) Here, by contrast, defendant does not suggest the prosecution affirmatively misled him about its intent to present evidence respecting convictions for attempted murder.

Second, defendant argues the trial court erred in admitting Arthur Cox's testimony that defendant participated in a gang planning meeting prior to the Green Meadow Park shootings. Defendant argues the planning meeting evidence was improperly admitted under section 190.3, factor (b), because the meeting did not "involve[] the use or attempted use of force or violence or the express or implied threat to use force or violence." In support, defendant cites Black's Law Dictionary for the proposition that, in order to constitute a "threat," an activity must involve some communication to the person or persons who are the object of the threat.

We need not decide whether evidence respecting the planning meeting established violence or a threat of violence for the purposes of section 190.3. Arthur Cox's testimony was that he "was there when Barry set the meeting to shoot up Green Meadow Park. There were about nine, ten dudes at the

---

[7]Even were it factually analogous, the Court of Appeal has opined that "*Sheppard* cannot be squared with binding California Supreme Court authority." (*People* v. *Scott* (1991) 229 Cal.App.3d 707, 717 [280 Cal.Rptr. 274], citing *People* v. *Murtishaw* (1981) 29 Cal.3d 733, 751, fn. 11 [175 Cal.Rptr. 738, 631 P.2d 446] [under short form accusatory murder pleading, accused may be convicted of first degree murder on felony-murder theory].)

meeting. There were a lot of guns, too. Barry would do most of the talking and handed out assignments." Defendant concedes the evidence presented constituted the crime of conspiracy. As previously discussed, "all crimes committed during a continuous course of criminal activity which includes force or violence may be considered in aggravation even if some portions thereof, in isolation, may be nonviolent." (*People* v. *Cooper*, *supra*, 53 Cal.3d at p. 841.) Accordingly, evidence respecting defendant's participation in a criminal conspiracy that was part of a continuous course of conduct, including the Billingsley murder, was properly admitted in aggravation of penalty under the statute. There was no error.

Third, defendant argues the trial court's permitting the jury to consider his prior conviction for murdering Donald Billingsley both as a factor in aggravation of penalty and for the purpose of establishing the special circumstance making him death eligible constituted inappropriate multiple use of that prior conviction, in violation of the Eighth and Fourteenth Amendments. Defendant concedes we have rejected similar claims (see, e.g., *People* v. *Montiel* (1993) 5 Cal.4th 877, 943 [21 Cal.Rptr.2d 705, 855 P.2d 1277]), but asks that we reconsider the issue. Defendant offers neither evidence nor argument compelling such a reexamination.

Finally, defendant argues the trial court erred in allowing the penalty jury to consider, as aggravating evidence, not only his conviction for murdering Donald Billingsley, but the facts underlying that conviction as well. Defendant concedes we have upheld the introduction of similar evidence in previous cases. (See, e.g., *People* v. *Alcala* (1992) 4 Cal.4th 742 [15 Cal.Rptr.2d 432, 842 P.2d 1192].)

Moreover, we have specifically rejected defendant's contention that relitigation at the penalty phase of a capital trial of the facts underlying a defendant's prior felony conviction denies him equal protection or conflicts with our observation in *People* v. *Guerrero* (1988) 44 Cal.3d 343, 348-355 [243 Cal.Rptr. 688, 748 P.2d 1150] that in considering sentence enhancement in a noncapital case, the prosecution is effectively barred from relitigating the facts behind the record of a prior offense. In *People* v. *Johnson*, we observed that sentence enhancement statutes focus on a defendant's criminal history, while section 190.3 focuses on the defendant's conduct. (*People* v. *Johnson*, *supra*, 3 Cal.4th at p. 1242.) "Capital defendants," we concluded, "are thus situated differently from defendants subject to sentence enhancements, and no equal protection violation occurs when they are treated differently." (*Id.* at pp. 1242-1243.) We agree with the People that defendant has not provided any convincing reason why we should readdress this issue. There was no error.

In sum, defendant fails to demonstrate that either his statutory or constitutional rights were violated when the jury was permitted to consider, as evidence in aggravation at the penalty phase of his trial, testimony respecting the Green Meadow Park shooting incident.

### G. *Witness Intimidation Evidence*

Defendant next contends the trial court prejudicially violated both his state statutory and federal constitutional rights by permitting the jury to consider as a factor in aggravation evidence that he engaged in witness intimidation. Specifically, defendant argues that Kenneth Simmons's guilt phase testimony (about Mark Williams's statements to him respecting the shooting of Patricia Lewis's home) was insufficient as a matter of law to support a finding that defendant engaged in witness intimidation. Therefore, defendant concludes, the trial court erred in permitting his penalty jury to consider witness intimidation as an aggravating factor.

As previously discussed (see pt. II.C.2, *ante*), evidence that defendant engaged in witness intimidation was adduced at the guilt phase. At the penalty phase, the judge instructed the jury on witness intimidation and the prosecutor argued that defendant had directed the shooting of Patricia Lewis's house. Defendant acknowledges that Kenneth Simmons's testimony—reporting Mark Williams's statements—would, if true, tend to establish that defendant directed the shooting of Lewis's house. Defendant maintains, however, that because Mark Williams was an accomplice, and Williams's statements to Simmons were uncorroborated, the trial court's instructing the jury to consider witness intimidation as an aggravating factor violated section 1111.

Section 1111 provides, in pertinent part, that "[a] conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." Having examined the record in light of section 1111's elements, we conclude defendant's statutory rights were not violated.

Defendant correctly points out that one of Mark Williams's statements (that he and others had gone "to take care of some business" for "Barry"), construed as referring to the shooting of Lewis's home, also identifies Williams as an accomplice to that criminal activity. Indeed, the People concede Williams was an accomplice to the shooting of Patricia Lewis's house. Moreover, the People do not dispute that section 1111 governs proof,

at the penalty phase, of prior crimes in aggravation. (*People* v. *Williams* (1988) 45 Cal.3d 1268, 1321 [248 Cal.Rptr. 834, 756 P.2d 221].) Nevertheless, it is not clear that section 1111 applies to Mark Williams's out-of-court statements.

Williams's statements, it will be recalled, were admitted pursuant to the prior inconsistent statement exception to the hearsay rule. In *People* v. *Belton* (1979) 23 Cal.3d 516 [153 Cal.Rptr. 195, 591 P.2d 485], we held that, consistent with legislative intent, the prior inconsistent statements of an accomplice *may* constitute "testimony" as the term is used in section 1111. (23 Cal.3d at p. 526.) Thereafter, we held, in a capital case, that a particular "[accomplice]'s extrajudicial statement was not 'testimony' within the meaning of section 1111 and therefore did not require corroboration." (*People* v. *Sully*, *supra*, 53 Cal.3d at p. 1230.) In so holding, we noted "[t]he usual problem with accomplice testimony—that it is consciously self-interested and calculated—is not present in an out-of-court statement that is itself sufficiently reliable to be allowed in evidence." (*Ibid.*)

*People* v. *Sully* involved an accomplice's out-of-court "excited utterance" to the effect that the defendant there had smashed a victim's face with a sledgehammer. We held that the utterance, testified to by another accomplice, was not only admissible, but did not require corroboration under section 1111 because "spontaneous and excited utterances have sufficient indicia of reliability to be admitted in evidence without violating a defendant's right to confront the witnesses against him." (*People* v. *Sully*, *supra*, 53 Cal.3d at p. 1229; see also *People* v. *Jeffery* (1995) 37 Cal.App.4th 209, 218 [43 Cal.Rptr.2d 526] [statements to undercover officer made in course of methamphetamine sales and without knowledge of officer's status not "testimony" within meaning of section 1111].)

The Court of Appeal, in *People* v. *Jeffery*, *supra*, 37 Cal.App.4th 209, has reconciled *Belton* and *Sully* thus: "From *Belton*, we conclude that 'testimony' within the meaning of . . . section 1111 includes all oral statements made by an accomplice or coconspirator under oath in a court proceeding *and* all out-of-court statements of accomplices and coconspirators used as substantive evidence of guilt which are made under suspect circumstances. The most obvious suspect circumstances occur when the accomplice has been arrested or is questioned by the police." (*People* v. *Jeffery*, *supra*, 37 Cal.App.4th at p. 218, original italics.) "On the other hand, when the out-of-court statements are not given under suspect circumstances, those statements do not qualify as 'testimony' and hence need not be corroborated under . . . section 1111." (*Ibid.*, citing *People* v. *Sully*, *supra*, 53 Cal.3d at p. 1230.)

The circumstances surrounding Mark Williams's statements to Kenneth Simmons are more analogous to those surrounding the statements we allowed without corroboration in *Sully*, than to those surrounding the statements we required to be corroborated in *Belton*. Williams was neither incarcerated nor detained when he spoke to Simmons. Rather, Williams made his statements to a fellow drug user, while they were ingesting drugs together. The record discloses no substantial motive for Williams then to dissemble. Accordingly, we conclude Williams's statements were "not given under suspect circumstances, [and, therefore] those statements do not qualify as 'testimony' and hence need not be corroborated under . . . section 1111." (*People* v. *Jeffery, supra*, 37 Cal.App.4th at p. 218, citing *People* v. *Sully, supra*, 53 Cal.3d at p. 1230.)

Even assuming, arguendo, that section 1111 properly applies to Mark Williams's statements, the trial court did not violate the statute. Defendant is simply mistaken in asserting that Williams's statements were uncorroborated. Williams's statements were corroborated by Arthur Cox. As previously noted, Cox testified that defendant told Cox he was "going to get some witnesses shot" in order to "beat this case." Defendant, Cox testified, "said he was going to get Curtis [Thomas] to shoot one of the witnesses . . . ." Cox further testified the witness defendant referred to was Patricia Lewis.

Corroborative evidence sufficient to satisfy section 1111 need not corroborate every fact to which the accomplice testified or establish the corpus delicti, but is sufficient if it tends to connect the defendant with the crime in such a way as to satisfy a fact finder the accomplice is telling the truth. (*People* v. *Fauber, supra*, 2 Cal.4th at p. 834.) "Corroborative evidence may be slight and entitled to little consideration when standing alone." (*Id.* at p. 835.) Measured by these standards, Arthur Cox's testimony was sufficient to corroborate Mark Williams's statements testified to by Kenneth Simmons.

Defendant reiterates his observation (previously discussed, in connection with defendant's guilt phase arguments) that Cox's testimony was to a statement of future intention by defendant, not to an admission by defendant that he had engaged in witness intimidation. But, as previously discussed, "[f]rom the declared intent to do a particular thing an inference that the thing was done may fairly be drawn." (*People* v. *Alcalde, supra*, 24 Cal.2d at p. 185.) Therefore, defendant's statement to Cox that he was "going to" have witnesses or a witness shot constitutes evidence from which the jury could infer that defendant authorized the shooting that actually occurred.

Defendant also suggests that any corroboration by Arthur Cox was not sufficient for the purposes of section 1111, because Cox, himself, "was

certainly an accomplice as a matter of law to the Green Meadow aggravating evidence, and possibly an accomplice as to the Dunn shooting and the Lewis shooting." Defendant's suggestion is insupportable.

First, that Cox may or may not have been defendant's accomplice in the Green Meadow Park shooting (in connection with which defendant, in a *different* trial, was convicted of murdering Donald Billingsley) is statutorily irrelevant to the question whether Cox's testimony, at *this* trial (for the murder of Jerome Dunn), regarding defendant's engaging in intimidation of a witness (Patricia Lewis) at *this* trial, requires corroboration. "An accomplice [for the purposes of section 1111] is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)

Second, there is no evidence Arthur Cox was defendant's accomplice in the killing of Jerome Dunn or the intimidation of Patricia Lewis. Cryptically, defendant suggests "Cox's status as possible accomplice to the Dunn shooting comes from Cox's testimony about the identity of the people in the van at the time that Jerome Dunn was killed." Defendant's references provide no support whatsoever for the notion Cox might be liable for prosecution in this case. Defendant asserts, without citation to the record, that "at the time Cox communicated the statements allegedly made to him by [defendant], Cox was a suspect in one of the homicides for which [defendant] was charged." The record indicates that Cox was, at one time, a suspect in the Green Meadow Park incident, based generally on his membership in the 89th Street Family Bloods gang. As just mentioned, Cox's liability, if any, to prosecution in *that* case is statutorily irrelevant to his status, in *this* case, as an accomplice in the killing of Jerome Dunn or the intimidation of Patricia Lewis.

The burden is on defendant to prove by a preponderance of the evidence that Arthur Cox is an accomplice whose testimony requires corroboration. (*People* v. *Fauber*, *supra*, 2 Cal.4th at p. 834, citing *People* v. *Tewksbury* (1976) 15 Cal.3d 953, 960 [127 Cal.Rptr. 135, 544 P.2d 1335].) In order for Cox to have been an accomplice as a matter of law (for purposes of defendant's claim he was convicted on uncorroborated accomplice testimony), the record must establish either that Cox aided and abetted defendant in committing the killing or that Cox was involved in a conspiracy with the intent to commit the offense that was the object of the conspiracy. (*People* v. *Garceau*, *supra*, 6 Cal.4th at p. 183.) Defendant has cited to no record evidence indicating that Arthur Cox participated in (or aided and abetted) the murder of Jerome Dunn or the intimidation of Patricia Lewis, or that he conspired to do either.

In sum, the trial court did not violate defendant's state statutory rights in permitting the jury to consider witness intimidation as an aggravating factor

because, even assuming section 1111 properly applies to Mark Williams's out-of-court statements, Arthur Cox's testimony satisfied the statutory corroboration requirement.

Defendant also argues that permitting his penalty phase jury to consider witness intimidation as an aggravating factor violated his right to a fair and reliable determination of the proper penalty. Defendant correctly points out that the jury may consider evidence of other crimes in aggravation only when commission of the other crimes has been proved beyond a reasonable doubt. (*People* v. *Mitcham* (1992) 1 Cal.4th 1027, 1075 [5 Cal.Rptr.2d 230, 824 P.2d 1277].) Citing *In re Miguel L.* (1982) 32 Cal.3d 100, 108 [185 Cal.Rptr. 120, 649 P.2d 703], defendant argues his penalty jury could not lawfully have found beyond a reasonable doubt that he engaged in witness intimidation based on the uncorroborated out-of-court statement of Mark Williams, whom defendant characterizes as an accomplice.

Defendant's argument is rather cursorily presented; his citation, however, suggests its legal premise may have evaporated, at least partly, since defendant filed his opening brief. Our decision in *In re Miguel L.*, *supra*, 32 Cal.3d 100 (that an accomplice's extrajudicial statements were insufficient to prove the defendant there committed a certain burglary), cited by defendant, was based on the rule of *People* v. *Gould* (1960) 54 Cal.2d 621 [7 Cal.Rptr. 273, 354 P.2d 865] that "[a]n extrajudicial identification that cannot be confirmed by an identification at the trial is insufficient to sustain a conviction in the absence of other evidence tending to connect the defendant with the crime." (*Id.* at p. 631.) ▇▇ We recently overruled *Gould* and its corroboration requirement, holding that the sufficiency of an out-of-court identification to support a conviction is henceforth to be judged by the substantial evidence test. (*People* v. *Cuevas* (1995) 12 Cal.4th 252, 274-275 [48 Cal.Rptr.2d 135, 906 P.2d 1290].)

Moreover, as already discussed, the factual premise of defendant's argument is mistaken; Mark Williams's statements were corroborated by other record evidence, specifically, that given by Arthur Cox and Patricia Lewis. Thus, whether or not *Cuevas* undermined *Miguel L.*, defendant has failed to demonstrate the trial court erred in permitting the penalty jury to consider witness intimidation evidence in aggravation.

As there was no error, we need not consider defendant's arguments respecting prejudice. In any event, defendant bases those arguments primarily on the trial court's failure to instruct the jury either with the corroboration requirement of section 1111 or to regard accomplice testimony with distrust. We address these asserted instructional omissions, *post*, in connection with defendant's comprehensive attack on the penalty phase jury instructions.

## H. *Evidence of Gang Membership*

Defendant next argues his judgment of death must be reversed because the trial court admitted evidence of his gang membership at the penalty phase of his trial. Over defendant's objection, the prosecution was permitted to introduce gang paraphernalia seized from his bedroom, including a poster, a book and a photo album. As revealed in the prosecutor's cross-examination of defendant, the seized gang paraphernalia contained gang names and symbols, including the names "Mr. Loco," "Baby Slaughter" and "Mr. Butcher." Defendant contends admission of the gang paraphernalia was erroneous in several respects.

First, defendant asserts admission of the gang paraphernalia was erroneous because it was irrelevant. Defendant argues, as did defense counsel, that "the mere existence of old gang paraphernalia does not indicate present membership in a gang." The People point out that defendant testified at the penalty phase he had ceased being a gang member in May 1980 and argue that gang paraphernalia seized from his bedroom in August 1981 is relevant to impeach defendant's testimony, tending to prove his gang membership continued past that date.

The trial court agreed with the prosecution, as do we. Relevant evidence is that "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code, § 210.) That defendant testified he had terminated his gang membership in May 1980 made evidence to the contrary relevant, if only as "rebuttal to the defense penalty evidence." (See *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1103, fn. 30 [259 Cal.Rptr. 630, 774 P.2d 659].)

Defendant concedes evidence indicating his gang membership continued after May 1980 would be relevant. Defendant insists, however, that the gang paraphernalia seized in his bedroom in August 1981, does *not* tend to prove his gang membership continued after May 1980. Recent precedent (as well, we think, as common sense) is to the contrary.

In *People* v. *Champion, supra,* 9 Cal.4th at page 921, a police officer testified that defendants in that case admitted gang membership some years prior to the murders at issue, and that they continued to associate with other admitted gang members until the time of the murders. We held that the jury, based on such testimony, reasonably could have concluded defendants were still gang members at the time of the murders. (*Ibid.*) Accordingly, we upheld the trial court's admission of gang membership evidence. (*Id.* at p. 922.) In so doing, we specifically observed that the prosecution's failure to

demonstrate defendants were still gang members when the killings occurred "goes to the weight, not the admissibility" of the evidence of past gang membership. (*Id.* at p. 921.)

Similarly, here: In view of the evidence of defendant's past gang membership, defendant's testimony that he terminated membership in May 1980 goes to the weight, not the admissibility, of the gang paraphernalia seized from his bedroom in August 1981. There was no error.

Second, citing Evidence Code section 352, defendant contends admission of the gang paraphernalia was erroneous because its prejudicial effect outweighed its probative value. The claim of error was not preserved. The record reveals defendant objected to admission of the gang paraphernalia solely on relevance grounds. Thus, defendant waived any section 352 objection and cannot raise it on appeal. (Evid. Code, § 353; *People* v. *Garceau, supra,* 6 Cal.4th at p. 179.) Although defendant cites *People* v. *Frank, supra,* 38 Cal.3d at page 729, footnote 3, for the proposition there was no waiver of that ground under our rules as they existed at the time of trial, we previously have shown defendant's reliance on *Frank* lacks merit.

In any event, there was no error; admission of the gang paraphernalia did not violate Evidence Code section 352. As discussed, the gang paraphernalia was probative of defendant's gang membership after May 1980. It is true, as we have observed, that, "[b]ecause evidence that a criminal defendant is a member of a juvenile gang may have a 'highly inflammatory impact' on the jury [citation], trial courts should carefully scrutinize the evidence before admitting it." (*People* v. *Champion, supra,* 9 Cal.4th at p. 922, quoting *People* v. *Cox, supra,* 53 Cal.3d at p. 660.) Here, the record reflects the trial court adequately scrutinized the gang paraphernalia evidence before admitting it.

Last, defendant contends that admission of the gang paraphernalia implicated certain of his federal constitutional rights, specifically, his right to due process of law, his Eight Amendment right to a fair and reliable sentence, and his associational rights under the First and Fourteenth Amendments. Defendant, however, waived these constitutional objections to admission of gang paraphernalia evidence by failing to raise them at trial. (Evid. Code, § 353; *People* v. *Garceau, supra,* 6 Cal.4th at p. 179.) Moreover, defendant's due process and Eighth Amendment arguments are perfunctorily raised without argument in support and, for that reason as well, need not further be addressed. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 985, fn. 15.)

In sum, admission of gang paraphernalia at the penalty phase of defendant's trial did not infringe his federal constitutional rights. Thus, on none of

the grounds defendant advances could his trial counsel have raised a valid objection to admission of the disputed gang paraphernalia. Accordingly, we reject defendant's suggestion his trial counsel was ineffective for failing to object.

## I. *Mistrial Motion After Alleged Prosecutorial Misconduct*

 Defendant argues the trial court erred in denying his motion for a mistrial made after the prosecutor, when cross-examining defense psychologist Margaret Bennett, referred to certain facts not in evidence—namely, that a probation report mentioned a confrontation defendant may have had with a probation officer respecting defendant's possession of a knife while in jail. We review a trial court's denial of a motion for mistrial for abuse of discretion. (*People* v. *Marshall* (1996) 13 Cal.4th 799, 839 [55 Cal.Rptr.2d 347, 919 P.2d 1280].)

Specifically, the prosecutor asked Dr. Bennett: "Given the fact that when he [i.e., defendant] was confronted by a probation officer at the time that—after he pled guilty to the possession of the knife in the county jail—." At that point, the court interrupted the prosecutor, stating, "[c]ounsel, that's not in evidence."

Defense counsel moved for a mistrial, correctly noting the court previously had admonished the district attorney not to question Dr. Bennett about "any matters other than what ha[d] been proved" at trial. Trial counsel complained that "the impression now before the jury is that there's another charge pending that has not been put in evidence . . . ."

The trial court denied the mistrial motion, but admonished the prosecutor, thus: "I will tell you this, Mr. [prosecutor], that I specifically stopped you from referring to that probation report in any manner—." The court went further: "I think it is misconduct and contemptuous." When the prosecutor protested, the court added: "I'm not going to let you refer to this probation report in any way. It is hearsay and improper and you know it." Cross-examination of Dr. Bennett then resumed, focusing on other topics.

Defendant contends the trial court erred in not granting his mistrial motion because the prosecutor, in deliberately referring to the probation report in contravention of the trial court's ruling, committed egregious misconduct. The People take the position there was no misconduct, arguing the trial court should have permitted the prosecutor to ask psychologist Bennett whether she considered the probation report in formulating her opinion and whether her opinion would be different in light of defendant's "denial" to the

probation officer that he possessed a knife in county jail. Because the prosecutor *should* have been permitted to ask these questions, the People appear to reason, he cannot have committed misconduct in asking them. The People's argument is flawed.

To begin with, the trial court did not prevent the prosecutor from asking Bennett whether she had considered the probation report. In fact, the prosecutor asked Bennett what sources of background information she had used in preparing her report on defendant; Bennett responded she had relied primarily on interviews with and testing of defendant. She did not mention the probation report. Moreover, the prosecutor was permitted to cross-examine defendant, himself, as to whether he told a probation officer that he had not possessed a knife in jail.

The only limitation the court placed on cross-examination of Dr. Bennett—that it be restricted to "matters that have been introduced into evidence in this case"—was clearly appropriate. ■■■ "A party attacking the credibility of the expert may bring to the jury's attention material that is relevant to the issue of which the expert was unaware [citation], but that party may not by its questions testify regarding the content of that material." (*People* v. *Visciotti, supra*, 2 Cal.4th at p. 81.)

■■■ The prosecution's cross-examination of Dr. Bennett was improper, therefore, insofar as it revealed to defendant's penalty jury contents of the probation report previously ruled inadmissible. If the prosecutor had merely been trying to show that Dr. Bennett had not read all relevant background materials, he could easily have asked about the probation report without revealing its contents. (Cf. *People* v. *Bell* (1989) 49 Cal.3d 502, 532 [262 Cal.Rptr. 1, 778 P.2d 129].) Too, as defendant correctly notes, the fact Dr. Bennett was not permitted to answer the prosecutor's question does not automatically mitigate the impropriety of its having been asked. ■■■ The question itself may place inadmissible hearsay before the jury. (*People* v. *Wagner* (1975) 13 Cal.3d 612, 619 [119 Cal.Rptr. 457, 532 P.2d 105].)

■■■ Pointing to the trial court's harsh rebuke of the prosecutor, defendant avers the prosecutor must have known his reference to the "confrontation" noted in the probation report was improper, and that he intentionally violated the court's prior ruling on the topic. Examining the record, it is difficult to disagree. Nevertheless, despite the prosecutor's apparent misbehavior, we cannot conclude there was reversible misconduct.

■■■ "What is crucial to a claim of prosecutorial misconduct is not the good faith *vel non* of the prosecutor, but the potential injury to the defendant." (*People* v. *Benson* (1990) 52 Cal.3d 754, 793 [276 Cal.Rptr. 827, 802

P.2d 330].) "When [a prosecutorial misconduct] claim focuses on comments made by the prosecutor before the jury, a court must determine at the threshold how the remarks would, or could, have been understood by a reasonable juror. [Citations.] If the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable." (*Ibid.,* citing *People* v. *Warren* (1988) 45 Cal.3d 471, 487 [247 Cal.Rptr. 172, 754 P.2d 218].) ▮▮▮ We conclude the prosecutor's remark about a "confrontation" defendant had with a probation officer could not reasonably have been understood by the jury as conveying significantly damaging information about defendant.

Contrary to defendant's assertion, the prosecutor's question did *not* contain an unequivocal statement that defendant had another, unrevealed, charge against him. The jury was already aware of defendant's knife possession and his guilty plea respecting it. Nor can we agree with defendant that the question invited the jury to speculate about the existence of other violent behavior by defendant, for the simple reason that the fact defendant was "confronted" does not imply he behaved violently. Finally, based upon a plain reading of the transcript, we disagree with defendant that the prosecutor's mention of a confrontation between defendant and a probation officer "put . . . possible uncharged crimes before the jury."

In short, we do not think there is a reasonable likelihood that the jury would have understood the prosecutor's question as the defendant claims. Accordingly, as "the remarks would have been taken by a juror to state or imply nothing harmful, they obviously cannot be deemed objectionable" (*People* v. *Benson, supra,* 52 Cal.3d at p. 793) so as to support a claim of prosecutorial misconduct. We conclude the trial court was within its discretion in denying defendant's motion for a mistrial.

## J. *Prosecutor's Penalty Phase Argument*

▮▮▮ Defendant next argues reversal of his death sentence is required because the prosecutor committed prejudicial misconduct in his argument to the jury at the penalty phase of the trial. Specifically, defendant argues the prosecutor wrongfully and repeatedly urged the jury to sentence defendant to death on the basis of an alleged lack of remorse, inappropriately appealed to the fears of the community in urging a verdict of death, wrongly implied in his argument that only evidence relating to the crime itself could be mitigating and improperly vouched for a government witness.[8]

Defendant's arguments respecting prosecutorial misconduct rely primarily on mischaracterizations of the prosecutor's comments.

---

[8]Defendant also argues in his opening brief that the prosecutor improperly urged the jury to consider defendant's age as an aggravating factor, but concedes, in his reply brief, that the

First, defendant contends the prosecutor wrongfully and repeatedly urged the jury to sentence defendant to death because he lacked remorse. Defendant argues the prosecution "in essence" urged the jury to penalize defendant for failing to take the stand and confess his guilt.

In fact, the prosecution did not specifically argue lack of remorse as a factor in aggravation of penalty. The record reveals no prosecutorial reference linking "remorse" (or its lack) and "aggravation."[9] Having reviewed the relevant portions of the record, we agree with the People that the specific prosecutorial statements cited by defendant ("Where is the remorse?"—"Did you see any remorse?"—"[H]ave you seen the remorse?") were simply comment on the absence of remorse as a mitigating factor, such as we repeatedly have held proper. (See, e.g., *People* v. *Sims* (1993) 5 Cal.4th 405, 464-465 [20 Cal.Rptr.2d 537, 853 P.2d 992].) In *People* v. *Sims* we considered prosecutorial remarks similar to those defendant complains of here, observing that, "[a]lthough a defendant's lack of remorse may not be considered by the jury as a factor in aggravation, defendant's prosecutor did not describe the absence of remorse as an aggravating factor." (*People* v. *Sims*, *supra*, 5 Cal.4th at p. 465.) We found no misconduct. (*Ibid.*)

In any event, defendant did not object at trial to the prosecutor's arguments respecting defendant's lack of remorse. Accordingly, defendant is deemed to have waived his right to raise on appeal any misconduct claim based on those arguments. (*People* v. *Sims*, *supra*, 5 Cal.4th at p. 465.)

■ Defendant suggests he adequately preserved a prosecutorial misconduct claim by objecting "in the context of a motion for new trial." We are not persuaded. The primary purpose of the requirement that a defendant object at trial to argument constituting prosecutorial misconduct is to give the trial court an opportunity, through admonition of the jury, to correct any error and mitigate any prejudice. (See *People* v. *Mitcham*, *supra*, 1 Cal.4th at pp. 1050-1051.) Obviously, that purpose can be served only if defendant is required to, and does, raise any objection before the jury retires. Defendant offers no authority for his implied suggestion that subsequent arguments in a motion for new trial may substitute for a timely objection.

■ Second, defendant contends the prosecutor wrongly appealed to the fears of the community in urging a verdict of death. Specifically, defendant complains of the prosecutor's arguing: "How many nights do

---

high court's recent decision in *Tuilaepa* v. *California* (1994) 512 U.S. 967 [114 S.Ct. 2630, 129 L.Ed.2d 750] resolves this issue against him.

[9]Indeed, defendant does not contend the prosecutor actually *stated* to the jury that they should consider defendant's lack of remorse as an aggravating factor, only that he "invited" them to do so.

children go to parks in South Central Los Angeles, talk and gather in Torrance, Redondo Beach, Hermosa Beach. Throughout the city. At those times that they go to that park, do they expect to die? Well, death came on June 16, 1981, and it came in the persona of the defendant. A jury much like yourself found that to be a fact." Defendant argues that these remarks encouraged the jurors to view defendant, not as an individual accused of a particular crime, but as the embodiment of all of their fears for their children's safety.

Any misconduct claim was waived. We have repeatedly held "that failure to object and request an admonition waives a misconduct claim on appeal unless an objection would have been futile or an admonition ineffective." (*People* v. *Arias, supra,* 13 Cal.4th at p. 159.) Defendant does not dispute that his trial counsel failed either to object, or to request an admonition, when the prosecutor made his remarks.

Defendant, citing *People* v. *Price, supra,* 1 Cal.4th at page 440, insists the prosecutor's argument respecting children visiting parks at night was so emotional and inflammatory that an objection would have been ineffective; thus, his failure to object may not be deemed a waiver of the present claim. We discern no aspect or quality of the cited remarks that must have called forth from defendant's jury an emotional response impervious to a timely, curative admonition. Defendant fails to demonstrate the contrary; accordingly, we agree with the People that any misconduct claim must be deemed waived. (Cf. *People* v. *Sanchez* (1995) 12 Cal.4th 1, 66 [47 Cal.Rptr.2d 843, 906 P.2d 1129].)[10]

Even had defendant preserved the right to advance on appeal a misconduct claim based on the prosecutor's remarks about children visiting parks at night, we are not persuaded such a claim would have merit. Defendant compares the prosecutor's comments to those a dissenting Eleventh Circuit justice, writing in a habeas corpus matter, thought so "inflammatory" as to "suggest that they were intended to appeal to the jury's generalized fear of violence." (*Brooks* v. *Kemp* (11th Cir. 1985) 762 F.2d 1383, 1430 (dis. opn. of Johnson, J.), remanded 478 U.S. 1016 [106 S.Ct. 3325, 92 L.Ed.2d 732].) In *Brooks,* the prosecutor argued: " 'It was Mrs. Galloway's daughter this time, Bobby Murray's girl friend; whose girl friend or daughter will it be next time . . . ?' " (762 F.2d at p. 1430.) The majority of the court, however, found the prosecutor's comments to be "appropriate inferences

---

[10]Once again citing *People* v. *Frank, supra,* 38 Cal.3d at page 729, footnote 3, defendant implies we should disregard any "technical insufficiencies" in his objections to the prosecutor's remarks concerning children visiting parks at night. Defendant is mistaken, for reasons previously discussed.

from the record." (762 F.2d at pp. 1429, 1430.) We view similarly the remarks made by defendant's prosecutor.

Even if the prosecutor's remarks about children visiting parks at night were improper appeals to juror emotions, and even if defendant had not waived any misconduct claim based on them, we could not conclude they prejudiced defendant. "[I]n *People* v. *Fields* (1983) 35 Cal.3d 329, 361 [197 Cal.Rptr. 803, 673 P.2d 680], . . . we found . . . no prejudice, when the prosecutor unmistakably appealed to the sympathy of the jury, asking them to ' "think of yourself as [the victim]." ' " (*People* v. *Sanders, supra,* 11 Cal.4th at p. 527.) In *People* v. *Sanders* we held, "even if the prosecutor's brief and relatively bland references to 'victims, their loved ones' and 'survivors' constituted misconduct, it was . . . not prejudicial." (*Ibid.*) Similarly, here, defendant fails to demonstrate the prosecutor's single reference to children visiting parks "throughout the city" prejudiced his penalty jury.

Third, defendant contends the prosecutor wrongly implied that only evidence relating to the crime itself could be mitigating. He cites the following words: "Do you really believe things have been brought forward to you during the defense case that takes any severity away from the murder of Don Billingsley? Takes anything away from your verdict on Jerome Dunn? Takes anything away from what happened in 1980 from the shooting of Patricia Lewis' house in 1983? And he grasps at straws in the hopes to tangle one of your hearts for sympathy." We agree with the People that the prosecutor's argument does not imply any improper limitation on what evidence the jury could consider as mitigating. Rather, the gist of the prosecutor's remarks was that, while mitigating evidence was in fact presented for the jury's consideration, it should not persuade them. There was no misconduct.

In any event, defendant fails to demonstrate prejudice. The jury was instructed to consider anything related to defendant's background or character offered by the defense in mitigation of penalty, and we presume they followed their instructions.

Finally, defendant contends the prosecutor improperly "vouched" for prosecution witness Arthur Cox, who testified, among other things, about defendant's involvement in the Green Meadow Park shooting. Defendant claims, specifically, that improper "vouching" occurred when the prosecutor stated that Cox had "cut a deal" with the prosecution, agreeing to testify "truthfully and honestly" in return for being allowed to plead guilty to robbery on certain charges pending against him.

Defendant failed to object to the prosecutor's remarks, and thereby waived his objection on appeal. (*People* v. *Fierro* (1991) 1 Cal.4th 173, 211 [3

Cal.Rptr.2d 426, 821 P.2d 1302].) Moreover, even assuming the claim was preserved, we discern no error.

"Impermissible 'vouching' may occur where the prosecutor places the prestige of the government behind a witness through personal assurances of the witness's veracity or suggests that information not presented to the jury supports the witness's testimony." (*People v. Fierro, supra,* 1 Cal.4th at p. 211.) The People acknowledge it is improper for a prosecutor to argue that he has a superior knowledge of sources unavailable to the jury (*People v. Bolton* (1979) 23 Cal.3d 208, 212-213 [152 Cal.Rptr. 141, 589 P.2d 396]), but deny the prosecutor stated or implied any such thing.

There was no error in the prosecutor's faithfully recounting the nature of the prosecution's agreement with Cox as an aid to the jury's evaluation of his credibility. "Prosecutorial assurances, *based on the record*, regarding the apparent honesty or reliability of prosecution witnesses, cannot be characterized as improper 'vouching,' which usually involves an attempt to bolster a witness by reference to facts *outside* the record." (*People v. Medina, supra,* 11 Cal.4th at p. 757, original italics.) No impermissible "vouching" occurs where "the prosecutor properly relie[s] on facts of record and the inferences reasonably drawn therefrom, rather than any purported personal knowledge or belief." (*Ibid.,* citing *People v. Anderson* (1990) 52 Cal.3d 453, 479 [276 Cal.Rptr. 356, 801 P.2d 1107] and *People v. Stansbury* (1993) 4 Cal.4th 1017, 1059 [17 Cal.Rptr.2d 174, 846 P.2d 756].)

In light of the preceding, we conclude defendant has failed to demonstrate a valid misconduct claim based upon the prosecutor's remarks respecting either defendant's lack of remorse, his age, children visiting parks at night or Arthur Cox's "deal."

### K. *Effectiveness of Counsel at Penalty Phase*

Defendant next contends that, in violation of the Sixth Amendment, he received ineffective assistance of counsel at the penalty phase of his trial. Specifically, defendant contends his counsel: (1) failed to prepare for and defend against the prosecution's aggravating evidence respecting the Cakewalk shooting; (2) failed in the same manner respecting the Green Meadow Park shooting; (3) failed to object to cumulative and unduly prejudicial photographic evidence; (4) failed to prepare mitigation witnesses; and (5) delivered an inadequate closing argument. In order to prevail on a claim of ineffective assistance, defendant must show deficient performance under a standard of professional reasonableness, and prejudice under a test of reasonable probability. (*Strickland v. Washington, supra,* 466 U.S. at pp.

687-688 [104 S.Ct. at pp. 2064-2065]; *People* v. *Sanchez, supra,* 12 Cal.4th at pp. 57-58.)

First, defendant argues his trial counsel was ineffective for failing adequately to prepare for and defend against the prosecution's aggravating evidence respecting defendant's participation in the Cakewalk shooting incident. As defendant acknowledges, counsel moved to exclude the testimony of several witnesses on the ground the prosecution had given insufficient notice of its intention to present the testimony. In support of the motion, defense counsel noted that the prosecution had provided only the police reports related to the Cakewalk incident, and had not specifically identified which potential witnesses mentioned in the reports would actually be called. The court denied the defense motion and admitted the evidence.

Defendant suggests his trial counsel erroneously believed the prosecution would rely solely on the police reports as aggravating evidence and would not present actual witnesses to the Cakewalk incident at the penalty phase. According to defendant, his counsel did not understand that the police reports had been provided only as *notice* of the names of potential penalty phase witnesses, and that the prosecution would present actual testimony at the penalty phase. Moreover, defendant suggests, defense counsel relied on the insupportable expectation that the police reports would be excluded as containing only hearsay and because there had been no previous probable cause determination respecting the Cakewalk incident. Consequently, defendant argues, his trial counsel neither mounted an independent investigation of the Cakewalk incident, nor prepared to cross-examine the prosecution's penalty phase witnesses regarding it.

The record does not support defendant's suggestions.

In arguing for his motion to exclude, defense counsel complained that the prosecution "doesn't give us the statement of any of the people who are going to testify, and the mere statement that he is going to bring them in is not a statement . . . that is sufficient to bring these charges which are obviously so serious before the penalty phase of a jury." Counsel also stated: "We always asked the People to give us the witnesses they intended to use. They refused. They always said it is in the police reports. There are hundreds of names in the police reports." It is apparent from the foregoing that defense counsel anticipated the prosecution would present witnesses to the Cakewalk incident.

Defendant also argues that no reasonably competent counsel would have believed the prosecution's evidence respecting the Cakewalk incident to be

inadmissible as a matter of law. Defendant cites *In re Wilson* (1992) 3 Cal.4th 945, 955-956 [13 Cal.Rptr.2d 269, 838 P.2d 1222] for the proposition that counsel's failure to prepare a defense as a result of ignorance or misunderstanding of our clear precedent, rather than because of an informed tactical decision, constitutes representation falling below the standard of competence demanded of criminal defense attorneys.

The People suggest that our decision in *People* v. *Phillips* (1985) 41 Cal.3d 29 [222 Cal.Rptr. 127, 711 P.2d 423], decided in the weeks immediately preceding counsel's argument, lent itself to defense counsel's honest but incorrect interpretation that evidence respecting the Cakewalk incident would not be admitted in aggravation because no preliminary hearing had been held prior to dismissal of the charges originally filed against defendant in connection with that incident. The record suggests counsel may have had *Phillips* in mind when arguing for exclusion of the Cakewalk evidence. In *Phillips,* we stated that "in many cases it may be advisable for the trial court to conduct a preliminary inquiry before the penalty phase to determine whether there is substantial evidence to prove each element of the other criminal activity. This determination . . . can be routinely made based on the pretrial notice by the prosecution of the evidence it intends to introduce in aggravation . . . ." (*People* v. *Phillips, supra,* 41 Cal.3d at p. 72, fn. 25.)

In light of this language, the People suggest defense counsel took a tenable, if incorrect, position, when moving to exclude evidence respecting the Cakewalk incident on the ground no previous "substantial evidence" determination had been made. We agree with defendant that, by its terms, the *Phillips* footnote would have supported, at most, the trial court's having required the prosecution preliminarily to demonstrate that substantial evidence established each element of any crimes comprised by the Cakewalk evidence, but would not have supported the court's excluding the evidence altogether. Trial counsel's invocation of *Phillips,* however, was not beyond the bounds of reason. In attempting to fit the facts of his case within arguably applicable dictum from this court, counsel did not evince "ignorance or misunderstanding of the holding of clearly applicable precedent" (*In re Wilson, supra,* 3 Cal.4th at p. 955). Therefore, trial counsel was not incompetent insofar as he may have harbored some reasonable hope of succeeding on his exclusion motion.

Defendant argues, further, however, that competent counsel would not have relied on the anticipated success of a motion to exclude the Cakewalk evidence without also preparing for the opposite consequence, even if the law appeared to support the exclusion.

For purposes of argument, we assume without deciding that defense counsel, having received the police report on the Cakewalk incident approximately two years previously, exhibited less than reasonable competence in

failing to interview in advance of trial persons named therein as potential witnesses. (Cf. *In re Jones* (1996) 13 Cal.4th 552, 567 [54 Cal.Rptr.2d 52, 917 P.2d 1175] ["reasonably competent defense counsel, having been placed on notice that a witness in a capital case had contacted the police prior to commission of the charged offense, offering information that was pertinent to the special circumstance ultimately charged against the defendant, would have attempted to locate such a witness"].) Nevertheless, defendant was not prejudiced. For one thing, the Cakewalk incident was not the only prior criminal activity offered in aggravation. As defendant acknowledges, the jury also was permitted to consider aggravating evidence respecting the shooting incident at Green Meadow Park in Los Angeles, in connection with which defendant was convicted of attempted murder and murder.

Moreover, defendant concedes, the trial court granted defense counsel an opportunity to interview the Cakewalk incident witnesses whom the prosecution planned to call. The trial court also gave defense counsel an opportunity to request additional interview time. Defendant points to nothing in the record suggesting that counsel's decision not to request a continuance for additional time to interview the prosecution's witnesses was other than tactical. Under similar circumstances, we recently observed "[c]ounsel may have had tactical reasons for not seeking a delay of trial; indeed, counsel may not have needed additional time to prepare for trial. Moreover, in light of the additional aggravating evidence properly presented by the People, it is not reasonably probable that any omissions regarding notice were prejudicial." (*People* v. *Medina*, *supra*, 11 Cal.4th at p. 772.)

As evidence he was prejudiced by counsel's failure to conduct pretrial interviews of the Cakewalk witnesses, defendant suggests counsel's cross-examination of these witnesses was "cursory" and not "successful." Defendant fails to demonstrate his trial counsel's cross-examination was deficient under constitutional standards. As the People point out, Karry Island, Thelma Turner, Mary Nixon, Barbara Nixon, Michael Hardwick and Deontray Turner were all cross-examined by defense counsel, and numerous inconsistencies and other deficiencies in their testimony were thereby revealed. "As to whether certain witnesses should have been more rigorously cross-examined, such matters are normally left to counsel's discretion and rarely implicate inadequacy of representation." (*People* v. *Cox*, *supra*, 53 Cal.3d at p. 662.)

 Second, defendant argues his trial counsel was ineffective for failing sufficiently to defend against the prosecution's aggravating evidence respecting the Green Meadow Park shooting, in connection with which defendant was convicted of murdering Donald Billingsley. Defendant complains counsel failed to cross-examine all of the prosecution's witnesses,

inadequately cross-examined others and presented no alibi or defense witnesses. He also complains counsel made two remarks in closing argument that prejudiced him: first, that counsel was "confused" by the prosecution's evidence respecting the Billingsley murder; and, second, that defendant "has admitted killing Don Billingsley."

We agree with the People that defense counsel's truncated response to the prosecution's evidence respecting the Green Meadow Park shooting appears the result of an unsurprising tactical decision not to relitigate, and thereby emphasize for the jury, murder charges that defendant had litigated and lost before a previous jury. Counsel in the present case had represented defendant at the previous trial as well, and thus assuredly was familiar with weaknesses in the defense evidence respecting events at Green Meadow Park. Although counsel did not cross-examine all of the prosecution's witnesses to the Green Meadow Park shooting, counsel did, as defendant concedes, cross-examine the investigating officer about a knife found under the victim's body. He also cross-examined a witness who had testified to seeing a car drive away from the shooting about a mistaken identification the witness had previously made. Moreover, trial counsel interposed meritorious objections to other witnesses' testimony about the shooting. Again, we normally leave to counsel's discretion the decision of how rigorously to cross-examine particular witnesses. (*People* v. *Cox, supra,* 53 Cal.3d at p. 662.)

Defense counsel may indeed have misspoken when, in explaining the abbreviated defense response to the prosecution's evidence, he stated, "Mr. Williams has admitted killing Don Billingsley, murder of the first degree." As noted, defendant had not, in so many words, admitted "killing Billingsley." He *had* admitted, however, that he had "previously been *convicted* of murder of Donald Billingsley," that "that murder was murder in the first degree" and the date of the conviction. Counsel's failure, in a brief remark of this sort, to maintain the distinction could not, with any reasonable probability, have prejudiced the outcome of defendant's penalty trial.

Counsel's remark that he was "willing to admit that [he] was confused by all the detail and all the witnesses and the other evidence that the D.A. introduced on the Billingsley murder" would appear to have been calculated to suggest to the jury that this evidence was, indeed, "confusing," and, therefore, not to be greatly credited. The suggestion would be consistent with an overall tactical decision to deemphasize that evidence by declining to litigate extensively against it.

Thus, defendant fails to demonstrate his trial counsel was ineffective either for presenting a truncated defense to the prosecution's aggravating

evidence respecting the Green Meadow Park shooting or for his closing remarks about that evidence.

■ Third, defendant argues his counsel was ineffective for failing to object to certain photographic evidence. Specifically, defendant complains that counsel failed to object, on the grounds either of undue prejudice or cumulativeness, when the prosecution, in the course of examining investigating Officer Tom Lange, introduced into evidence eight photographs of the Green Meadow Park crime scene. The photographs showed the location of the victim's body in relation to the victim's location when shot and, from several angles, a trail of blood.

Defendant contends his counsel should have objected to the crime scene photographs on Evidence Code section 352 grounds because they were "gruesome," especially in conjunction with Officer Lange's repeated references to the "trail of blood" they showed. The People suggest blood, by itself, is not necessarily gruesome and point out that the photos didn't actually show wounds or bodies. The record does not affirmatively disclose that counsel acted from ignorance or mistake in failing to object to the photos, and there are plausible reasons why competent counsel might not oppose their admission. (Cf. *People* v. *Turner* (1990) 50 Cal.3d 668, 706 [268 Cal.Rptr. 706, 789 P.2d 887] [failure to object to admission of videotape depicting crime scene and victim's body and related autopsy photos of wounds, not ineffective assistance].) As discussed, defense counsel's overall strategy with respect to the Green Meadow Park shooting may well have been, by protesting little, to deemphasize it.

Defendant also argues counsel should have objected on the ground that photographs of the blood trail were cumulative of Officer Lange's testimony. That the photos "may have been somewhat cumulative is not determinative: '[w]e repeatedly have rejected the argument photographs of a murder victim should be excluded as cumulative if the photographs are offered to prove facts established by testimony.'" (*People* v. *Lucas*, *supra*, 12 Cal.4th at p. 450.)

■ Fourth, defendant argues his trial counsel was ineffective for failing adequately to prepare the mitigation witnesses. According to defendant, each mitigation witness gave similar damaging answers to certain questions, compelling the conclusion that counsel inadequately prepared them.

Defendant complains, specifically, of testimony by his aunt, Lena Bridges (who cared for defendant after he was abandoned by his mother) that "if [Barry]'s not guilty, I don't feel that he deserves to be put to death."

According to defendant, Bridges's answer "essentially" meant that she believed if he was guilty he deserved to be put to death. Defendant also complains that counsel, by asking Bridges whether she had ever felt her children should not associate with defendant, opened the door for her to be cross-examined about her children's gang affiliations, despite the topic's prejudicial effect. Finally, defendant complains that Reverend Thomas, Margaret Smith and Reverend Prothro, each called as a mitigation witness, apparently had not been told in advance about defendant's two murder convictions. Defendant argues that, had they been told, they might have better prepared for cross-examination on that topic.

Defendant exaggerates the negativity contained in the mitigation witnesses' testimony. Lena Bridges, as noted, did *not* testify she thought defendant should be sentenced to death. Reverend Thomas did *not* testify to a negative view of defendant's character upon learning of defendant's convictions; he testified, rather, that such knowledge did not change his opinion. Similarly, Reverend Prothro did not *unequivocally* testify that he would have had a negative opinion of defendant had he known of defendant's convictions. Reverend Prothro was only asked if his opinion would be "different." In response, he said: "I don't think so, not—unless I knew for a fact, you know."

That the mitigation witnesses' answers on cross-examination were not entirely favorable, moreover, does not establish counsel's ineffectiveness. For one thing, no amount of preparation can make human witnesses impervious to effective cross-examination. As defendant concedes, negative portions of Lena Bridges's testimony *might* have been a witness's unfortunate spontaneous response rather than a consequence of poor preparation by trial counsel. Moreover, counsel must sometimes take a calculated risk that a witness will say something damaging on cross-examination in order to obtain that witness's favorable testimony on direct. "[O]n this record we cannot ascertain that counsel knew or did not know what [Bridges, Thomas, Smith and Prothro] might say on the witness stand. Under these circumstances, it cannot be said that there could be no satisfactory explanation for any tactic counsel might have chosen." (*People* v. *Osband*, *supra*, 13 Cal.4th at p. 701 [claim of ineffective witness preparation].) Defendant himself points out that each mitigation witness testified positively about defendant's character—specifically, that he was obedient and respectful. Counsel might have had the tactical aim of suggesting to the jury that defendant, being obedient and respectful, was a good candidate for successfully serving out a prison sentence. Even assuming trial counsel did not fully prepare every witness, the record does not suggest that any witness's assessment of defendant's character (in light of his convictions) would have been different had that witness been earlier informed about the convictions.

 Finally, defendant argues his trial counsel presented an inadequate and prejudicial closing argument. Specifically, defendant claims that counsel, in closing, made several remarks that were inconsistent with the duty to provide zealous representation.

First, contrasting defendant's insistence that "he didn't do it" (i.e., the Cakewalk shooting), counsel mentioned, in passing, that "Barry Williams admitted the two murders [i.e., the Billingsley and Dunn murders] . . . ." As discussed, defendant's actual admissions were to *convictions*, not, in so many words, to actual "guilt." Nevertheless, "[i]t is within the permissible range of tactics for defense counsel to candidly recognize the weaknesses in the defense in the closing argument." (*People* v. *Jones, supra*, 53 Cal.3d at p. 1150.) We cannot conclude defendant, with any reasonable probability, was prejudiced by his counsel's technical inaccuracy when tactically conceding this point.

Defendant suggests the remark that defendant "admitted the two murders" suggested to the jury that defendant had, at some other time, confessed to defense counsel. That seems unlikely. Rather, considered within the context of the entire argument, the jury is more likely to have understood defense counsel's phrase "admitted the two murders" as shorthand for defendant's actual concession. In fact, in the same portion of his penalty argument respecting "the Billingsley murder," defense counsel correctly stated, "Mr. Williams admitted he was convicted of first degree murder on that case."

Defendant also suggests that trial counsel's phrasing suggested to the jury that defendant had "lied both to [defense] psychologist [Margaret Bennett] and [to the jury] on the stand." We do not agree. For one thing, the jury could not validly have concluded that defendant lied to *them* regarding the two murders, even if they understood counsel's remark as defendant suggests they may have understood it. Defendant did not testify at the guilt phase; at the penalty phase, as defendant acknowledges, he did not testify at all about the two murders.

Psychologist Bennett testified she had told the prosecutor, in a hallway conversation prior to taking the stand, that defendant had denied participation in the two murders when she interviewed him. Even assuming the jury interpreted counsel's misstatement of defendant's admission to conflict with Bennett's testimony, however, we do not think there is a reasonable probability the jury would have reached a different penalty determination had counsel's remark been accurately stated. In short, counsel's misstatements do not amount to ineffective assistance.

 Second, defendant argues that counsel conceded, in closing argument, that defendant was guilty of the Cakewalk shooting, which concession

conflicted with defendant's own assertion of innocence. Defendant cites *People* v. *Moore* (1988) 201 Cal.App.3d 51, 57 [248 Cal.Rptr. 31], wherein the Court of Appeal noted "[r]eversals for ineffective assistance of counsel during closing argument rarely occur; when they do, it is due to an argument against the client which concedes guilt, withdraws a crucial defense, or relies on an illegal defense." Defendant mischaracterizes counsel's argument. The portion of the record defendant relies on reveals that his counsel argued only that, *assuming* defendant actually did the Cakewalk shooting, he ought not to be held 100 percent responsible for subsequent offenses he committed during the period of time he would likely have been incarcerated therefor, had the authorities properly tried and convicted him. In fact, counsel emphasized the conditional nature of this portion of his argument, repeating three times the words, "[l]et's assume. . . ." In hindsight, the argument may appear weak (if not a bit bizarre), but it certainly falls short of conceding defendant's guilt of the Cakewalk shooting. Counsel's having made the argument does not amount to ineffective assistance.

 Third, defendant argues his trial counsel was ineffective for arguing that "whatever happened that was bad to Barry Williams happened as a result of his gang association." Defendant points out that he had testified he possessed, as protection against rival gang members, a homemade weapon while he was incarcerated in county jail, thereby suggesting to the jury, defendant argues, that gangs and gang activity exist in prison. Coupled with this suggestion, defendant argues, counsel's statement that gang associations caused bad things to happen with defendant, gave the jury a reason for sentencing him to death, rather than sending him to prison.

We disagree. A juror might believe defendant felt he needed protection from hostile gang members in jail without necessarily concluding defendant would form new gang associations if sent to prison. Defense counsel logically could argue that gangs were to blame for defendant's past criminality without necessarily implying that defendant would inevitably become involved with similar criminal gang activity in prison. Counsel was not ineffective for arguing that gangs were responsible for defendant's going astray.

 Fourth, defendant argues his trial counsel made the "devastating" admission that he did not see any good qualities in his own client when he asked the jury rhetorically: "Don't you think there must be some qualities in Barry that I don't see or I am sure you can't see with the short association that I had or you've had[?]" The question neither carries the "admission" defendant sees in it, nor was likely to have had much negative impact on the

jury—even if it could be so interpreted. Counsel, in asking this rhetorical question, evidently sought to suggest only that the jury should not presume it had heard every possible good fact about defendant. Defendant demonstrates neither incompetence nor prejudice.

Defendant also asserts that "[t]he ineptness of defense counsel was demonstrated again in his mistaken presentation of the facts about the shooting of Mrs. Lewis' house." Defendant neither elaborates nor provides record references or citation to authority, thus failing properly to raise a claim. (*People* v. *Ashmus, supra,* 54 Cal.3d at p. 985, fn. 15.)

■ Defendant also points out that counsel misstated certain facts surrounding the murder conviction of Charles Manson. Addressing the prosecutor's rhetorical question whether the jury could "think of anything more heinous or a more horrible crime" than defendant's, counsel listed several possible examples, including that of Manson. Counsel stated: "Manson when he was convicted, we didn't have a death penalty in those days so he got straight life . . . ." Defendant complains this was incorrect, insofar as Manson did receive the death penalty, but it was commuted to a life sentence following our 1972 decision in *People* v. *Anderson* (1972) 6 Cal.3d 628 [100 Cal.Rptr. 152, 493 P.2d 880]. Defendant argues counsel's misstatements respecting the Manson sentence gave the jurors reason to "take advantage of having a death penalty." We are not persuaded.

Counsel carefully noted for the jury that the law under which Charles Manson was sentenced "doesn't exist anymore. The statute under which Mr. Williams was convicted with special circumstances says it is life without the possibility of parole. So that the Manson situation, as far as parole is concerned, does not exist with Mr. Williams." As defendant acknowledges, counsel used the Manson example (with others) to argue that defendant's crimes did not deserve the death penalty—which should be reserved for crimes of the extreme seriousness of Charles Manson's. Defendant asserts that counsel could have argued "more successfully" had he known the correct facts concerning Manson's penalty. Perhaps so, but such speculation does not establish that defendant received ineffective assistance.

In sum, while defendant has identified some imperfections in defense counsel's penalty phase argument, these do not, either individually or collectively, constitute ineffective assistance of counsel.

## L. *Penalty Phase Instructions*

Defendant next argues that seven types of penalty phase instructional error violated his rights under the California Constitution and the Sixth, Eighth,

and Fourteenth Amendments of the United States Constitution, requiring reversal of the death sentence.

### 1. *Failure to Define "aggravating" and "mitigating"*

 First, defendant argues the trial court erred in not instructing the jury with definitions of "aggravating" and "mitigating," despite the defense's having proffered an instruction including both. We repeatedly have held that "aggravating" and "mitigating" are commonly understood terms that need not be defined for the jury. (See, e.g., *People* v. *Kirkpatrick* (1994) 7 Cal.4th 988, 1018 [30 Cal.Rptr.2d 818, 874 P.2d 248].) There was no error.

Defendant suggests the jury must have been confused about the meaning of "aggravating" and "mitigating" because the prosecutor, in closing, referred to "anything that extenuates [defendant's crime]" and the court itself closely conjoined the phrases "aggravating and mitigating circumstances" and "the balance between good and bad." Defendant argues the prosecutor's language must have suggested to the jury it could consider in mitigation only evidence that extenuated a charged offense, and the court's language must have left it believing that mitigating evidence included only evidence of "good" or positive aspects of defendant's life.

Contrary to defendant's speculations, the jury gave no indication it was confused about the meaning either of "aggravating" or "mitigating." Consequently, he fails to persuade us to depart from our settled rule.

### 2. *Vague and Irrelevant Factors*

 Second, defendant argues the trial court instructed the jury to consider vague and irrelevant factors in selecting his penalty. This part of defendant's argument has several subparts.

#### a. *Vague aggravating factors*

Defendant complains the aggravating factors listed in section 190.3 are unconstitutionally vague. Recent decisions of both the United States Supreme Court and this court indicate the contrary. Indeed, defendant concedes the high court recently rejected a vagueness challenge to section 190.3, factors (a) (circumstances of the crime and existence of any special circumstance), (b) (presence or absence of criminal activity involving force or threat) and (i) (age of defendant at the time of the offense). (See *Tuilaepa* v. *California, supra,* 512 U.S. 967.) Defendant suggests, however, that section 190.3, factors (d) (extreme mental or emotional disturbance), (g) (duress or

domination), (k) (any other extenuating circumstance or aspect of defendant's character), (e) (victim participation or consent) and (f) (reasonable belief in moral justification or extenuation), not at issue in *Tuilaepa*, lack the " 'common-sense core of meaning . . . that criminal juries should be capable of understanding' " (*Tuilaepa* v. *California, supra*, 512 U.S. at p. 975 [114 S.Ct. at p. 2632], quoting *Jurek* v. *Texas* (1976) 428 U.S. 262, 279 [96 S.Ct. 2950, 2959, 49 L.Ed.2d 929]), which the high court in *Tuilaepa* indicated it continues to require. We do not agree.

We recently considered whether "by its vagueness, section 190.3 and the instructions based on that section violate the Eighth Amendment's requirement of guided discretion in determining sentence in a capital case." (*People* v. *Mayfield* (1993) 5 Cal.4th 142, 193 [19 Cal.Rptr.2d 836, 852 P.2d 331].) The defendant in *Mayfield* challenged, as unconstitutionally vague, section 190.3, factors (a), (b), (d) and (i). We held that no prejudice "could have resulted from any error in relying on section 190.3 and reading the challenged instructions." (*People* v. *Mayfield, supra*, 5 Cal.4th at p. 194.) In so holding, we noted that the defendant "points to no evidence, argument or instruction possibly giving rise to the [jury's] consideration in aggravation of an impermissible matter." (*Ibid.*)

Similarly here, the record does not suggest that the penalty jury considered impermissible matter in aggravation or failed to consider appropriate matter in mitigation. Accordingly, as we held in *Mayfield* under analogous circumstances, defendant fails to demonstrate prejudice.

b. *Failure to delete inapplicable factors*

Defendant complains the trial court failed to delete from former CALJIC No. 8.84.1 the sentencing factors not applicable to his case and failed to label the applicable factors specifically as *either* aggravating *or* mitigating. These were not errors.

As defendant concedes, we have repeatedly rejected the claim that failure to delete inapplicable factors is error. (See, e.g., *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].) Defendant asks us to reconsider the point in light of *Tuilaepa* v. *California, supra*, 512 U.S. 967, but *Tuilaepa*, it will be recalled, *upheld* against Eighth Amendment challenge several specific sentencing factors derived from section 190.3, without calling into question any of the others. *Tuilaepa* provides no grounds for departing from our established rule so as to require deletion of inapplicable factors.

Similarly, our previous pronouncements establish that the trial court's failure to label the statutory sentencing factors as *either* aggravating *or*

mitigating was not error. (See, e.g., *People* v. *McPeters* (1992) 2 Cal.4th 1148, 1192 [9 Cal.Rptr.2d 834, 832 P.2d 146]; *People* v. *Duncan* (1991) 53 Cal.3d 955, 979 [281 Cal.Rptr. 273, 810 P.2d 131].) Moreover, the United States Supreme Court recently rejected this precise contention in *Tuilaepa* v. *California, supra*, 512 U.S. 967, concluding that defendant's labeling argument "is foreclosed by our cases." (*Id.* at p. 979 [114 S.Ct. at p. 2638].) "A capital sentencer," the high court stated, "need not be instructed how to weigh any particular fact in the capital sentencing decision." (*Ibid.*)

### c. *Failure to instruct on absence of mitigation*

Finally, defendant suggests the trial court erred in not explaining to the jury that mere absence of mitigating evidence is not aggravation. (*People* v. *Davenport* (1985) 41 Cal.3d 247, 288-290 [221 Cal.Rptr. 794, 710 P.2d 861].) Defendant acknowledges a sua sponte instruction to that effect is "not required, at least not unless the court or parties make an improper contrary suggestion." (*People* v. *Livaditis, supra*, 2 Cal.4th at p. 784.) Defendant contends, however, that the prosecutor here implied in penalty phase argument that the jury should regard the absence of evidence satisfying certain sentencing factors as aggravation.

Specifically, defendant objects to five statements the prosecutor made in closing argument about the evidence relating to section 190.3's sentencing factors:

(1) "Whether or not its absence [i.e., the absence of duress or domination as described in factor (g)] places it into that category, one less reason to explain what happened."

(2) "Here we don't have any accomplices being shot [such as factor (e) might encompass]. We have totally innocent, unaware unarmed citizens."

(3) "At what point in time does age cease to be a mitigator and become an aggravating circumstance as the person's conduct becomes more and more and more and more violent?"

(4) "The only explanation if it's not emotional disturbance [under factor (d)] is that he is a cold, calculated, premeditated murderer."

(5) "Was it [i.e., factor (h) (capacity to appreciate criminality impaired by mental disease or defect or intoxication)] there or not? If it was there . . . you could possibly understand why a person would open fire on a group of 60 or 70 people . . ."

As defendant correctly points out, in *People* v. *Davenport, supra,* 41 Cal.3d at page 290, we condemned as having a form "improper under section 190.3," the prosecutor's argument that "[t]he lack of evidence that appellant acted under the influence of an extreme mental or emotional disturbance ([factor] (d)), or acted in submission to the will of another person ([factor] (g)), or that his capacity to appreciate the criminality of his act or conform his conduct to the law was impaired by alcohol ([factor] (h)) all demonstrated that appellant acted calmly, deliberately and of his own free will . . . ." (*Id.* at p. 278.)

It seems plain the first three of the prosecutor's listed statements do not share the form we condemned in *Davenport,* i.e., they do not logically imply that mere absence of mitigating evidence is aggravating. The first two statements seem merely to emphasize the lack of mitigating evidence under section 190.3, factors (g) and (e). ▆▆▆ The third is consistent with our previous pronouncement that whether a defendant's age at the time of the offense is either aggravating or mitigating is "up to the jury to decide" (*People* v. *Edwards* (1991) 54 Cal.3d 787, 844 [1 Cal.Rptr.2d 696, 819 P.2d 436]), and the high court's recent observation, in upholding that statutory factor, that "[b]oth the prosecution and the defense may present valid arguments as to the significance of the defendant's age in a particular case." (*Tuilaepa* v. *California, supra,* 512 U.S. at p. 977 [114 S.Ct. at p. 2637].)

▆▆▆ Defendant does not claim the prosecutor affirmatively argued to the jury that mere absence of mitigation constituted aggravation, only that he implied as much. It is true that the fourth and, to a lesser extent, the fifth, of the prosecutor's listed statements are somewhat similar in form to those we condemned in *Davenport* as "likely to confuse the jury as to the meaning of 'aggravation' and 'mitigation' under the statute" (*People* v. *Davenport, supra,* 41 Cal.3d at p. 290). We do not discern, however, "an improper . . . suggestion [that absence of mitigation is aggravating]" such as we have suggested may give rise to the need for a corrective instruction. (See *People* v. *Livaditis, supra,* 2 Cal.4th at pp. 784-785.)

In any event, any claim of error based on the prosecutor's listed remarks was, apparently, waived. Although trial counsel objected on relevancy grounds to the inclusion of section 190.3, factor (h), like counsel in *People* v. *Montiel, supra,* 5 Cal.4th 877, "he did not challenge [what he now asserts was] the prosecutor's improper attempt to convert 'absence of mitigation' into 'aggravation.' Hence, a direct claim of *Davenport* error is barred." (*People* v. *Montiel, supra,* 5 Cal.4th at p. 937.)

Even assuming the prosecutor's misleading remarks were sufficiently misleading to oblige the court sua sponte to instruct defendant's penalty jury

the mere absence of mitigating evidence is not aggravating, we cannot conclude defendant was prejudiced. The jury was instructed to consider only those sentencing factors it deemed "applicable." It was told it could consider sympathy and any sympathetic aspect of defendant's background or history. The jury was also instructed on the importance of each juror's "individual consideration" and "judgment" regarding penalty. Finally, the jury was instructed it had the right to sentence defendant to life imprisonment without the possibility of parole "if any mitigating factor or circumstance persuades you that death is not the appropriate penalty for the defendant in this case." Thus, despite any erroneous implications of the prosecutor's statements, the jury was made aware of its broad sentencing discretion and likely did not assign substantial aggravating weight to the mere absence of mitigating evidence with respect to any listed sentencing factor. There is no reasonable likelihood that the prosecutor's statements misled the jury to defendant's prejudice. (Cf. *People* v. *Montiel, supra,* 5 Cal.4th at pp. 937-938; *People* v. *Clark* (1992) 3 Cal.4th 41, 169 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

### 3. *Instruction That Factors Could Be Aggravating or Mitigating*

 Third, defendant argues the trial court erred in stating to the jury, after instructing them as to the factors they should consider in determining the appropriate punishment, that "[t]he factors which I have just listed for you may be considered by you as either aggravating or mitigating factors." Defendant argues that, to the contrary, only section 190.3, factors (a), (b), (c) and (i) may be considered in aggravation, and the court's statement allowing the jury to consider the other listed factors in aggravation, as well, violated his due process and Eighth Amendment rights.

In *Zant* v. *Stephens* (1983) 462 U.S. 862, 885 [103 S.Ct. 2733, 2747, 77 L.Ed.2d 235] (*Zant*) the high court stated that, when a trial court instructs a capital sentencing jury in the words of a state statute that "attach[es] the 'aggravating' label to . . . conduct that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness . . . due process of law would require that the jury's decision to impose death be set aside." Defendant contends the trial court's having expressly permitted his penalty jury to consider all of the sentencing factors listed in former CALJIC No. 8.84.1 as "either aggravating or mitigating" contravenes the high court's pronouncement in *Zant.*

The People take the position the instruction was not erroneous, citing *Tuilaepa* v. *California, supra,* 512 U.S. 967, for the proposition that all of the listed sentencing factors were properly considered as either aggravating or mitigating. In *Tuilaepa,* the People point out, the high court held there is "no

constitutional deficiency in factor (i) [(age of defendant at the time of the crime)]," after construing the factor to mean that "[b]oth the prosecution and the defense may present valid arguments as to the significance of the defendant's age in a particular case." (*Tuilaepa* v. *California, supra*, 512 U.S. at p. 977 [114 S.Ct. at pp. 2637-2638].)

We do not agree that *Tuilaepa* necessarily forecloses defendant's claim of error based on *Zant*. For one thing, the high court cited *Zant* with approval in *Tuilaepa*. (See *Tuilaepa* v. *California, supra*, 512 U.S. at p. 968 [114 S.Ct. at pp. 2632-2633].) More importantly, nothing in *Tuilaepa* indicates the high court would, without qualification, extend its approval of "competing arguments" about what significance to assign the age of the defendant in a particular case, under section 190.3, factor (i), to other statutory factors. It is not clear, in short, that *Tuilaepa* undermined *Zant*'s suggestion that states may not, consistently with due process, label as "aggravating" factors "that actually should militate in favor of a lesser penalty, such as perhaps the defendant's mental illness" (*Zant, supra*, 462 U.S. at p. 885 [103 S.Ct. at p. 2747]).

Nevertheless, we reject defendant's claim the trial court erred in permitting the jury to consider the listed sentencing factors "as either aggravating or mitigating factors." The challenged instruction did not "attach[] the 'aggravating' label to . . . conduct" (*Zant, supra*, 462 U.S. at p. 885 [103 S.Ct. at p. 2747]) described in the factors. Rather, it explicitly refrained from labeling the individual factors as either "aggravating" or "mitigating," leaving to the jury the determination whether they were either.

"What is crucial for [claims of error of this sort] is the meaning that the instructions communicated to the jury. If that meaning is not objectionable, the instructions cannot be deemed erroneous." (*People* v. *Benson, supra*, 52 Cal.3d at p. 801 [failure to label sentencing factors as either aggravating or mitigating and to instruct that absence of mitigation is not aggravation].) Examining a claim similar to defendant's, we found no error under *Zant* when a prosecutor's argument "le[ft] it to the jury to decide whether defendant's mental condition was mitigating or aggravating . . . ." (*People* v. *Clark, supra*, 3 Cal.4th at p. 169.) In *Clark,* we noted with approval our decision in *People* v. *Poggi, supra*, 45 Cal.3d 306, upholding the constitutionality of section 190.3, factor (d). In *Poggi,* we declared "it seems *plain* that the provision does not authorize the jury to consider the presence of extreme mental or emotional disturbance in aggravation." (*People* v. *Poggi, supra*, 45 Cal.3d at p. 344, italics added.) Similarly here, there is no reasonable likelihood that defendant's jury understood the court's instruction, that the penalty factors "may be considered by you *either* as aggravating or mitigating," as labeling factor (d) (extreme mental or emotional

disturbance), or any other factor, as an "aggravating" factor. As we previously have observed, "[i]t is pellucid in the very words" of factor (d), particularly, that it "look[s] to the past, not the future [so as to indicate future dangerousness], and support[s] life, not death." (*People* v. *Benson, supra*, 52 Cal.3d at p. 802.)

As it is not reasonably likely that defendant's penalty jury misunderstood the trial court's instructions in the manner he asserts, the instructions are not erroneous under the Eighth Amendment. (*People* v. *Benson, supra*, 52 Cal.3d at p. 801.) For the same reason, the court's instructions did not, contrary to defendant's suggestion, permit the jury to consider nonstatutory aggravating evidence. (*People* v. *Boyd* (1985) 38 Cal.3d 762, 775 [215 Cal.Rptr. 1, 700 P.2d 782].)

### 4. *Ambiguity in Former CALJIC No. 8.84.1*

Fourth, defendant argues, ambiguity in section 190.3, factor (c)'s language (specifically, its failure to specify as to *what* "any prior felony conviction" might be "prior") erroneously permitted the jury to consider as aggravating, under that factor, his conviction before trial in the instant case for murdering Donald Billingsley, even though the Billingsley murder occurred subsequent to the killing of Jerome Dunn. Thus, defendant argues, he was unconstitutionally deprived of mitigating consideration for his not suffering felony convictions before the date of Jerome Dunn's killing. Moreover, according to defendant, the trial court's instructions actually permitted the jury to "triple count" the Billingsley murder, i.e., the jury was permitted to consider the murder of Donald Billingsley as aggravation under section 190.3, factors (a) (any true special circumstance), (b) (violent criminal activity) *and* (c) (prior felony conviction).

As discussed, the trial court instructed defendant's penalty jury with former CALJIC No. 8.84.1, tracking the language of section 190.3. In *People* v. *Balderas, supra*, 41 Cal.3d at page 201, we held that "the 'prior felony conviction[s]' described in [factor] (c) of section 190.3 are limited to those entered *before commission* of the capital crime." (Original italics.) Accordingly, as defendant correctly points out, section 190.3, factor (c) does not encompass defendant's 1985 conviction for the murder of Donald Billingsley (or any of his other convictions stemming from the Green Meadow Park shooting) because judgment on those 1985 convictions obviously was *not* entered before the 1982 murder of Jerome Dunn, the capital crime at issue. Here, however, the jury was not misled.

With respect to section 190.3, factor (c), the prosecutor began by noting "we have to take a look at the 1982 date [of Jerome Dunn's murder], March

25th, 1982. Prior to March 25th, 1982, had the defendant had any prior felony convictions? No." The prosecutor also noted there had been evidence of a "shooting in 1980 which [defendant] was never prosecuted for," and that "[s]ubsequent to 1982 he had [the] Don Billingsley murder, and he had the shank case in county jail." The prosecutor acknowledged, however, that "the fact that when [defendant] committed the murder in 1982, he had not been convicted of a felony could possibly be a mitigator."

Finally, the prosecutor argued, "although it [i.e., the Billingsley murder] is not a [prior] felony conviction [for the purposes of factor (c)], you have to believe what they [i.e., the prosecution witnesses] told you beyond a reasonable doubt before you can consider it as an aggravating circumstance. You have to believe it to the same degree in which you would find him guilty. If you do that, I submit this becomes a wash. Not applicable." The prosecutor then moved on to discuss section 190.3, factor (b), concerning prior criminal activity.

Defendant is perhaps correct that some portions of the prosecutor's remarks here are a bit confused, but they did not invite the jury to "double count" any aggravating evidence. We agree with the People the jury most likely understood the prosecutor to suggest defendant's conduct at Green Meadow Park should be considered a factor in aggravation, while acknowledging it had not resulted in a "prior felony conviction" for the purposes of section 190.3, factor (c). Additionally, as the People point out, defense counsel argued forcefully in closing that the absence of any prior conviction was a mitigating factor and that defendant did not, in fact, have any prior convictions.

Concerning specifically the multiple counting of the murder, in *People v. Visciotti, supra,* 2 Cal.4th at page 76, as defendant acknowledges, we rejected a claim similar to defendant's, noting that "[t]he jury was not told that it should or could 'double count' or 'triple count' evidence under these factors . . . and the court is not under a duty to instruct sua sponte that such consideration would be improper." We concluded that, "[s]ince the prosecutor did not mislead the jury, or suggest that the evidence be considered more damning because it related to more than one factor, we do not agree that it is likely the jury overemphasized its importance." (*Ibid.,* fn. omitted; see also *People v. Mincey, supra,* 2 Cal.4th at p. 474 [Noting ". . . the prosecutor merely asked the jury to consider the offenses, not that it consider them two or three times. The prosecutor's argument did not mislead the jury. Thus, the trial court did not err in giving CALJIC No. 8.84.1 (4th ed.) in this case."].)

We conclude there is no reasonable possibility the jury was misled, either by the court's instructions or the prosecutor's argument, to overemphasize

the importance of the aggravating evidence derived from defendant's conduct at Green Meadow Park.

### 5. *Double Counting of Shank-possession Conviction*

Fifth, defendant argues that the trial court's failure expressly to define section 190.3, factors (b) (violent criminal activity) and (c) (prior felony convictions) caused the jury to double count in aggravation his possession of a shank while in jail, thus unconstitutionally eliminating a valid mitigating factor (i.e., lack of prior felony convictions under factor (c)). For reasons just discussed, we reject the claim. As explained, the court had no obligation to instruct sua sponte against double counting of aggravating evidence. (*People* v. *Visciotti, supra,* 2 Cal.4th at p. 75.) The prosecutor did not argue that evidence respecting the shank conviction should be considered more than once or under more than one factor; he argued only—and correctly— that it was prior criminality the jury could consider in aggravation if they were persuaded of defendant's culpability beyond a reasonable doubt. Both the prosecutor and defense counsel stated to the jury that defendant had no prior felony convictions for the purposes of factor (c). Defendant demonstrates neither error nor prejudice.

### 6. *Failure to Instruct on Reasonable Doubt*

Sixth, defendant argues the trial court erred in refusing to instruct the jury that a sentence of death could be imposed only if the jurors were convinced beyond a reasonable doubt that death was the appropriate penalty. As defendant concedes, we previously have rejected the identical argument. (See, e.g., *People* v. *Mayfield, supra,* 5 Cal.4th at pp. 192-193.) Defendant fails to persuade that our prior analysis does not satisfy federal constitutional standards.

### 7. *Failure to Give Cautionary Accomplice Instructions*

 Seventh, defendant argues the trial court should sua sponte have cautioned the penalty jury about accomplice testimony because, defendant suggests, Arthur Cox, who testified at both the guilt and penalty phases, was an accomplice. As defendant correctly points out, the general rules requiring accomplice instructions apply at the penalty phase as well as the guilt phase of a capital trial.

In this case, the criminality with respect to which defendant most forcefully contends Arthur Cox was defendant's accomplice—the Green Meadow Park shooting—was presented to the jury as a factor in aggravation of

penalty. We previously have held that "when the prosecution seeks to introduce evidence of the defendant's unadjudicated prior criminal conduct, the jury should be instructed at the penalty phase that accomplice testimony must be corroborated." (*People* v. *Mincey*, *supra*, 2 Cal.4th at p. 461.) However, we have *not* interpreted the statutory corroboration requirement to extend to cases where "a jury ha[s] already found defendant guilty, beyond a reasonable doubt" of the aggravating prior crime. (*People* v. *Easley* (1988) 46 Cal.3d 712, 734 [250 Cal.Rptr. 855, 759 P.2d 490].) Defendant concedes he was tried and found guilty by a jury of the murder of Donald Billingsley and other crimes in connection with the Green Meadow Park shooting. Accordingly, even if Arthur Cox had been an accomplice, as a matter of law, with respect to the Green Meadow Park shooting, the court would not have been required sua sponte to instruct the jury that Cox's penalty phase testimony about defendant's involvement in that shooting required corroboration.

In light of the foregoing, we conclude that defendant fails to demonstrate the trial court committed prejudicial error when instructing the penalty phase jury.

## M. *Constitutionality of Capital Sentencing Statutes*

Defendant next argues that California's capital sentencing statutes violate the federal Constitution. Specifically, defendant contends: (1) permitting the jury to find factors in aggravation without written findings deprived him of his due process and Eighth Amendment rights to meaningful appellate review; (2) lack of a requirement that aggravating factors (as well as any finding that aggravation outweighs mitigation) be proved beyond a reasonable doubt violated his rights under due process, equal protection and the Eighth and Fourteenth Amendments; (3) qualifying the description of some potential mitigating evidence with such adjectives as "extreme" (CALJIC No. 8.85, factors (d), (g)) and "substantial" (*id.*, factor (g)) obstructed the jury's consideration of mitigation evidence in violation of his Fifth, Sixth, Eighth and Fourteenth Amendment rights; and (4) statutory special circumstances have so proliferated that they did not perform for his penalty jury a constitutionally adequate narrowing function.

Defendant concedes we have rejected all of these arguments in previous cases. Indeed, we repeatedly have held that, as a general matter, the 1978 death penalty laws are facially valid under both the federal and state Constitutions. (See, e.g., *People* v. *Mayfield*, *supra*, 5 Cal.4th at pp. 192-193.)

More specifically, we have held that: (1) written findings of the existence of aggravating factors are not required (*People* v. *Mayfield*, *supra*, 5 Cal.4th

at p. 192); (2) neither the existence of aggravating factors, nor that aggravation outweighs mitigation, constitutionally needs to be proven beyond a reasonable doubt (*ibid.*); (3) qualifiers found in the descriptions of specific mitigating factors do not, considering the sentencing scheme as a whole and especially in light of the "catchall" mitigation factor, act as unconstitutional barriers to the jury's consideration of all mitigating evidence (*People* v. *Sheldon* (1989) 48 Cal.3d 935, 957 [258 Cal.Rptr. 242, 771 P.2d 1330]); and (4) our death penalty sentencing statutes adequately perform the constitutionally required "narrowing" function (*People* v. *Bacigalupo* (1993) 6 Cal.4th 457, 468 [24 Cal.Rptr.2d 808, 862 P.2d 808]).

Defendant requests that we reconsider our prior holdings regarding the constitutionality of California's death penalty sentencing statutes, but offers no persuasive reason why we should do so in this case.

N. *Effect of Guilt Phase Errors on Penalty Phase*

At the penalty phase of the trial, defendant's jury was instructed to consider, in determining the appropriate penalty, all of the evidence received during any part of the trial (including, obviously, all guilt phase evidence). Defendant argues, based on this instruction, that every error committed during the guilt phase, even those we conclude did not prejudice the guilt determination, must separately be evaluated for their impact, if any, on the penalty determination. Defendant does not state which specific guilt phase error or errors he believes prejudicially impacted the penalty phase, asserting, instead, that the present case was so closely balanced on the penalty issue that *any* error could very well have made for him the difference between life and death.

As will be recalled, defendant has carried his burden of demonstrating guilt phase error in only one instance, the trial court's unmodified use of CALJIC No. 2.11.5 (see fn. 5, *ante*), and that error did not prejudice the guilt determination. Defendant offers neither specific argumentation nor record citation to support his speculation the trial court's guilt phase use of CALJIC No. 2.11.5 impacted the jury's penalty deliberations.

Defendant thus fails to demonstrate the death judgment must be reversed because guilt phase errors prejudiced the penalty phase of the trial.

O. *Proportionality of Death Judgment*

Defendant argues the judgment of death entered against him must be reversed because it is impermissibly disproportionate to his culpability. Defendant's argument has three parts.

First, defendant argues the trial court erred in denying his motion to strike the death penalty and for discovery. At the penalty phase, defendant moved to strike the death penalty on the ground that it was arbitrary, discriminatory and disproportionate. Defendant also requested that the People produce, for comparison purposes, all records concerning California murder cases since 1978 in which the defendant was charged with a special circumstance under section 190.2, subdivision (a)(2) (prior murder) or (a)(3) (multiple murder), and in which the district attorney did not seek the death penalty.

As we have held on many prior occasions, "intercase" proportionality review is not constitutionally required. (See, e.g., *People* v. *Hayes, supra,* 52 Cal.3d at p. 645; *People* v. *Adcox* (1988) 47 Cal.3d 207, 274 [253 Cal.Rptr. 55, 763 P.2d 906].) Nevertheless, in this case, on defendant's motion, a hearing was held at the conclusion of the penalty phase. Curt Livesay, a representative of the Los Angeles County District Attorney, testified he was the attorney in that office responsible for deciding in which special circumstance cases the death penalty would be sought and in which a penalty of life imprisonment without the possibility of parole would be sought. Livesay testified the district attorney's decision to seek the death penalty in this case was based upon the facts of the case, including defendant's criminal history. Livesay also testified regarding differences and similarities between this case and over 60 others. The trial court denied defendant's motion, ruling he had not articulated a valid claim that the district attorney's decision to seek the death penalty was arbitrary, capricious or irrational. We agree.

Defendant acknowledges that, under California law, the individual prosecutor has complete discretion to determine whether to seek the death penalty in appropriate cases of first degree murder. Defendant asserts such prosecutorial discretion is contrary to the principled decisionmaking mandated by the United States Supreme Court, but we have long held to the contrary. "[P]rosecutorial discretion to select those eligible cases in which the death penalty would actually be sought does not in and of itself evidence an arbitrary and capricious capital punishment system or offend principles of equal protection, due process, or cruel and/or unusual punishment." (*People* v. *Keenan* (1988) 46 Cal.3d 478, 505 [250 Cal.Rptr. 550, 758 P.2d 1081], citing numerous high court decisions.) Defendant offers no persuasive reason for our departing, in this case, from our previous pronouncements.

Defendant asserts the prosecutor here acted arbitrarily and capriciously in deciding to seek the death penalty in that he did not adhere to the guidelines set forth in section 190.3. Defendant concedes, however, that Curt Livesay testified precisely to the contrary—i.e., that the district attorney relied on the factors listed in section 190.3 in determining the appropriateness of the death

penalty in this case. Indeed, Livesay summarized for the court a five-page memorandum memorializing the facts upon which his office relied in reaching its decision. Livesay's summary shows that the district attorney's decision process tracked the section 190.3 factors, with emphasis on the particular facts of the killings at issue in this case and defendant's participation in them. The district attorney also took into account defendant's age and lack of prior convictions in reaching the decision to seek the death penalty.

Second, defendant argues that impermissible race factors affected the prosecutor's decision to seek death. Defendant suggests the prosecutor's remarks at voir dire that potential witnesses might have "different cultural ethics," "different ethical value[s]" or "different ethnic, social, cultural, moral backgrounds" than some jurors constituted "veiled references to racial bias." We agree with the People that the prosecutor's references were to the gang membership or prior criminality of certain witnesses, not to their race. As the People point out, defendant has presented the prosecutor's remarks somewhat out of context; the prosecutor followed up with the comment that it was not the jury's job to judge witnesses' morality or values, but only their credibility. As previously mentioned, all of the victims and most of the witnesses on both sides of this case were of the same race as defendant. Defendant simply has not established that the prosecutor, trial court or jury engaged in invidious racial discrimination.

Finally, defendant argues he has been denied equal protection because he has not received either intercase proportionality review or appropriate intracase proportionality review. Defendant concedes, however, that he is not entitled to an intercase proportionality review on appeal. (*People* v. *Bacigalupo* (1991) 1 Cal.4th 103, 151 [2 Cal.Rptr.2d 335, 820 P.2d 559].) Neither the Eighth Amendment nor equal protection requires us to provide such. (*People* v. *Bacigalupo, supra,* 1 Cal.4th at p. 151.) The People do not dispute that, under article I, section 17 of the California Constitution, defendant is entitled to intracase review to determine whether the death penalty is disproportionate to his personal culpability.

Defendant complains that Jerome Dunn's killing, Donald Billingsley's killing and the Cakewalk shooting all involved multiple perpetrators, yet the prosecutor sought the death penalty against defendant only. Defendant asserts that "seeking a death sentence as to one participant while failing to charge other participants constitutes impermissible disproportionality." We disagree. Even if defendant had demonstrated his factual premise (as he has not), the legal conclusion he urges is erroneous. As the People point out, we previously have affirmed judgments of death rendered against only one of multiple perpetrators. (See, e.g., *People* v. *Carrera, supra,* 49 Cal.3d at p.

346.) "Unless the state's capital punishment system is shown by the defendant to operate in an arbitrary and capricious manner, the fact that such defendant has been sentenced to death and others who may be similarly situated have not does not establish disproportionality violative of constitutional principles." (*People* v. *McLain, supra* 46 Cal.3d 97, 121, citing *McCleskey* v. *Kemp* (1987) 481 U.S. 279, 306-312 [107 S.Ct. 1756, 1774-1777, 95 L.Ed.2d 262].)

For the foregoing reasons, and in view of the facts reviewed, *ante,* defendant fails to demonstrate that the penalty of death imposed upon him is impermissibly disproportionate to his culpability.

### P. *Automatic Motion to Reduce Sentence*

 Defendant argues, finally, that the trial court erred in denying his motion to modify his sentence, which was automatic pursuant to section 190.4. Defendant concedes that, at the automatic modification hearing, the court reviewed and considered each of the aggravating and mitigating circumstances presented at the penalty phase. Defendant insists the court nevertheless erred in two ways: in misunderstanding how mitigating evidence is to be considered under section 190.3, factor (k), and in improperly considering defendant's probation report before ruling on the automatic modification motion. We are not persuaded.

First, defendant argues the trial court, in ruling on his modification motion, erroneously considered mitigating evidence relevant only insofar as it extenuated the gravity of the charged crimes. In support, defendant notes the trial court, after reviewing certain mitigating evidence, remarked: "The Court finds these to be mitigating factors, but they do not extenuate the gravity of the crime which defendant committed and for which he was convicted." Defendant argues the court's statement demonstrates that, in contravention of *Lockett* v. *Ohio* (1978) 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] and *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], the court considered only statutory mitigation and ignored all nonstatutory mitigating evidence.

 In *Lockett,* the high court declared that the "Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering *as a mitigating factor,* any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett* v. *Ohio, supra,* 438 U.S. at p. 604 [98 S.Ct. at pp. 2964-2965], original italics.) In *Easley,* we recognized that "a jury that is not specifically informed [that section 190.3, factor (k)

should, under *Lockett*, be interpreted to encompass all proffered mitigating evidence] could reasonably construe the instruction's language to permit consideration only of circumstances that relate to the 'gravity *of the crime*' and not of circumstances that relate to the general character, family background or other aspects *of the defendant*." (*People* v. *Easley, supra*, 34 Cal.3d at p. 878, original italics.) "In order to avoid potential misunderstanding in the future," we directed, "trial courts—in instructing on the factor embodied in section 190.3, subdivision (k)—should inform the jury that it may consider as a mitigating factor 'any other circumstance which extenuates the gravity of the crime, even though it is not a legal excuse for the crime' and any other 'aspect of [the] defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death.' " (*People* v. *Easley, supra*, 34 Cal.3d at p. 878, fn. 10, quoting *Lockett* v. *Ohio, supra*, 438 U.S. at p. 604 [98 S.Ct. at pp. 2964-2965].)

 Defendant acknowledges that the trial court here gave the penalty jury proper instructions under *Lockett* and *Easley*. Based solely on the trial court's remark mentioned above, however, defendant suggests the trial court failed to follow the law in its own determination of sentence. For several reasons, we conclude the record does not reasonably support such a conclusion.

The trial court's full remarks regarding section 190.3, factor (k) were as follows: "Evidence was introduced by Mr. Williams at the penalty phase of the trial that Mr. Williams performed satisfactorily in school, that he participated in church services, Sunday school and the church choir, and that his conduct in the cadet corps was exemplary. Also, that he is a devoted father and worked to support his infant son. Further, defendant's background and prior history of being discarded at the time of his birth. [¶] The court finds these to be mitigating factors, but they do not extenuate the gravity of the crime which defendant committed for which he was convicted."

A plain reading of the court's remarks suggests—contrary to defendant's interpretation—that, far from "ignoring" nonstatutory items related to defendant's background and character, the court found those it mentioned "to *be* mitigating factors" even though they did not, in the court's view, extenuate the gravity of the crime.

Moreover, as the People point out, the court, in stating that certain factors did not "extenuate the gravity of the crime," merely quoted the statutory language. Nothing in the record suggests the court was ignorant of section 190.3, factor (k)'s proper interpretation under *Lockett* and *Easley*. Indeed, the record suggests the contrary. At one point, the court expressly weighed, as

"a mitigating factor," Dr. Bennett's finding defendant would probably function well in prison against the fact defendant possessed a weapon while incarcerated. Had the court been laboring under the misunderstanding that mitigating evidence had no relevance unless it extenuated the gravity of the charged crime, it would, logically, have had no reason to weigh Dr. Bennett's mitigating testimony against the weapon-possession evidence, which did *not* relate to a charged crime.

In light of the foregoing, we reject defendant's contention the court too restrictively applied section 190.3, factor (k). Moreover, even assuming error, defendant has not shown prejudice. Defendant suggests "strong mitigation" in this case might have led to a different modification ruling had the court not misunderstood section 190.3, factor (k), but we discern no such "strong mitigation" in the record.

Defendant argues also that remand is required because the trial court's refusal to modify the death verdict was partly based on its improper consideration of defendant's probation report. Again, we disagree. While there may have been error, there was no prejudice.

Just prior to ruling on defendant's automatic modification motion, the court stated: "The probation report has been received, has been read and has been considered by the court, and it is hereby ordered filed herein and made a part of the records of this case as provided by law." Thus, as the People concede, it is clear the trial court read the probation report prior to the automatic modification hearing. "The better procedure, as we have previously stated, is to defer reading the report until after ruling on the modification motion, which is to be made on the basis of the evidence that was before the jury." (*People* v. *Cain, supra,* 10 Cal.4th at p. 81.) We have stated that "[c]onsideration of the probation report . . . before ruling on the application for modification is . . . error." (*People* v. *Fauber, supra,* 2 Cal.4th at p. 866.)

"In similar cases, however, we have assumed, absent evidence in the record to the contrary, that the court was not improperly influenced by material in the probation report." (*People* v. *Cain, supra,* 10 Cal.4th at p. 81, citing *People* v. *Berryman* (1993) 6 Cal.4th 1048, 1106 [25 Cal.Rptr.2d 867, 864 P.2d 40]; *People* v. *Fauber, supra,* 2 Cal.4th at p. 866.) Here, the trial court ruled on the section 190.4 motion after filing the probation report, but did not expressly link the two actions. After ordering the probation report filed, the trial court simply stated: "Now, Mr. Williams, this then is the date and time heretofore and duly and regularly set for the court's ruling on your automatic motion to modify the jury verdict imposing the penalty for Count

1 to be death." Significantly, in then proceeding to rule, the court noted that "the law of this state requires the trial judge in ruling on your application to review the evidence, consider, take into account and be guided by the aggravating and mitigating circumstances provided in section 190.3 . . . ." The court also noted it had "in fact made an independent determination as to whether the jury's verdict that the aggravating circumstances outweigh the mitigating circumstances is contrary to the law or the evidence presented."

As a whole, the record suggests the trial court properly understood its ruling on defendant's automatic modification motion under section 190.4 was to be based solely upon the evidence presented to the jury. Moreover, to any extent the trial court erred, defendant has not shown prejudice. We agree with the People there is no affirmative record indication the trial court would have ruled differently on defendant's section 190.4 motion had it not read the probation report beforehand. Consequently, any error was harmless.

### IV. DISPOSITION

The judgment is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied September 24, 1997, and the opinion was modified to read as printed above.